## BROKERAGE SERVICES AGREEMENT

This Brokerage Services Agreement (the "Contract") is made and entered into as of the 1st day of August, 2004, by and between Online Brokerage Services, Inc., an Ohio corporation (the "Corporation"), and First Federal Bank of the Midwest (the "Bank").

WHEREAS, the Corporation is a duly licensed provider of web enabled brokerage services and is in the business of providing access to such services to banks, credit unions and other financial institutions;

WHEREAS, the Bank is a federally chartered savings association providing a variety of financial services to its customers; and

WHEREAS, the Bank desires to retain the Corporation, and the Corporation desires to be retained by the Bank, to perform certain brokerage services for customers of the Bank upon the terms and subject to the provisions of this Contract;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

1.  **Term of Contract**.  This Contract shall continue in force unless terminated by 30 days' written notice given at any time by any party hereto.  This Contract shall terminate on any earlier date required by order of any court or regulatory agency with jurisdiction over either party.

2.  **Services to be Provided by the Corporation**.

a. **Design of the Program**.  The Corporation agrees to work with the Bank to design a non-deposit investment program that the Corporation shall make available to customers of the Bank ("Customers") pursuant to the terms of this Contract (the "Program").

b. **Registered Representatives**.  Non-deposit investment products ("Security Products") shall be offered and sold only by licensed registered representatives of the Corporation who are also employees of First Insurance and Investments, Inc. ("FII"), an Ohio corporation ("Registered Representatives"), or through a website to be made available by the Corporation.  While performing the brokerage services contemplated as being provided by the Corporation and its representatives pursuant to the terms of this Contract, the Registered Representatives shall be under the exclusive control and supervision of the Corporation.

c. **Product Selection**.  The Corporation shall provide the Bank with materials designed to assist the Bank in establishing the Approved Products List described in Section 6.e. of this Contract.

d. **Compliance**.  The Corporation shall provide the Bank with materials and advice designed to assist the Bank with the development and implementation of a compliance

program that complies with guidelines specified in the Interagency Statement on Retail Sales of Nondeposit Investment Products published by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation (the "FDIC"), the Office of the Comptroller of the Currency and the Office of Thrift Supervision, dated February 15, 1994, as such statement may be amended from time to time (the "Interagency Statement"), and with other applicable requirements, including but not limited to, the Rules of Fair Practice of the National Association of Securities Dealers, Inc. ("NASD"). The Corporation shall prepare and provide the Bank with a manual covering the Corporation's policies and procedures.

      e. **Training**. The Corporation shall, without charge to the Bank, assist in the training of Registered Representatives and Bank employees in their role and limitations in connection with the Program.

      f. **Back Office Services**. The Corporation shall provide brokerage back office functions, including, but not limited to, commission accounting, due diligence, data processing, trading and operations.

      g. **Website Access**. The Corporation shall make available to the Bank and its Customers a professionally designed website that will enable Customers to transact securities transactions through the Corporation.. The design of the website, which shall be agreed upon by the Corporation and the Bank, shall contain the name of the Bank on each page but shall also comply with all statutes, regulations, policies and guidelines requiring disclosure that securities transactions are being effected by the Corporation. The Corporation shall provide access to Customers 7 days per week, 24 hours per day, subject to reasonable maintenance requirements that could cause temporary unavailability. The Corporation will provide technical support by a toll free number from 8:00 a.m. to 8:00 p.m. or e-mail to all Customers.

    3.    **Services to be Provided by the Bank**. The Bank may, to the extent permitted by applicable laws and regulations and consistent with the Bank's policies with respect to Customer information and confidentiality, provide the Corporation with the names, addresses and telephone numbers of Customers. The Corporation will treat such information as proprietary to and owned by the Bank, as applicable, will use such information only for the purposes contemplated by this Contract, and will keep such information as confidential. No such information will be disclosed to a third party without the prior written consent of the Bank or the applicable Customer, unless the Corporation is required to make such disclosure by law and/or a regulatory agency or court having jurisdiction over the Corporation. The confidentiality provisions of this paragraph shall survive the termination of this Contract.

    4.    **Marketing of Program**. The parties may agree from time to time on advertising and promoting the Program to Customers through promotional literature mailed to Customers, newspaper and other media advertisements, seminars, and other approaches. Any such advertisements and promotions shall contain conspicuous and easy to comprehend disclosures that the Security Products are not insured by the FDIC, are not deposits or other obligations of the Bank and are subject to investment risks, including the possible loss of principal. The costs of all such marketing shall be paid for by the Bank. Each party must obtain the prior written

permission of the other party before distributing any advertisement or promotional material of any kind that refers to the other party or the advice and services available from it.

5.    **Regulatory Compliance by the Corporation**.

a.    **General Compliance**.  The Corporation agrees to comply with all applicable state and federal laws, rules and regulations, including but not limited to the rules and regulations of the Securities and Exchange Commission (the "SEC"), the NASD, and the provisions of the Interagency Statement.  The Corporation acknowledges that the Bank's management and appropriate regulators will be verifying such compliance, and the Corporation agrees to conform to the polices and procedures adopted by the Bank that it is made aware of and which specifically apply to the Corporation.  The Corporation shall maintain at all times internal compliance and procedural guides for the operation of the Program.

b.    **Disclosures and Investment Disclosure Acknowledgment Form**.  Prior to or at the time that a new account is opened for a Customer, the Corporation shall obtain from such Customer a signed statement acknowledging such Customer's receipt of an Investment Disclosure Acknowledgment Form.  At a minimum, such acknowledgment shall contain clear and conspicuous disclosures that the Security Products are not insured by the FDIC, are not deposits or other obligations of the Bank and are subject to investment risks, including the possible loss of principal.  Investment Disclosure Acknowledgment Forms shall be retained by the Corporation.  In addition, the above described disclosures shall be made in all written and oral sales presentations, advertising and promotional materials and customer statements that include information on both deposit and non-deposit products.

c.    **Customer Complaints**.  The Corporation shall require Registered Representatives to promptly report all Customer complaints to the Corporation.  The Corporation shall maintain a written record of all complaints and their resolution, and shall provide the Bank with copies of Customer complaints.  The Corporation shall address Customer complaints in an expedient and timely manner, and shall report to the Bank regarding the resolution of such complaints.  The Corporation shall promptly address any problems related to the Program that are identified as a result of Customer complaints.  In addition, the Corporation shall establish a contingency plan to be utilized in the event of a heavy volume of Customer inquires or complaints.

d.    **Suitability**.  The Corporation shall institute procedures designed to ensure that its sale of Security Products to Customers complies with the suitability standards of the NASD's Rules of Fair Practice.

6.    **Regulatory Compliance by the Bank**.  In performing this Contract, the Bank agrees to comply with all applicable federal and state laws, including but not limited to, the rules and regulations of the Interagency Statement and, to the extent applicable, the rules and regulations of the SEC and the NASD.  The Bank further agrees to comply with those provisions of the Corporation's policies and procedures discussed below, to the extent such provisions apply to the Bank.  In this regard, the Bank agrees to the following:

a. **Loans**.  The Bank shall not make any loans to Customers if the Bank has actual knowledge that the proceeds of the loan are to be used for the purchase of Security Products through the Corporation.

b. **Supervision of Employees**.  The Bank acknowledges and understands that its employees who are not licensed to sell shall not recommend or endorse the purchase or sale of any Security Product, provide any advice or detailed information on Security Products or receive compensation directly or indirectly form the purchase or sale of Security Products.  Such employees may only distribute literature regarding the Corporation, the Program and the Security Products and inform customers of the availability of the services of the Corporation.  In addition, any referral Program established by the Bank must comply with the provisions of Section 7.e. of this Contract.

c. **Compliance Program**.  The Bank shall institute procedures reasonably necessary to insure compliance by all of its employees with the Interagency Statement and all applicable government rules and orders.  In this regard, the Bank shall establish and maintain a procedure for monitoring Customer complaints and periodically reviewing Customer accounts to detect and prevent abusive practices.  In addition, the Bank shall issue a written statement (the "Policy Statement") that assesses the risks associated with activities contemplated by this Contract and provides a summary of the policies and procedures that the Bank has established to address these risk.  Such policies and procedures and the Policy Statement shall be periodically reviewed, approved and adopted by the Board of Directors of the Bank.

d. **Person Associated with a Broker or a Dealer**.  The Bank acknowledges that by entering into this Contract, it shall be deemed to be a "person associated with a broker or a dealer" as defined in Sections 3(a)(18) of the Securities Exchange Act of 1934.

e. **Selection of Appropriate Non-Deposit Investment Products**.  The Corporation shall only offer Customers those types of Security Products and the issuers that the Bank's management, in its sole discretion, has determined to be appropriate to be offered through the Program (the "Approved Product List").  The Bank may modify the Approved Product List at any time.  In no event shall a Security Product with a name identical to the Bank's or FII's be included on the Approved Product List.  Furthermore, if a Security Product with a name similar to that of the Bank or FII appears on the Approved Product List, care shall be taken to minimize any confusion that may result from such similarity.

7.    **Compensation and Fees**.

a. **Fee for Establishment and Maintenance of Website**.  The Bank shall pay to the Corporation a monthly fee of $500 per month, provided, however, that the monthly minimum fee will be offset by the charge per trade discussed in Section 7.b(i)(1) of this Contract.  After twelve months from the completion of the website and the commencement of operation of the website, the Corporation may adjust the monthly fee upon 60 days' notice to the Bank, which adjusted fee would be fixed for 12 months.  If the Bank objects to such increased fee, the Bank may terminate this Contract upon 60 days' notice to the Corporation.

For an additional one-time fee of $300, the Corporation will include the Bank's name on client applications, statements and confirmations, as approved by the Bank. All disclaimers required by all applicable statutes, regulations, policies and other regulatory guidance would be included on any such documents.

b. **Commissions**. The Bank shall determine the commissions to be charged to Customers pursuant to the Program through use of the website, and the Corporation shall determine the commissions to be charged to Customers pursuant to the Program other than through use of the website. Each party shall periodically provide such commission amounts to the other. All commissions for trades through use of the website must equal at least the amount of commission specified in subsection (i) to be retained by the Corporation.

(i)    <u>Website Trades</u>. The Corporation shall retain the following amounts for each trade by a Customer placed through the website. Any commission amount in excess of the amount to be retained by the Corporation will be paid to the Bank.

(1) $7.95 for each equity order entered and executed through the electronic execution system provided for the Bank;

(2) $12.95, plus $2.25 per contract, for each option order executed through the electronic system provided for the Bank;

(3) $30.00 for each mutual fund transaction, all of which must be called into the trading desk utilizing the Corporation's toll free number for execution.

(ii)    <u>Trades Other Than Through the Website</u>. The Bank shall be entitled to the payment of 90% of the commissions charged to such Customers.

(iii)    <u>Monthly Maintenance Fees</u>. The Bank shall pay to the Corporation a monthly fee of $150 per month for each Registered Representative; provided, however, that the monthly maintenance fee shall be waived for each representative who has $150,000 of gross annual production under this Contract.

c. **Payments**. Commissions due to the Bank will be paid by the Corporation on a monthly basis approximately 15 days, but not later than 20 days, after each month end.

d. <u>Compensation of Registered Representatives</u>. The Bank shall be responsible for paying compensation to the Registered Representatives in connection with the Program from the commissions paid by the Corporation to the Bank. No Registered Representative will receive any trip, prize or other non-commission sales incentive from any insurer or provider of a Security Product sold to a Customer through the Program.

e. **Payment of Referral Fees**. The Bank's employees who participate in referral programs will not be compensated by the Corporation. Such employees may receive only a one-time nominal referral fee of a fixed dollar amount from the Bank, if and to the extent that such practice is permitted by law and the policies of the Bank. The payment of any such referral fee shall not be conditioned on whether the referral results in the purchase or sale of a Security Product.

8.  **Customer Funding of Accounts**. Customers may fund their brokerage accounts in the following manners:

a.  Deposit via check, with the funds swept into a money market of the Customer's choice from a list of funds offered;

b.  Wire transfer, with the funds swept into a money market of the Customer's choice from a list of funds offered; and

c.  ACH sweep to and from a checking or savings account at the Bank. This function is currently available for Fiserv accounts only.

The Customer will be responsible for paying to the Bank the Bank's customary fees for such services.

9.  **Non-competition**. During the term of this Contract and except for securities transactions conducted through the Bank's Trust Department, the Bank agrees to refer all securities business of Customers to the Corporation and shall not compete with the Corporation's securities services in the state or recommend the advice or services of any other broker/dealer, insurance agency (other than FII) or investment advisor (other than FII); provided, however, that the provision by the Bank of traditional Bank deposit products or of trust services or the sale of insurance products or investment advice by FII shall not be deemed competition with the Corporation's services. During the term of this Contract, the Bank shall not induce or attempt to influence any employee or consultant of the Corporation or its affiliates or subsidiaries to terminate their employment or contractual arrangement with the Corporation or its affiliates or subsidiaries or engage in any such competition in the United States.

10.  **Confidentiality**. All information or materials relating to or prepared by a party to this Contract that are obtained or reviewed in any inspection or through the course of business during the term of this Contract, including but not limited to, the Bank's list of Customers and the Corporation's policies and procedures, marketing materials, business methods and trade secrets, shall be held in strict confidence by the parties hereto. Upon termination of this Contract, the Bank agrees to return to the Corporation all copies of the Corporation's policies and procedures, marketing materials, and training materials, and (b) the Corporation agrees to return to the Bank any Customer lists provided by the Bank, which Customer lists shall not be used by the Corporation after termination of this Contract. Neither party shall permit any third party to copy, review or use the others' confidential or proprietary materials at any time. This Section 10 shall survive the termination of this Contract.

11.  **Control of Customer Accounts.**  The Corporation makes no proprietary claim to Customer accounts.  In the event that this Contract is terminated, the Corporation agrees to cooperate, subject to applicable laws, rules and regulations, in the transfer of all accounts obtained in connection with the Program to an entity designated by the Bank.  If such accounts are not transferred in a timely manner, or if such transfer would violate an applicable law, rule or regulation, then the Corporation reserves the right to service these accounts as are required by NASD guidelines.  In any event, the Corporation will maintain all records required by applicable laws, rules or regulations.

12.  **Representations and Indemnification.**

a.  **The Corporation.**  The Corporation represents and warrants to the Bank that it is an Ohio corporation in good standing, that this Contract has been duly executed, that it has or will have all governmental licenses and permits necessary for it to carry on the activities contemplated by this Contract, that it is not the subject of any disciplinary or license revocation proceeding in any jurisdiction and that it may enter into and perform this Contract without violating any contractual or other obligation it has to anyone else.  These representations shall survive the termination of this Contract  The Corporation shall promptly inform the Bank if the Corporation becomes the subject of any disciplinary or license revocation proceeding or governmental order that affects the Corporation's right or ability to perform its obligations under this Contract.  The Corporation shall indemnify and hold the Bank harmless against all claims and damages, including reasonable attorneys' fees and costs, arising out of the broker/dealer activities to be conducted by the Corporation pursuant to this Contract or the Corporation's breach of this Contract; provided, however, that such indemnification shall not apply to claims and damages relating to the Bank's breach of this Contract.

The Corporation agrees that all Registered Representatives will be insured, until notified otherwise by the Corporation, under the Corporation's errors and omissions insurance policy. Such policy currently has a coverage level of $1 million aggregate/$1 million per occurrence. The Corporation further represents that upon execution of this Contract, it will cause the Bank and its directors and officers to be listed as additional insureds to this errors and omissions insurance policy and will provide the Bank with written proof of the same.  The Corporation does not commit to maintain this policy in perpetuity; at some point in the future this type of policy may not be available or it may only be available at a price or from an insurance carrier deemed not to be acceptable, in which event coverage would lapse, the Corporation agrees to give the Bank prompt notice of the termination or lapse of its errors and omissions policy or any change in coverage relating to the Program, the Bank or a Registered Representative.

b.  **The Bank.**  The Bank represents and warrants to the Corporation that it is a federally chartered savings bank, that the terms and provisions of this Contract have been adopted and approved by its Board of Directors, that it has or will have all governmental licenses and permits necessary for it to carry on the activities contemplated by this Contract, that it is not the subject of any disciplinary or license revocation proceeding in any jurisdiction and that it may enter into and perform this Contract without violating any contractual or other obligation it has to anyone else.  These representations shall survive the termination of this Contract.  The Bank will promptly inform the Corporation, to the extent permitted by law, if it becomes the

subject of any disciplinary or license revocation proceeding or governmental order that affects the Corporation's right or ability to perform its obligations under this Contract.

13.     **Right of Inspection**.  The Corporation hereby authorizes the Bank to monitor and periodically review and verify the Corporation's and Registered Representatives' compliance with the terms of this Contract and agrees to provide the Bank with reasonable access to appropriate records in connection with any such activities.  The Corporation shall also provide the Bank and its regulatory examiners with reasonable access to appropriate records in connection with any inspection by the Bank or its regulatory examiners of the Program and shall permit the Bank to copy such records, provided that such inspection and copying is required by the laws, rules or regulations of a regulatory agency with jurisdiction over the Bank.

The Bank hereby authorizes the Corporation to monitor and periodically review and verify the Bank's compliance with the terms of this Contract and agrees to provide the Corporation with reasonable access to appropriate records in connection with any such activities. The Bank shall also provide the Corporation and/or its regulatory examiners with reasonable access to appropriate records in connection with any inspection by the Corporation or its regulatory examiners of the Program and shall permit the Corporation to copy such records, provided that such inspection and copying is limited to the broker/dealer activities contemplated by this Contract and is required by the laws, rules or regulations of a regulatory agency with jurisdiction over the Corporation.

14.     **Notices**.     Notices and all other communications provided for in this Contract shall be in writing and shall be deemed to have been duly given when personally delivered or sent by certified mail, return receipt requested, postage prepaid, or by expedited (overnight) courier with an established national reputation, shipping prepaid or billed to sender, in either case

sent to the address provided below, or to such other address as either party may have furnished to the other in writing in accordance herewith:

If to the Corporation, to:

Board of Directors
Online Brokerage Services, Inc.
103 N. River Road
Waterville, Ohio 43566

with a copy to:

Secretary
Online Brokerage Services, Inc.
103 N. River Road
Waterville, Ohio 43566

If to the Bank, to

First Federal Bank of the Midwest
601 Clinton Street
Defiance, Ohio 43512
Attention: William J. Small

with a copy to:

Vorys, Sater, Seymour and Pease LLP
Suite 2000, Atrium Two
221 E. Fourth Street
Cincinnati, Ohio 45202
Attention: Terri R. Abare

15.  **Assignment**.  This Contract shall inure to the benefit of the parties and their legal representatives, successors and assigns, but no party may assign rights or obligations under this Contract without the prior written approval of the other parties hereto.

16.  **Amendments, Modifications and Waivers**.  This Contract supersedes any and all other agreements, both oral and written, between the parties with respect to the rendering of services by the Corporation for the Bank and contains all of the covenants and agreements between the parties with respect to the rendering of these services in any manner whatsoever. Each party acknowledges that no representations, inducements, promises or agreements, written or oral, have been made by either party, or by anyone acting on behalf of either party, that are not embodies in this Contract.  No provision of this Contract may be modified, amended, waived or discharged unless such modification, amendment, waiver or discharge is agreed to in writing and signed by a duly authorized officer of the Bank and such officer as may be specifically designated by the Board of Directors of the Corporation.  No waiver by either party hereto at any

time of any breach by the other party hereto of, or compliance with, any condition or provision of this Contract to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

17.    **Headings**.  Headings used in this Contract are for convenience only and shall not be used to interpret or construe its provisions.

18.    **Severability**.  The invalidity or unenforceability of any provision of this Contract, whether in whole or in part, shall not in any way affect the validity and/or enforceability of any other provision herein contained.  Any invalid or unenforceable provision shall be deemed severable to the extent of any such invalidity or unenforceability.  It is expressly understood and agreed that while the Corporation and the Bank consider the restrictions contained in this Contract reasonable for the purpose of preserving for the Corporation the goodwill, other trade secrets, proprietary rights and intangible business value of the Corporation, if a final judicial determination is made by a court having jurisdiction that the time or territory or any other restriction contained in this Contract is an unreasonable or otherwise unenforceable restriction against the Bank, the provisions of such clause shall not be rendered void but shall be deemed amended to apply as to maximum time and territory and to such other extent as such court may judicially determine or indicate to be reasonable.

19.    **Relationship of Parties; No Joint Venture**.  The Bank and the Corporation are independent of each other, and each party has sole responsibility and authority for the conduct of its own business.  By the terms of this Contract, no party is the agent, employee, joint venturer or partner of the other.  No party has the right to bind the other party in any way.

20.    **Governing Law**.  In the absence of controlling federal law, this Contract shall be construed and enforced pursuant to the laws of the State of Ohio, notwithstanding any conflict of laws doctrines.  Any action arising out of this Contract or the relationship between the parties established herein shall be brought only in a court of competent jurisdiction in Lucas County, Ohio, and the Bank hereby consents to and agrees to submit to the jurisdiction of such courts for such purpose.

21.    **Counterparts**.  This Contract may be executed in counterparts, and all documents so executed shall constitute one agreement binding on all of the parties hereto.

IN WITNESS WHEREOF, this Contract has been duly executed by the Corporation and the Bank as of the date first above written.

ONLINE BROKERAGE SERVICES, INC.          FIRST FEDERAL BANK OF THE MIDWEST

By: _____          By: _____

Print name: _Kevin M. Overy_             Print name: _James L. _____

Title: _COO_                             Title: _President & CEO_

Date: _10/5/04_                          Date: _9/27/04_

## Investment Advisory Program Agreement

THIS INVESTMENT ADVISORY PROGRAM AGREEMENT (this "Agreement") is executed as of the 5 day of June, 2006, to be effective as of June 15, 2006, (the "Effective Date"), by and among FIRST INSURANCE & INVESTMENTS, Inc, an Ohio corporation ("FII"); ONLINE BROKERAGE SERVICES, INC., an Ohio corporation (the "Portfolio Manager"); and FIRST FEDERAL BANK OF THE MIDWEST (the "Custodian").

### Recitals

A. FII has established and currently operates an investment advisory program (the "Program") for individuals who are or become its clients and wish to participate in the Program ("Clients"), which Program is organized and operated within the safe harbor of Rule 3a-4 under the Investment Company Act of 1940, as amended (the "Investment Company Act"), and in compliance with applicable laws, rules, and regulations including the Investment Advisers Act of 1940, as amended (the "Advisers Act").

B. FII, the Portfolio Manager and the Custodian now wish to enter into this Agreement for the purpose of defining functions and responsibilities of each relating to the Program.

C. FII shall serve as the sponsor of the Program and provide Client management services, individualized investment advisory services, ongoing client relationship counseling, communications and consultations, and the performance of record keeping obligations of a sponsor hereunder.

D. The Portfolio Manager shall serve as portfolio manager for the mutual fund shares comprising each Model Allocation Portfolio (defined below) of the Program and shall be primarily responsible for designing each Model Allocation, selecting particular mutual funds out of the Dimensional Fund Advisers family of mutual funds for each Model Allocation, directing the purchase, exchange, redemption and sale of the shares of such funds, calculating the Advisory Fee (defined below) of the Program and performing record keeping obligations of a portfolio manager hereunder. While Clients may select and participate in one or more Model Allocations simultaneously, each Model Allocation Portfolio in which a Client participates requires the establishment of a separate Client Account.

E. The Custodian will maintain all Client funds in a Program Custodial Account governed by this Agreement. The Custodian will serve as custodian of the assets of the Program pursuant to the terms of a Custody Agreement between FII and the Custodian. The Custodian will also be responsible for the distribution of the Advisory Fee (defined below) of the Program and perform such other record keeping obligations as are expressly identified herein or in the Custody Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and other good and valuable consideration, the parties hereto, intending to be legally bound, hereby agree as follows:

## Article 1
## FII Obligations

1.1.   Client Relationship Management.   FII will solicit Clients for the Program, manage each Client's Account and deliver investment advisory services with the following characteristics:

> (a)   Individualized Management.  Each Client's Account in the Program will be managed on the basis of such Client's financial situation and investment objectives and in accordance with any reasonable restrictions imposed by the Client on the management of such Client's Account.

> (b)   Opening of Account.  At the opening of each Client's Account, FII will obtain written information signed by each Client regarding such Client's individual financial situation and investment objectives and give such Client the opportunity to impose restrictions on the management of such Client's Account.

> (c)   Annual Contact.  At least annually, FII will contact each Client in writing to determine whether there have been any changes in the Client's financial situation or investment objectives, and whether the Client wishes to impose any restrictions on the management of such Client's Account or modify existing restrictions, if any. In addition, FII will annually deliver to each Client, who meets the definition of "customer" under Regulation S-P, the Privacy Notices (as hereinafter defined) for itself and Portfolio Manager and offer to each Client FII's Brochure (as hereinafter defined) and Portfolio Manager's Brochure (as hereinafter defined).

> (d)   Quarterly Contact.  At least quarterly, FII will notify each Client in writing to contact FII if there have been any changes in the Client's financial situation or investment objectives, or if the Client wishes to impose any restrictions on the management of the Client's Account or modify existing restrictions, if any, and FII will provide a means through which the Client may contact FII to do so.

FII will promptly provide the Portfolio Manager with all such information so obtained from each Client to the extent necessary for Portfolio Manager to perform its obligations hereunder with regard to the Program.

1.2.   Program Materials.  FII will deliver to each prospective Client the following written materials for the Program (collectively, the "Program Materials") at least forty-eight (48) hours prior to the Client signing any such documents and otherwise in accordance with the requirements of the Advisers Act:

> (a)   a copy of the current program client agreement between FII and each Client ("Program Client Agreement"), prepared by FII and substantially in the form of Exhibit 1.2(a) attached hereto;

(b)     a copy of Part II of FII's then current Uniform Application for Registration as an Investment Adviser (Form ADV) or, if required, FII's brochure (both referred to as "FII's Brochure"), prepared by FII pursuant to Rule 204-3 (a) under the Advisers Act;

(c)     a copy of the current Form ADV, Part II of the Portfolio Manager or, if required, the Portfolio Manager's brochure (both referred to as the "Portfolio Manager's Brochure"), prepared by the Portfolio Manager pursuant to Rule 204-3(a) under the Advisers Act;

(d)     a written consent to waiver of trade confirmations, prepared by FII and substantially in the form of Exhibit 1.2(d); and

(e)     if required, a copy of the privacy notices required by Regulation S-P for each of FII and the Portfolio Manager (both referred to as the "Privacy Notice").

FII will see that each person who is to become a Client properly executes and delivers to FII each of the agreements, consents, instruments and applications contained within the Program Materials. On an annual basis thereafter, FII will coordinate the delivery or offer of delivery to each Client of the Portfolio Manager's Brochure and FII's Brochure. FII may, with the consent of the other party or parties hereto affected thereby, update, change, add and delete items within those Program Materials prepared by FII from time to time.

1.3.    Reasonable Availability for Client Consultations.  FII will have its personnel reasonably available to each of the Clients for consultation regarding the Program, the Client's Account, and its management.  In carrying out these activities, FII will use personnel who are knowledgeable about the Program, each Client's Account and its management.

1.4.    Advisory Services.  In consultation with FII, each Client will allocate (or direct FII to allocate) the Client's Account assets to one Model Allocation Portfolio and FII shall inform the Portfolio Manager of the Model Allocation Portfolio to which the Client's assets shall initially be allocated and invested based on the Client's financial situation, investment objectives and any restrictions imposed by the Client on the management of the Client's Account.  Each Client may withdraw funds from one Model Allocation Portfolio and move those funds to a separate Model Allocation Portfolio; provided, however, that a separate Client Account must be opened, including the execution of a separate Client Agreement and other documents required by FII in connection with the opening of a new Client Account, in the event the Client wishes to move less than all of the funds from one Model Allocation Portfolio to a separate Model Allocation Portfolio.

1.5.    Account Management Restrictions.  FII will discuss with and document for each Client any restrictions that the Client wishes to impose or change on the management of the Client's Account. If a Client imposes restrictions on the management of a Client's account, FII shall inform such Client that any such restrictions may limit FII's discretion to allocate the Client's Program assets among one or more of the

Model Allocation Portfolios and/or FII's discretion to invest the Client's assets allocated to a Model Allocation Portfolio in particular mutual funds or types of mutual funds (*e.g.*, specific country or sector funds, emerging market funds that invest a significant portion of their assets in a specific country or region or high yield bond funds that invest a significant portion of their assets in defaulted bonds). FII will promptly notify the Portfolio Manager of any Client-imposed restrictions or changes in restrictions under the Program applicable to the Portfolio Manager's management of the Program assets of any Client allocated to a Model Allocation Portfolio. FII and the Portfolio Manager have developed a procedure to review in advance any Client-imposed restrictions or changes in restrictions, with a view toward deeming them reasonable or unreasonable. If deemed unreasonable in advance by FII or the Portfolio Manager, FII may refuse to accept the Client or request modification or withdrawal of the restriction and the Portfolio Manager shall not be obligated to manage the Client's Program assets subject to any such restrictions. FII will promptly notify each Client of any restriction or change in restriction requested by the Client that FII or the Portfolio Manager deems unreasonable, and FII and the Portfolio Manager shall document each Client-imposed restriction or change in restriction that it deems unreasonable.

1.6.    <u>Client Ownership of Assets in Account</u>.  The relationship between each Client and FII will be structured and documented under the Client Agreement to permit the Client to retain, with respect to all mutual fund shares and other assets in the Client's Account, to the same extent as if the Client held the mutual fund shares and other assets outside of the Program, all of the rights described in Rule 3a-4(a)(5) under the Investment Company Act, including the following rights:

(a)  <u>Ability to Withdraw Securities</u>. The Client shall have the option to withdraw the securities and/or cash from the Client's Account following proper notice to FII.

(b)  <u>Voting Rights, etc</u>. Pursuant to the terms of the Client Agreement, the Client will delegate to FII the right to receive and vote any proxy materials related to the underlying portfolio securities in the Client's account in the event proxy materials are delivered to FII and/or the Portfolio Manager on a Client's behalf but the Client will also have the right to elect to receive the proxy materials by providing written notice to FII.

(c)  <u>Timely Notification of Securities Transactions</u>.  The parties acknowledge that, as currently structured, the Program offers Clients a choice between receiving immediate confirmation statements upon completion of each account transaction or the opportunity to waive immediate confirmations and, instead, receive only periodic statements containing all the information required by SEC regulations.  Accordingly, a written agreement to waive their rights to receive immediate trade confirmations and, instead, receive only periodic statements, substantially in the form of <u>Exhibit 1.2(d)</u> attached hereto (the "Waiver"), will be delivered by FII to each Client.

(i) <u>Waiving Clients</u>.  For those Clients who voluntarily sign the Waiver, the Portfolio Manager will deliver only a Client Account Activity

Statement (as described in Section 2.11 below). Those Clients signing the Waiver will have the right upon written notice to the Portfolio Manager, to later elect to receive, at no additional cost to them, confirmations mailed as soon as possible from the Portfolio Manager for any prior transactions effected for them since the immediately preceding periodic Client Account Activity Statement and also request confirmations from the Portfolio Manager for all subsequent transactions at no additional cost to them.

(ii) <u>Non-waiving Clients</u>. For those Clients who do not sign the Waiver, the Portfolio Manager will provide each such Client in a timely manner with a written confirmation or other notification of each securities transaction and all other documents required by law to be provided to securities holders for fee of $2.00 per confirmation.

(iii) <u>Initial Notification from Portfolio Manager</u>. In either event, the Portfolio Manager shall make its best efforts to report daily trade activity relating to each Model Allocation Portfolio to FII as and when set forth in Section 2.7 hereof.

(d)     <u>Right to Proceed Directly</u>. The Custodian and FII will preserve each Client's right to proceed directly as a security holder against the issuer of the securities in the Client's Account without the obligation of joining any person involved in the operation of the Program (including, without limitation, the Custodian) or any other Client of the Program, as a condition precedent to initiating such proceeding.

1.7. <u>Addition/Withdrawal of Funds</u>. FII and the Portfolio Manager have developed the following mutually acceptable guidelines for periodic admission of new Clients to the Program and additions to and withdrawals from existing Client accounts designed to minimize discrepancies from the Portfolio Manager's allocation formula for the Client's selected Model Allocation Portfolio(s):

(a)     <u>Additions</u>. Unless the parties otherwise agree, new Clients and existing Client's funds will be invested in or added to a Model Allocation Portfolio only on the fifteenth (15th) calendar day of each month (or the next business day if such fifteenth (15th) calendar day is a weekend day or holiday). Accordingly, the parties acknowledge that it is possible within a month, that all or a significant portion of a Client's funds may be invested by the Portfolio Manager in a default investment selected by the Portfolio Manager and approved by FII (such as a money market fund), rather than invested by the Portfolio Manager in the selected Model Allocation Portfolio. Prior to such investment by the Portfolio Manager, the Custodian, in consultation with FII, will notify the Portfolio Manager on such dates of the aggregate amount of funds in the custody of the Custodian that are available for immediate investment within each Model Allocation Portfolio.

(b)     <u>Withdrawals</u>. Each Client may make a partial or full withdrawal of mutual fund shares or cash of the Client allocated to a Model Allocation Portfolio

following notice to FII in accordance with the Program. Partial withdrawals as of any day that is not the fifteenth (15th) calendar day of a month or, if such day is not a business day, the next business day, are subject to the withdrawal fee, if any, set forth in Section 4.1(c) hereof payable by each Client to FII. In addition, for any such withdrawals, the Client shall pay the $100 fee imposed by the Custodian in accordance with the Custody Agreement.

(c)  FII reserves the right, upon a Client's request and upon notification by FII to Portfolio Manager, to vary the date(s) upon which FII makes additions to and withdrawals from Model Allocation Portfolios to such other day or days as it determines appropriate on a situation-specific basis, in such event, FII and/or the Client will pay to the Portfolio Manager any extraordinary fees associated with such addition or withdrawal.

1.8.  Program Minimums.  Unless otherwise agreed between FII and the Portfolio Manager, the following minimums shall apply to the Program:

(a)  Client Investment.  Unless otherwise waived by FII, each non-financial planning Client must have a minimum aggregate amount of Fifty Thousand Dollars ($50,000) of funds per Client Account; financial planning Clients may participate in the Program with a minimum of Ten Thousand dollars ($10,000) of funds per Client Account.

(b)  Client Minimum for Model Allocation. Unless otherwise waived by FII, to participate in a particular Model Allocation Portfolio, a Client must invest a minimum of Ten Thousand Dollars ($10,000) in such Model Allocation Portfolio.

(c)  Program Minimum for Model Allocation Portfolio.  Unless otherwise agreed between FII and Portfolio Manager, to commence the operation of a Model Allocation Portfolio, the Program must have a minimum of Two Hundred Thousand Dollars ($200,000) for investment in such Model Allocation Portfolio.

If and when requested by the Portfolio Manager, FII will promptly notify the Portfolio Manager of each Client account created under the Program, the amount thereof, each addition thereto and each full or partial withdrawal therefrom, and FII will promptly notify the Portfolio Manager of each allocation and reallocation of each Client's Program assets to or from a Model Allocation, the mutual funds involved and of any Client-imposed restrictions applicable thereto.

1.9.  Reporting of Possible Governmental Actions.  If FII receives any inquiry for information from any government authority relating to the federal or state securities or tax or labor laws (whether the inquiry relates to its conduct or the conduct of a third party) or if FII becomes aware of any conduct of its own that may be improper under the federal or state securities, tax or labor laws, then, to the extent permitted by law, FII will advise Portfolio Manager in writing of such inquiry or awareness, respectively, promptly of the receipt of such inquiry or of its gaining of such awareness related to its conduct, as the case may be.

1.10.   <u>Reporting of Claims of Misconduct</u>. FII will advise the Portfolio Manager and the Custodian in writing within one week after it learns that any claim alleging misconduct by FII has been reported, whether by FII or a third party, to any of FII's liability insurance carriers.

**Article 2**
**Portfolio Manager Obligations**

2.1.   <u>Model Allocation Portfolios</u>.   The Portfolio Manager has developed certain model portfolios (the "Model Allocation Portfolios"), in consultation with FII, which are described on <u>Exhibit A</u> to the Program Client Agreement.  FII and the Portfolio Manager may consider adding or deleting Model Allocation Portfolios and may do so by amending <u>Exhibit A</u> to the Program Client Agreement by mutual agreement between FII and Portfolio Manager, without Custodian's consent, from time to time. Each Model Allocation Portfolio will consist of selections of different types of mutual funds from the Dimensional Fund Advisers family of mutual funds to reflect different asset allocation formulas, stated investment objectives, related risk parameters and investment limitations. Following consultation with and notice to FII, the Portfolio Manager may change the types of mutual funds within a Model Allocation Portfolio from time to time, so long as such changes remain consistent with the Model Allocation Portfolio descriptions set forth in <u>Exhibit A</u> to the Program Client Agreement hereto and all mutual funds within the Model Allocation Portfolio remain members of the Dimensional Fund Advisers family of mutual funds. The Portfolio Manager follows the trading strategies described in <u>Exhibit A</u> to the Program Client Agreement attached hereto. Portfolio Manager shall, upon the direction of FII (given pursuant to a Client's direction), distribute Client deposits to the specified model allocation portfolio.

2.2.   <u>Investment Brokerage Firm Selection</u>. National Financial, Inc. shall serve as the investment brokerage firm for the Program and the Portfolio Manager or FII will instruct the Custodian to hold securities in a nominee name or names at such investment brokerage firm.   The Custodian will comply with such instruction and will establish an omnibus account at such brokerage firm.

2.3.   <u>Program Trading</u>.  To expedite service, increase efficiency and reduce Program costs, the Portfolio Manager will, except where necessary to comply with applicable Client-imposed restrictions, if any, and except in the case of withdrawals, generally seek to direct the investment and reinvestment of Program funds at the Program Custodial Account level within each Model Allocation Portfolio in accordance with such Model Allocation Portfolio's stated investment objectives, related risk parameters and limitations and the Client's and/or FII's mutual fund selections. To accomplish such trading, Portfolio Manager shall, separately for each contribution to and/or withdrawal from a Model Allocation Portfolio, track the net amount of purchases, exchanges, redemptions and/or sales to be effected by the Portfolio Manager for each mutual fund within such Model Allocation Portfolio.

2.4.   <u>Trading Authority</u>. The Portfolio Manager will direct the investment and reinvestment of Client funds in Client Program Accounts (a) in reliance on and in accordance with each Client's grant of such authority for FII, as the Client's investment adviser and/or agent, to engage the Portfolio Manager hereunder as set forth

-7-

herein, which authority will be granted through the execution by each Client and delivery to FII of the Program Client Agreement substantially in the form of Exhibit 1.2(a) attached hereto; and (b) in accordance with the Model Allocation Portfolio's stated investment objectives and related risk parameters and any and all Client-imposed restrictions applicable thereto that the Portfolio Manager has been notified of by FII and has not rejected as unreasonable.

2.5.  Portfolio Manager Brochure.  The Portfolio Manager will prepare, keep current and deliver to FII, the Portfolio Manager's Brochure (PDF Format) as required by Rule 204-3(a) under the Advisers Act.

2.6.  Reasonable Availability for Client Consultations.  The Portfolio Manager will, whenever requested to do so by FII, have personnel reasonably available to Program Clients for consultation.  Such personnel will be knowledgeable about the Model Allocation Portfolios and the Portfolio Manager's management of Clients' assets within them.

2.7.  Timely Reporting of Trading Activities.  The Portfolio Manager shall, for each Model Allocation Portfolio, report in writing (via electronic mail) to FII trade activity relating to such Model Allocation Portfolio included in the Program on an as-requested basis and in a timely manner by appropriate category, as follows:

(a)  Notification of all purchase, exchange, redemption and other orders placed for execution on a trading day, as soon as practicable following the close of trading on such same trading day, followed by confirmation of such orders before noon on the business day immediately following such trading day;

(b)  Trade errors and corrections, as and when the Portfolio Manager learns of such errors and corrections; and

(c)  Dividends, interest and capital gain distributions when the Portfolio Manager learns of such activity.

All such notifications will, to the extent possible, and all such confirmations shall contain dollar or share amounts, net asset values or per share prices and any other information that may be reasonably requested by FII.

2.8.  FII Approval Prior to Initial Trading.  The Portfolio Manager will provide FII and the Custodian with information concerning a participating investment brokerage firm's contact persons, expenses, if any, and other information relevant to the process of arranging prior authorization for the Portfolio Manager to invest and trade Program funds with a particular investment brokerage firm. Prior to initiating Program trading activity with the particular investment brokerage firm other than National Financial, Inc., FII and the Custodian will confirm such arrangements and information and the Portfolio Manager will secure FII's approval.

2.9.  Reporting of Possible Governmental Actions.  If the Portfolio Manager receives any inquiry for information from any government authority relating to the federal or state securities or tax or labor laws (whether the inquiry relates to its conduct or the conduct of

a third party) or if the Portfolio Manager becomes aware of any conduct of its own that may be improper under the federal or state securities, tax or labor laws, then, to the extent permitted by law, the Portfolio Manager will advise FII in writing of such inquiry or awareness, respectively, promptly of the receipt of such inquiry or of its gaining of such awareness related to its conduct, as the case may be.

2.10.   Reporting of Claims of Misconduct.  The Portfolio Manager will advise FII and the Custodian in writing within one week after it learns that any claim alleging misconduct by the Portfolio Manager has been reported, whether by the Portfolio Manager or a third party, to any of the Portfolio Manager's liability insurance carriers.

2.11.   Client Account Activity Statements and Internet Access.  No less frequently than quarterly, the Portfolio Manager will prepare and deliver to each Client (with a copy to FII) an account activity statement ("Client Account Activity Statement") describing all activity in the Client's Account during the preceding period, including all transactions made on behalf of the Client's Account, all contributions and withdrawals made by or for the Client, all fees, commissions and other expenses charged (excluding fees or expenses charged within a mutual fund by the fund manager, its affiliates or agents) to the Client's Account, the value of the Client's Account at the beginning and end of the period and the cash and number of shares of each mutual fund held in the Client's Account at the end of the period and the value thereof. The Portfolio Manager will consult with FII when preparing the Client Account Activity Statements.

In addition, the Portfolio Manager will provide the notifications set forth in Section 1.6(c) and make available to each Client and Client's designees (including FII), on a continuous, twenty-four (24) hour basis, access to the Client Account through Internet or other electronic access means.

2.12.   Tax Information Reporting Obligations.  The Portfolio Manager will fulfill appropriate tax reporting obligations with respect to each Client, in consultation with FII, which obligations will include, without limitation, issuance to each Client of appropriate and necessary IRS Forms such as IRS Forms 1099-DF/, 1099-INT, 1099-B, 1099-R and 5498.

2.13.   Client Account Allocations.  The Portfolio Manager will be responsible for allocating and reallocating purchases, exchanges, redemptions and sales of mutual fund shares effected by the Portfolio Manager for each Model Allocation Portfolio among each Client Account investing or invested in such Model Allocation Portfolio pursuant to the Model Allocation Portfolio provided by FII pursuant to Section 1.4 hereof. The Portfolio Manager shall report such allocations and reallocations to the Custodian on not less than a quarterly basis. FII shall from time to time monitor the correctness of such allocations by the Portfolio Manager. In the event FII determines that the Portfolio Manager is incorrectly allocating or reallocating Client assets, the Portfolio Manager shall immediately act to correct the incorrect allocations or reallocations and shall make appropriate changes to the Portfolio Manager's internal policies and procedures to prevent future incorrect allocations or reallocations.

2.14.   Advisory Fee Calculations.  The Portfolio Manager shall, pursuant to Sections 4.1 and 4.3 hereof, calculate the Advisory Fees payable by each Client and the portion thereof

payable to each of FII and the Portfolio Manager. In addition, the Portfolio Manager shall calculate the Custodial Fee payable to the Custodian pursuant to the Custody Agreement within 5 days of the end of each quarter.

2.15.    Proxies.  The Portfolio Manager shall notify FII immediately of the receipt of any requests for proxies and forward the same to FII upon its request.  The Portfolio Manager shall vote shares held in each Client's account in accordance with FII's instructions.

### Article 3
### Custodian Obligations

3.1.    Program Custodial Account.  The Custodian will collect all Client funds and maintain all Client assets in the Program custodial account (the "Program Custodial Account"), pursuant to a Custody Agreement between the Custodian and FII.  The Program Custodial Account will represent the total of each of the separate accounts of each Client participating in the Program ("Client Accounts").

3.2.    Mutual Fund Family Pre-arrangements.  The Custodian shall be the registered holder of all Clients' assets in Program accounts, and all Program account transactions shall be effected by the Portfolio Manager, separately for each Model Allocation Portfolio involved. With the cooperation of and assistance from FII and the Portfolio Manager, the Custodian will, pursuant to direction of the Portfolio Manager pursuant to Section 2.2 hereof, open and maintain an account in a nominee name or names with National Financial, Inc.

3.3.    Money Market Fund.  The Portfolio Manager will arrange for and make available to Clients of the Program for the investment of Client funds a money market mutual fund which fund is registered with the SEC and is authorized to invest in short-term debt obligations of the U.S. government, governmental agencies, and major U.S. corporations (the "Money Market Fund") the selection of which shall be reasonably acceptable to FII. Subject to the foregoing, the Money Market Fund may be a money market fund used by the Custodian in its fiduciary capacity for the investment of cash, including a non-affiliated Money Market Fund and the Custodian's own Money Market Funds. The fees and expenses charged in connection with the operation of the Money Market Fund shall be agreed upon in writing in advance by the Custodian and FII, and FII shall separately disclose to Clients any 12b-1 fees it or any of its affiliates may receive in connection therewith.

3.4.    System of Operating Procedures. FII, the Custodian, and the Portfolio Manager have agreed upon a system of operating procedures, which system may be modified in writing from time to time, dealing with the scope, timing service parameters and minimum standards for the performance of the custodial services anticipated by this Agreement and the Custody Agreement, as described in Exhibit 3.4 attached hereto.

3.5.    Instructions from Portfolio Manager. The Custodian will comply with the Portfolio Manager's instructions set forth in Section 2.2 regarding establishing accounts for Model Allocation Portfolios.

3.6.    Limitation Regarding Model Allocation Portfolios.  The Custodian shall have no responsibility to review, approve, monitor or otherwise manage the Model Allocation Portfolios, or to determine whether the Portfolio Manager has designed or is managing the Model Allocation Portfolios in accordance with the respective descriptions or objectives thereof.

3.7.    Transmission of Funds.  Custodian shall not be responsible for transmitting proceeds from checks or wires for Clients to their account at OBS the day received, if the check or wire is received by the Custodian after 1:00 PM Eastern Time and shall not be responsible for loss of interest because of late receipt.

3.8.    Other Limitations.    The Custodian's duties shall be limited to those expressly set forth herein or in the Custody Agreement, and no implied duties or responsibilities shall be imposed on the Custodian. The parties acknowledge and agree that the Custodian's duties and functions hereunder and under the Custody Agreement are purely ministerial in nature.

**Article 4**

**Program Fees and Other Transaction Costs**

4.1.    Program Fees.

(a) Advisory Fee.  FII will charge and collect a single fee (the "Advisory Fee") as set forth on Exhibit 4.1 attached hereto for investment advisory and financial management services provided to Clients by FII and the Portfolio Manager in connection with the Program. The Advisory Fee will be a *per annum* fee, calculated by the Portfolio Manager based on the product of the value of the assets in the Client's Account on each day multiplied by a certain per annum percentage and then adjusted to recognize that the percentage is per annum but the calculations are to be per day. Within ten (10) days following the end of each calendar quarter, the Portfolio Manager will calculate the Advisory Fees and instruct the Custodian to debit such Advisory Fees in arrears from the Program account for services rendered by FII and the Portfolio Manager under the Program during such calendar month, or part thereof. In connection with such debit, the Custodian will promptly remit to the Portfolio Manager and FII that portion of the Advisory Fee that is due to the Portfolio Manager and FII as set forth on Exhibit 4.1 attached hereto, together with a Client Advisory Fee accounts receivable report. The Portfolio Manager will not directly or separately charge or seek payment from any Client.

(b) Custodian Fee.  The Custodian will charge FII a separate custodial fee pursuant to the Custody Agreement (the "Custodian Fee").

(c) Partial Withdrawal Fee.  In addition to the Advisory Fee, FII may impose a reasonable fee of not less than One Hundred Dollars ($100), payable by each Client to FII, for any partial withdrawal of mutual fund shares or cash of the Client allocated to a Model Allocation Portfolio as of any day that is not the fifteenth (15th) day of a month.

-11-

4.2.   Transaction-Based Fees and Costs.  The Program fees described in Section 4.1 above do not include the expenses of the individual underlying mutual funds or transaction fees, sales loads, redemption fees and/or contingent deferred sales charges charged by persons other than FII and the Portfolio Manager such as the mutual funds and/or their distributors and/or broker-dealers (collectively, "Third-Party Charges"). Clients, as investors in such mutual funds, will bear their proportionate shares of the Third-Party Charges for the mutual funds in which each Model Allocation Portfolio's assets are invested, and the Portfolio Manager will allocate all such Third-Party Charges to the Client Account or Accounts involved and notify FII thereof. In connection therewith, the Portfolio Manager and FII will establish and maintain a Program policy and procedure to account for and properly allocate to the appropriate Client(s) any back-end redemption fees, contingent deferred sales charges or similar Third-Party Charges with respect to each Model Allocation Portfolio within the Program. Except with regard to the Third-Party Charges and the Program partial withdrawal fee described in Section 4.1(c) above, FII, the Portfolio Manager and Custodian will not charge any Client any commissions, mark-ups, markdowns or other similar transaction-based fees in connection with the operation of the Program.

Notwithstanding anything contained in this Agreement to the contrary, Portfolio Manager shall not charge a separate fee to any Client relating to any ticket charges or web-based account access charges, it being agreed by the parties that such charges have been allocated in addition to the Advisory Fee that shall be paid by FII pursuant to Section 4.1 above.

4.3.   Calculation of Advisory Fee.  The Portfolio Manager shall calculate the Advisory Fee due and payable by each Client as well as the portion of the Advisory Fee due to each of FII and the Portfolio Manager on a daily basis and shall provide to FII within five (5) business days following the end of each calendar month a per Client and per Client Account statement of such amounts.  The Portfolio Manager shall, within two (2) business days after receiving a request from FII, provide FII and the Custodian with any data or documentation necessary to substantiate the Portfolio Manager's calculations hereunder.  The Advisory Fee shall be the product of the value of the assets in each Client's Account on each day multiplied by a certain per annum percentage determined in accordance with Exhibit 4.1 attached hereto, as adjusted to recognize that the percentages set forth on Exhibit 4.1 are *per annum* and that the calculations hereunder are per day. For shares of mutual funds, the shares will be valued by the Portfolio Manager at the reported net asset values of such shares on each day or, if no report is made on such day, on the immediately preceding day on which a report was made.

Because the Portfolio Manager shall calculate the Advisory Fee based upon daily valuation of assets, no pro-ration shall be necessary for new Client Accounts, terminations or additions or withdrawals of assets.  Except as permitted by Section 205(b)(2) of the Advisers Act with regard to asset-based fees, neither FII nor the Portfolio Manager shall be compensated on the basis of a share of capital gains upon or capital appreciation of the assets, or any portion of the assets, in the Client's Account(s).

**Article 5 Term, Termination and Withdrawal or Removal of a Party without Termination**

5.1.   Term.  The term for the operation of the Agreement shall commence as of the Effective Date, and this Agreement shall remain in effect unless and until terminated as provided in Section 5.2 below.

5.2.   Termination.  This Agreement may be terminated by notice of termination as follows:

(a)   Any party may terminate this Agreement as of the close of any calendar quarter by giving the other parties at least one hundred and eighty (180) days prior notice.

(b)   At any time, by mutual consent of FII, the Portfolio Manager, and the Custodian.

(c)   In the event that any party shall commit a material breach or default of any covenant, representation or warranty herein or in any Program-related agreements, and such party shall fail to remedy or cure such breach or default within thirty (30) days following written notice of such breach or default from either or both of the non-defaulting parties.

(d)   In the event that: (i) any party files a petition in bankruptcy or seeks relief under provisions of any bankruptcy, reorganization, insolvency, dissolution, liquidation or similar law; (ii) a petition is filed against any party under any bankruptcy, reorganization, insolvency, dissolution, liquidation or similar law and such petition is not dismissed within ten (10) days of filing; (iii) any party is generally not paying its debts as such debts become due or is or becomes insolvent or makes an assignment for the benefit of its creditors; then, in any such event, either or both of the other parties may terminate this Agreement by notice to the other parties.

(e)   Immediately upon notice from one party to the other parties in the event that either or both of the other parties or any affiliate of either or both of the other parties becomes the subject of any civil, criminal or administrative proceeding commenced by or before one or more State or Federal regulators (e.g., SEC or Comptroller of the Currency) or is formally charged by another State or Federal authority with or indicted for alleged criminal law violations or violations of other laws involving fraud, deception, misrepresentation, breach of trust or fiduciary duty, moral turpitude, theft, conversion or similar allegations.

Any termination upon a notice given by Custodian to FII and/or Portfolio Manager pursuant to this Section 5.2 or upon a notice given by FII and/or the Portfolio Manager solely to Custodian pursuant to this Section 5.2 shall result in a termination of this Agreement only as to Custodian, and this Agreement shall, unless otherwise terminated pursuant to this Agreement, remain in full force and effect by and between FII and Portfolio Manager.

5.3  Consequences of Agreement Termination.  In the event of any termination of this Agreement, FII shall promptly notify each Client of such termination and the arrangements and obligations set forth herein shall continue for the purpose of, and the

parties shall mutually cooperate and proceed diligently to, wind up the operation of this Agreement as to the terminated party(ies) in an orderly and efficient manner and, to the extent possible, in a manner that reasonably protects the interests of the Clients of the Program. The obligations of the parties hereunder in respect of transactions and events occurring prior to the termination of this Agreement shall continue in full force and effect following such termination.

5.4 <u>Withdrawal or Removal Without Termination</u>.  FII reserves the right, without cause, to remove either the Custodian or the Portfolio Manager upon forty-five (45) days written notice, without said event causing a termination of this Agreement as to the non-removed party. FII may immediately remove either the Custodian or the Portfolio Manager without terminating this Agreement in the event such party or an affiliate of such party becomes the subject of any civil, criminal or administrative proceeding commenced by or before one or more State or Federal regulators (e.g., SEC or Comptroller of the Currency) or is formally charged by another State or Federal authority with or indicted for alleged criminal law violations or violations of other laws involving fraud, deception, misrepresentation, breach of trust or fiduciary duty, moral turpitude, theft, conversion or similar allegations. FII shall replace the party so removed immediately and the party so removed agrees to participate in the orderly transition to its successor. Custodian reserves the right, without cause and upon sixty (60) days written notice to FII, to resign and cease providing services pursuant to this Agreement. Portfolio Manager reserves the right, without cause and upon sixty (60) days written notice to FII, to resign and cease providing services pursuant to this Agreement.  To the extent that a party resigns, it agrees that it will, as long as FII is making a good faith effort to replace the resigning party, continue t o p rovide services hereunder until its successor is appointed by FII and begins providing the services provided by the resigning party.

5.5 <u>Transfer of Client Funds</u>.  Upon any removal, resignation or termination as to the Custodian, the Custodian shall transfer or transition the funds and/or other assets as directed in writing by FII.

### Article 6
### General Representations, Warranties
### and Covenants of the Parties

6.1. FII Representations and Warranties.  FII hereby represents, warrants and covenants to each of the other parties that:

    (a)  FII is a duly organized and validly existing limited liability company under the laws of the State of Ohio, has taken all requisite company action to authorize the execution, delivery and performance of this Agreement, and has full right and authority to perform all of its obligations hereunder.

    (b)  This Agreement constitutes the legal, valid and binding obligation of FII enforceable against FII in accordance with its terms.

    (c)  Neither the execution and delivery of this Agreement or any other Program Materials by FII nor the consummation of the transactions contemplated by them will violate or conflict with any provision of any law, rule, regulation or decision of any court or governmental agency binding upon FII.

    (d)  FII is and at all times during the term of this Agreement will be in compliance with all laws, rules, regulations and decisions applicable to FII and the operation of its business. FII owns, holds, possesses or lawfully uses: (i) in the operation of its business, all licenses, filings, registrations, and other authorizations which are necessary for it to conduct its business as now conducted and as contemplated hereby and, (ii) with regard to the Program, all licenses, filings, registrations, and other authorizations, if any, which are necessary for it to sponsor the Program as contemplated hereby under applicable State securities or blue sky laws. FII has not registered any Client's interest in the Program under Section 5 of the Securities Act o f 1933, as amended, in reliance on the SEC's noted exception from such requirement set forth in Rule 3a-4 under the Investment Company Act.

(e)   The information with respect to FII contained in the Program Materials is, and throughout the term of this Agreement, will be, complete and correct in all material respects, and the Program Materials do not contain, and throughout the term of this Agreement, will not contain any untrue statement of material fact with respect to FII and do not omit and, throughout the term of this Agreement, will not omit, to state a material fact with respect to FII required to be stated therein or necessary to make t he statements made with respect t o FII in such Program Materials, in light of the circumstances under which they were made, not misleading in any material respect. FII will not include any information or representation with respect to either of the other parties hereto in any advertising or other material for the Program unless such information or representation has been prepared by such other party for use in connection with the Program or has been approved by such other party prior to FII's use thereof.

(f)  FII will not omit to take any action that it is obligated to take hereunder or under the Program Materials or take any action which will in any way cause the Program not to qualify for and comply with the safe harbor conditions of Rule 3a-4 under the Investment Company Act.

(g) To the knowledge of FII, there is no civil, criminal or administrative proceeding or investigation pending or threatened (nor any basis therefore) against FII or any of its affiliates by one or more State or Federal regulators (e.g., SEC or Comptroller of the Currency) or by any other person of the type referenced in Section 5.2(e).  FII shall promptly notify the other parties in a reasonably detailed statement in the event that it or any of its affiliates becomes the subject of any such proceeding or investigation.

(h) FII is and, throughout the term of this Agreement, will continue to be, with respect to each person whose assets are or become invested in a Model Allocation Portfolio under the Program, duly authorized under the Client Agreement between FII and such person, to allocate and reallocate such person's assets within and among one or more of (x) the Model Allocation Portfolios selected by the Client in consultation with FII, and (y) the mutual funds in connection therewith; and all allocations and reallocations of such person's assets made or required to be made by FII pursuant to Section 1.4 hereof will be suitable for such person and will not violate any restriction imposed by such person.

(g)  FII shall maintain insurance coverage and fidelity bonding sufficient for compliance with all requirements of applicable laws. All such policies will be issued by insurance companies reasonably believed by FII to be financially sound and reputable.

16

6.2.  <u>Portfolio Manager Representations and Warranties.</u>  The Portfolio Manager hereby represents, warrants and covenants to each of the other parties that:

(a)  The Portfolio Manager is a duly organized and validly existing corporation under the laws of the State of Ohio, has taken all requisite corporate action to authorize the execution, delivery and performance of this Agreement, and has full right and authority to perform all of its obligations hereunder.

(b)  This Agreement constitutes the legal, valid and binding obligation of the Portfolio Manager enforceable against the Portfolio Manager in accordance with its terms.

(c)  Neither the execution and delivery of this Agreement or any other Program Materials by the Portfolio Manager nor the consummation of the transactions contemplated by them will violate or conflict with any provision of any law, rule, regulation or decision of any court or governmental agency binding upon the Portfolio Manager.

(d)  The Portfolio Manager is and at all times during the term of this Agreement will be in compliance with all laws, rules, regulations and decisions applicable to the Portfolio Manager and the operation of its business.  The Portfolio Manager owns, holds, possesses or lawfully uses in the operation of its business all licenses, filings, registrations, and other authorizations which are necessary for it to conduct its business as now conducted and as contemplated hereby.

(e)  The information with respect to the Portfolio Manager contained in those Program Materials prepared or approved by the Portfolio Manager is complete and correct in all material respects, and such Program Materials do not contain any untrue statement of material fact with respect to the Portfolio Manager and do not omit to state a material fact with respect to the Portfolio Manager required to be stated there in or necessary to make the statements made with respect to the Portfolio Manager in such Program Materials, in light of the circumstances under which they were made, not misleading in any material respect. The Portfolio Manager will, throughout the term of this Agreement, promptly provide FII with such changes and/or up-dated information with respect to the Portfolio Manager as may be necessary to enable FII to cause FII's Brochure and any other Program Materials previously prepared or approved by the Portfolio Manager to continue to include, with respect to the Portfolio Manager, information that is complete and correct in all material respects, and FII will promptly revise FII's Brochure and such other Program Materials to include such information.

17

(f) The Portfolio Manager will not omit to take any action that it is obligated to take hereunder or under any Program Material or take any action which will in any way cause the Program not to qualify for and comply with the safe harbor conditions of Rule 3a-4 under the Investment Company Act.

(g) The Portfolio Manager shall maintain insurance coverage and fidelity bonding sufficient for compliance with all requirements of applicable laws. All such policies will be issued by insurance companies reasonably believed by the Portfolio Manager to be financially sound and reputable.

(h) To the knowledge of the Portfolio Manager, there is no action, proceeding or investigation pending or threatened (nor any basis therefor) against the Portfolio Manager or any of its affiliates by one or more State or Federal regulators (e.g., SEC or Comptroller of the Currency) or by any other person of the type referred to in Section 5.2(e). The Portfolio Manager shall promptly notify the other parties in a reasonably detailed statement in the event that it or any of its affiliates becomes the subject of any such proceeding or investigation.

6.3. <u>Custodian Representations and Warranties.</u> The Custodian hereby represents, warrants and covenants to each of the other parties hereto that:

(a) The Custodian is a duly organized and validly existing federal savings and loan association, has taken all requisite corporate action to authorize the execution, delivery and performance of this Agreement, and has full right and authority to perform all of its obligations hereunder.

(b) This Agreement constitutes the legal, valid and binding obligation of the Custodian enforceable against the Custodian in accordance with its terms.

(c) Neither the execution and delivery of this Agreement by the Custodian nor the consummation of the transactions contemplated by it will violate or conflict with any provision of any law, rule, regulation or decision of any court or governmental agency binding upon the Custodian.

(d) The Custodian is and at all times during the term of this Agreement will be in compliance with all laws, rules, regulations and decisions applicable to the Custodian and the operation of its business. The Custodian owns, holds, possesses or lawfully uses in the operation of its business all licenses, filings, registrations, and other authorizations which are necessary for it to conduct its business as now conducted and as contemplated hereby.

18

(e)    The information with respect to the Custodian contained in the Program Materials is, and throughout the term of this Agreement, will be, complete and correct in all material respects, and the Program Materials do not contain, and throughout the term of this Agreement, will not contain, any untrue statement of material fact with respect to the Custodian and do not omit and, throughout the term of this Agreement, will not omit, to state a material fact with respect to the Custodian required to be stated therein or necessary to make the statements made with respect to the Custodian in such Program Materials, in light of the circumstances under which t hey were made, not misleading in any material respect. The Custodian will, throughout the term of this Agreement, promptly provide FII with such changes and/or up-dated information with respect to the Custodian as may be necessary to enable FII to cause FII's Brochure to continue to include, with respect to the Custodian, information that is complete and correct in all material respects, and FII will promptly revise FII's Brochure to include such information, and will promptly provide revised versions of FII's Brochure to Portfolio Manager and the Custodian as and when completed. Except as expressly provided herein, the Custodian shall have no responsibility for approving or monitoring the completeness or accuracy of any Program Materials.

(f)  The Custodian will not omit to take any action that it is obligated to take hereunder or under any Custody Agreement or take any action which will in any way cause the Program not to qualify for and comply with the safe harbor conditions of Rule 3a-4 under the Investment Company Act.

(g)  The Custodian shall maintain insurance coverage and fidelity bonding sufficient for (i) compliance with all requirements of applicable laws and (ii) adequate coverage for the assets and operations of the Custodian for all material risks normally insured against by a person carrying on the same or similar business as the Custodian.  All such policies will be issued by insurance companies reasonably believed by the Custodian to be financially sound and reputable.

(h) To the knowledge of the Custodian, there is no action, proceeding or investigation pending or threatened (nor any basis therefore) against the Custodian or any of its affiliates by one or more State or Federal regulators (e.g., SEC or Comptroller of the Currency) or by any other person of the type referred to in Section 5.2(e). The Custodian shall promptly notify the other parties in a reasonably detailed statement in the event that it or any affiliate thereof becomes the subject of any such proceeding or investigation.

(i) The Custodian is a "qualified custodian" as that term is defined in Section 206(4)-2 of the Advisers Act.

## Article 7
## Alternative Dispute
## Resolution

Each party agrees that any and all claims or controversies which may arise among or between the parties involving any Program-related transaction or the construction, performance, or breach of this Agreement or any other Program-related agreement between or among the parties, whether entered into prior, on or subsequent to the date hereof or relating in any way to the Program, shall be settled and determined by the alternative dispute resolution procedures set forth below.

7.1.  Negotiation.  The parties will attempt in good faith to resolve any controversy or claim involving, arising out of or relating to any such transaction, this Agreement, any other Program-related agreement or the Program promptly by negotiations among executives of the parties. If the parties do not reach a satisfactory solution within a period of 30 days or such longer period upon which the parties may mutually agree, then, upon notice by any party to the other parties hereto, the matter shall be finally settled by binding arbitration as set forth below.

7.2.  Binding Arbitration.  Following negotiations, any outstanding controversy or claim shall be settled by binding arbitration, which shall be conducted before a single, neutral arbitrator having experience with and knowledge of the securities and investment advisory industry.  The arbitration shall proceed under the arbitration rules then in force of the State of Ohio or such other arbitration rules to which the parties may mutually agree. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof or application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be.  In rendering the award, the arbitrator shall determine the rights and obligations of the parties in accordance with the laws of the State of Ohio and applicable federal laws of the United States.  The arbitration award shall be in writing and shall specify the factual and legal basis for the award.  The site of the arbitration shall be Toledo, Ohio, or at any place selected by mutual agreement of the parties. The parties hereby consent and submit to personal jurisdiction in the federal and State courts located in the State of Ohio to interpret or enforce any or all of these arbitration provisions and do hereby waive any objection to the personal jurisdiction or venue to any such action in any of the federal or State courts located in the State of Ohio.

7.3.  Remedies and Expenses.  Unless the applicable arbitration rules require otherwise, the arbitrator will have no authority to award punitive, incidental or special damages no measured by the prevailing party's actual damages (and each party hereby waives any form of damages other than actual damages).  The arbitrator is authorized to award any party or parties' sum(s) deemed proper for the time, expense, and trouble of arbitration, including arbitration fees and expenses and reasonable attorneys' fees and expenses.

7.4.  Consolidation.  Arbitration proceedings under this Agreement may be consolidated with arbitration proceedings pending between other parties and/or any of their affiliates and between parties and Clients of the Program if the arbitration

-20-

proceedings arise from the same transaction or relate to the same subject matter. Consolidation will be by an order of the arbitrator in any of the pending cases, or, if the arbitrator fails to make such an order, any party may apply to any court of competent jurisdiction for such an order.

7.5.  Confidentiality.  Neither a party nor an arbitrator may disclose the results of any arbitration hereunder without the prior written consent of the other parties hereto, except as required by applicable law.

7.6.  General ADR Provisions.  The procedures specified in this Article shall be the sole and exclusive procedures for the resolution of disputes between and among the parties arising out of or relating to this Agreement and the Program; provided, however, that a party may seek a preliminary injunction or other preliminary judicial relief if such action is necessary to avoid irreparable damage.  Despite such action, the parties will continue to participate in good faith in the procedures specified above.

## Article 8
## Indemnification

8.1.  Indemnification.

    (a)  FII agrees to assume responsibility for and indemnify and hold each of the other parties harmless from and against all demands, claims, losses, liabilities, judgments, costs and expenses (including, without limitation, the reasonable fees, disbursements, and expenses of attorneys) (collectively, "Losses") caused by the actions and/or omissions of FII, its employees, other agents and permitted assigns in connection with the wrongful performance of or failure to perform any of FII's obligations under this Agreement or under any of the Program Materials or in connection with the breach of any representation or warranty of FII hereunder or there under.

    (b)  The Portfolio Manager agrees to assume responsibility for and indemnify and hold each of the other parties harmless from and against all Losses caused by the actions and/or omissions of the Portfolio Manager, its employees, other agents and permitted assigns in connection with t he wrongful performance of or failure to perform any of the Portfolio Manager's obligations under this Agreement or in connection with the breach of any representation or warranty of the Portfolio Manager hereunder.

    (c)  The Custodian agrees to assume responsibility for and indemnify and hold each of the other parties harmless from and against all Losses caused by the actions and/or omissions of the Custodian, its employees, other agents and permitted assigns in connection with the wrongful performance of or the failure to perform any of the Custodian's obligations under this Agreement or under the Custody Agreement or in connection with the breach of any representation or warranty of the Custodian hereunder or there under.

-21-

8.2. <u>Notice and Defense of Third Party Claims</u>.  If any action, claim or proceeding is brought or asserted under Section 8.1 against an indemnified party or any successor thereto (the "Indemnified Person") in respect of which indemnity may be sought under Section 8.1 from an indemnifying person or any successor thereto (the "Indemnifying Person"), the Indemnified Person shall give prompt notice of such action, claim or proceeding to the Indemnifying Person, who shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Person and the payment of all expenses. The Indemnified Person shall have the right to employ separate counsel in any of the foregoing actions, claims or proceedings and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Person unless both the Indemnified Person and the Indemnifying Person are named as parties and the Indemnified Person shall in good faith determine that representation by the same counsel is inappropriate. In the event that the Indemnifying Person, within 10 days after receipt of notice of such action, claim or proceeding, fails to assume the defense thereof, the Indemnified Person shall have the right to undertake the defense thereof, and the compromise or settlement of such action, claim or proceeding for the account of the Indemnifying Person, subject to the right of the Indemnifying Person to assume the defense of such action, claim or proceeding with counsel reasonably satisfactory to the Indemnified Person at any time prior to the settlement, compromise or final determination thereof. Anything in this Section 8.2 to the contrary notwithstanding, the Indemnifying Person shall not, without the Indemnified Person's prior consent, settle or compromise any action, claim or proceeding or consent to the entry of any judgment with respect to any action, claim or proceeding for anything other than money damages paid by the Indemnifying Person. The Indemnifying Person may, without the Indemnified Person's prior written consent, settle or compromise any such action, claim or proceeding or consent to the entry of any judgment with respect to any such action or  claim that requires solely the payment of money damages by the Indemnifying Person and that includes as an unconditional term thereof the release by the claimant or plaintiff of the Indemnified Person from all liability in respect of such action, claim or proceeding.

### Article 9
### Non-exclusivity, etc.

9.1.    <u>Non-exclusive Arrangement</u>.  The parties acknowledge and agree that the obligations of each of them with respect to the Program and this Agreement are of a non exclusive nature. That is, from time to time, FII has entered into, and may enter into, arrangements with one or more additional persons to serve as a portfolio manager in connection with other Program portfolios, and the Portfolio Manager may manage the assets of persons who are not Clients of the Program and/or for other investment advisory programs. Moreover, the Custodian may act as custodian for persons who are not Clients of the Program and/or for other investment advisory programs.

9.2. <u>Proprietary Information</u>. Throughout the term of this Agreement and following the termination of this Agreement, it will be necessary for the Custodian and the Portfolio Manager to acquire proprietary information of FII including, without limitation, the identity of Clients and prospective clients of the Program, sales and marketing methods, Program manuals, software, operating systems, processes and methods of operation, and other information having actual or prospective independent

economic value to FII (collectively, to the extent such information is proprietary to or a trade secret of FII, "Proprietary Information"). Proprietary Information is the exclusive property of FII. It is essential to the protection of FII's good will and to maintain its competitive position that Proprietary Information be held in confidence by the Custodian and the Portfolio Manager and that neither uses Proprietary Information to such party's own advantage or to the disadvantage of FII. During the term of this Agreement and following termination, FII shall retain exclusive rights in and to the Program, its Clients and Proprietary Information and, following termination of this Agreement, may reconstitute and continue to operate the Program with one or more different custodians and/or portfolio managers in FII's discretion.

9.3.  Non-Solicitation of Clients.  The parties acknowledge and agree that it is essential for the proper protection of the business of FII that the Portfolio Manager be restrained from soliciting Clients of the Program. Therefore, the Portfolio Manager agrees that throughout the term of this Agreement and for a five (5) year period thereafter it shall not, directly or indirectly, solicit the investment management business of, or transact investment management business with any person who the Portfolio Manager actually knew or should have known is or was at any time as of or during the term of this Agreement, a Client of the Program without, in each instance, the prior consent of FII.

9.4.  Confidential Information.  Each party (including any affiliates thereof) agrees to retain in strict confidence any and all confidential information of the other parties hereto, whether disclosed prior to or after the date of this Agreement. Each party shall refrain from (a) using such information to compete with any of the other parties and (b) knowingly disclosing such information to third parties. Each party shall use its best efforts to cause its employees, other agents, other affiliates and consultants to comply with this Section 9.4. Notwithstanding Section 9.2 and/or the foregoing, this provision and Section 9.2 shall not apply to information which: (a) at the time of disclosure is a part of the public domain and is readily accessible to such third party; (b) at the time of disclosure is already known by the receiving party otherwise than under an obligation of confidentiality; (c) is required by law to be disclosed; or (d) is required by any vendor, distributor or supplier to carry on the Program, provided the disclosing p arty shall attempt to obtain the written undertaking o f confidentiality from any such third party prior to disclosure.

## Article 10
## Miscellaneous Terms

10.1.  Independent Contractors.  This Agreement shall not constitute, create or in any way be interpreted as a joint venture, partnership or formal business association. The parties hereto are performing services as independently contracting parties and, except as provided herein or in any Program Materials, no party has the right to direct or control the activities of any of the other parties who are performing services hereunder, and nothing herein shall be construed to be inconsistent with this relationship or legal status.

10.2.  Expenses. Except as otherwise provided in this Agreement, each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

10.3.  Contents of Agreement; Parties in Interest. This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby. It shall not be amended or modified orally, by course of dealing or otherwise, except by written instrument duly executed by each of the parties hereto.  Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

10.4.  Assignment and Binding Effect. This Agreement may not be assigned by any party hereto without the prior consent of each of the other parties. Subject to the foregoing, all of the terms and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of the parties hereto.

10.5.  Waiver. Any term or condition of this Agreement may be waived at any time by the party entitled t o the benefit thereof by a written instrument duly executed by such party.

10.6.  Notices. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by fax (with receipt confirmation), telegram or by registered or certified mail, postage prepaid, as follows:

If to FII, to:

> First Insurance & Investments, Inc.
> 419 Fifth Street, Suite 1200
> Defiance, Ohio 43512
> Attention: Steve Grosenbacher
> Fax: 419-782-7940

If to Portfolio Manager, to:

> Online Brokerage Services, Inc.
> Attn. Chris Campbell
> 103 N. River Road
> Waterville, OH 43566
> Fax: (419) 878-1919

If to Custodian, to:

> First Federal Bank of the Midwest
> 601 Clinton Street
> Defiance, Ohio 43512
> Attention: Lisa R. Christy
> Fax: (419) 782-5145

-24-

or to such other address as the addressee may have specified in a notice duly given to the sender as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, faxed, telegraphed or mailed.

10.7.  <u>Ohio Law to Govern</u>.  This Agreement shall be construed as a contract made in the State of Ohio and shall be governed by and interpreted and enforced in accordance with the laws of the State of Ohio, without regard to conflicts of law, all rights and remedies being governed by such laws.

10.8.  <u>No Benefit to Others</u>.  The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and the successors and permitted assigns, and they shall not be construed as conferring any rights on any other persons.

10.9.  <u>Headings, Gender.</u>  All article and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.

10.10.  <u>Exhibits</u>.  All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.10.  <u>Severability</u>.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.12.  <u>Further Assurances</u>.  The parties hereto agree that they will cooperate with each other and will execute and deliver, or cause to be delivered, all such other agreements and instruments, and will take all such other actions, as any other party hereto may reasonably request from time to time to carry out the provisions and purposes of this Agreement.

10.13  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by the parties. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

IN WITNESS WHEREOF, the parties hereto, each by its duly authorized officer, have entered into this Investment Advisory Program Agreement as of the date first written above.

First Insurance and Investments, Inc. "FII"

By: _Steve Gro_____

Printed Name: _Steven P. Grosenbacher_

Title: _President_

Online Brokerage Services, Inc. "Portfolio Manager"

By: _Christopher S. Campbell_

Printed Name: _Christopher S. Campbell_

Title: _President / CEO_

First Federal Bank of the Midwest "Custodian"

By: _Lisa Christy_

Printed Name _Lisa R. Christy_

Title: _Senior Vice President_

## Exhibit 1.2(a)

### Client Agreement
### FII - Investment Advisory Program

THIS CLIENT AGREEMENT (this "Agreement") is entered into as of the date written above the signature lines below by and between First Insurance & Investments, Inc., ("FII") and the undersigned ("Client"). **This Agreement amends, replaces and supersedes in its entirety any prior agreement between FII and Client relating to the same subject matter.**

### Recitals

A.  FII is the sponsor of an investment advisory program referred to as the FII Investment Advisory Program (the "Program") that is organized and operates within the safe harbor of Rule 3a-4 of the Investment Company Act of 1940, as amended.

B.  As sponsor of the Program, FII has arranged for OBS Financial Services, Inc. to serve as a portfolio manager (unless an alternative portfolio manager is designated by FII and Client in writing) ("Portfolio Manager") for the Program and for First Federal Bank of the Midwest to serve as the custodian (unless an alternative custodian is designated by FII in writing) ("Custodian") for the assets of each client participating in the Program by establishing and maintaining a separate client account ("Client Account") for each client of the Program.

C.  Client desires to invest and participate in the Program under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual promises contained herein and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### Article 1
### Client Obligations

1.1.  Retention of FII.  Client hereby retains FII as the sponsor of the Program and to manage the assets designated by Client for management under the Program, including all additions, substitutions, and alterations, upon the terms and conditions of this Agreement. Client hereby authorizes FII to act as Client's agent and attorney in fact to purchase and redeem for the Client Account, either directly or through Portfolio Manager, in accordance with the terms and conditions of this Agreement and the operation of the Program.

1.2.  Opening of Client Account.  At the opening of the Client Account, Client will complete the client questionnaire regarding Client's individual financial condition, risk tolerance, investment objectives, and possible investment restrictions ("Client Questionnaire"). FII will manage the Client Account in accordance with Client's investment objectives specified in the Client Questionnaire as updated from time to time and will use such information to assist Client in selecting one (1) or more Model Allocations suitable for Client's investment objectives and criteria. FII will communicate Client's choice of Model Allocation(s) to Portfolio Manager.

1.3.  Custodial Arrangement.  As a condition of investing in the Program, Client and the Custodian must enter into the Custody Agreement ("Custody Agreement").  Upon acceptance into the Program, Client shall deliver to Custodian an executed Custody Agreement and such funds that Client desires to invest in the Program.  Following Client's deposit of funds with Custodian, Portfolio Manager shall, on a date determined by Portfolio Manager, invest the funds in the Model Allocation(s) designated by Client.  Client agrees that any additions to the Client Account after the effective date hereof will be made in accordance with any applicable minimum amount requirements under operating

policies and procedures for the Program as in effect from time to time. Client recognizes that FII may designate a different financial institution to serve as Custodian if FII determines that such different institution could better serve the needs of Client and the Program, and Client agrees to promptly execute any and all documents reasonably necessary for the efficient transfer of the Client Account to such different institution so long as the custodian fee(s) charged by such institution are not materially greater than those charged by the current Custodian. Client acknowledges and agrees that FII, in its sole discretion, may direct Custodian to open and maintain such accounts with a broker-dealer that is an "affiliated person" (as defined in the Investment Advisers Act of 1940) of the Custodian. Client further acknowledges and agrees that the fees and/or commissions charged by any such affiliated broker-dealer shall be in addition to the Custodian fees assessed pursuant to the Custody Agreement.

1.4. Tax Matters. Client is responsible for all tax liabilities arising from such transactions. If Client is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Client agrees to maintain any bond required in connection with Client Account under the provisions of ERISA or other applicable law and to include within its coverage FII, any of its affiliates, officers, directors, employees or agents, and

Portfolio Manager, as may be required.

1.5.  Program Policies, Rules and Regulations.  Client's participation in the Program and any Program transactions involving Client and/or Client Account are subject to any Program trading rules and operating policies, as issued, modified or amended by FII from time to time, as well as applicable federal and state laws, rules and regulations, and the rules, regulations, customs and usages of any exchange, market, clearing agency or self-regulatory organization.

1.6.  Client's Capacity; Authority.  Client hereby represents and warrants that Client has full power, authority, and capacity to execute and deliver this Agreement (and the agreements, consents, instruments, questionnaires and applications contained within the Program Materials), and that this Agreement (along with such other items) constitutes the legal, valid, and binding obligation of Client enforceable against Client in accordance with its terms. For a retirement account, Client hereby represents and warrants that this Agreement is consistent with the document and instruments governing Client's plan and, if required, has been approved by an independent plan fiduciary of Client.

## Article 2
## FII's Obligations to Client

2.1.  Client Relationship Management.  FII will manage each Client Account and deliver investment advisory services with the following characteristics:

(a)  Individualized Management.  The Client Account will be managed on the basis of Client's financial situation and investment objectives and in accordance with any reasonable restrictions imposed by Client on the management of such Client Account.

(b)  Opening of Account.  At the opening of the Client Account, FII will obtain written information signed by Client regarding Client's individual financial situation and investment objectives (in the form of the

Client Questionnaire) and give Client the opportunity to impose reasonable restrictions on the management of the Client Account.

(c)  Annual Contact.  At least annually, FII will contact Client in writing to determine whether there have been any changes in Client's financial situation or investment objectives, and whether Client wishes to impose any restrictions on the management of such Client Account or modify existing restrictions, if any.

(d)  Quarterly Notification.  At least quarterly, FII will notify Client in writing to contact FII if there have been any changes in Client's

financial situation or investment objectives, or if Client wishes to impose any restrictions on the management of the Client Account or modify existing restrictions, if any, and FII will provide a means through which Client may contact FII to do so.

2.2.    Program Materials.    Client acknowledges that, at least 48 hours prior to Client entering into this Agreement, Client has received the following program materials (the "Program Materials"): (a) a copy of Part II of FII's Uniform Application for Registration as an Investment Adviser (Form ADV) or FII's Brochure (both referred to as "FII's Brochure") prepared by FII; (b) a copy of Part II of Portfolio Manager's Uniform Application for Registration as an Investment Adviser (Form ADV) or Portfolio Manager's Brochure (both referred to as "Portfolio Manager's Brochure"), prepared by Portfolio Manager; (c) the Custody Agreement; and (d) such other agreements, consents, instruments, questionnaires and applications relating to the Program as FII deems necessary or appropriate.

2.3.    Availability for Client Consultations.    FII will have FII and/or Portfolio Manager personnel reasonably available to Client for consultations regarding the Program, the Client Account and its management.

2.4.    Advisory Services.    In consultation with FII, Client will allocate (or direct FII to allocate) the Client Account assets to one Model Allocation and Portfolio Manager shall select the mutual funds based upon the Model Allocation selected by Client and to be based on Client's financial situation, investment objectives and any restrictions imposed by Client on the management of the Client Account. Thereafter, Portfolio Manager shall (and is hereby authorized and directed to) trade such assets in accordance with the strategies set forth in the Description of Model Allocations attached hereto as Exhibit A. Client hereby authorizes Portfolio Manager, without prior notice to, consent by or authorization of Client, to reallocate Client Account assets to and among available mutual fund families within Portfolio Manager's discretion, based on Client's financial situation, investment objectives, the parameters of the specific Model Allocation in which Client's assets are invested and any restrictions imposed by Client on the management of the Client

Account.    Following consultation with and authorization by the Client, FII may reallocate Client assets among and to the Model Allocations selected by the Client.

2.5.    Account Management Restrictions.    FII will discuss with and document for the Client any restrictions that the Client wishes to impose or change on the management of the Client Account. Any Client's imposed restrictions or changes in restrictions will be reviewed by FII and Portfolio Manager with a view toward deeming them reasonable or unreasonable. If deemed unreasonable in advance by FII or Portfolio Manager, FII may refuse to accept the Client or request modification or withdrawal of the restriction, and neither FII nor Portfolio Manager shall be obligated to manage the Client's Program assets subject to any such restrictions. FII will notify Client of any restriction or change in restriction requested by Client that FII or Portfolio Manager deems unreasonable.

2.6.    Certain Tax Matters.    FII will not be responsible for rendering any income tax advice to Client, nor shall FII be responsible to ensure that any necessary or required withdrawals are made from the Client Account in accordance with the provisions of the Internal Revenue Code of 1986, as amended. In the event that any assets held in the Client Account generate unrelated business taxable income, Client has the sole responsibility for reporting such income to the Internal Revenue Service and any other tax authorities and for complying with any other tax filing requirements resulting from receipt of such unrelated business taxable income.

2.7.    Other Transactions.    Nothing herein contained shall be construed to prevent FII, or its officers, managers, members or employees in any way from purchasing or selling any securities for its or their own account prior to, simultaneously with, or subsequent to any recommendation to, or purchase or sale for the Model Allocation, or to impose upon FII any obligation to purchase or sell, or to recommend for purchase or sale, any security which FII, its officers, directors, shareholders or employees may purchase or sell for its or their own accounts, or for the account of any other client, advisory or otherwise; provided,

however, that no such transaction shall be violative of any applicable law.

## Article 3
## Program Fees and Expenses

3.1. <u>Program Fees and Other Transaction Costs</u>.

(a) <u>Advisory Fee</u>. Client will pay a single fee (the "Advisory Fee") as set forth on the <u>Program Fee Schedule</u> attached hereto as Exhibit B, as amended by FII from time to time pursuant to Section 5.1 hereof, for investment advisory and financial management services provided to Clients by FII and Portfolio Manager in connection with the Program. Within fifteen (15) business days following the end of a calendar month, the Advisory Fee shall be automatically deducted from the Client Account in arrears for services rendered by FII and Portfolio Manager under the Program during such calendar month, or part thereof. The Advisory Fee is a *per annum* fee, calculated based on the value of the assets in the Client Account on each day of such calendar month or part thereof and as set forth in Section 3.3 below. Portfolio Manager will not directly or separately charge or seek payment from Client.

(b) <u>Partial Withdrawal Fee</u>. In addition to the Advisory Fee, FII may impose a reasonable fee of not less than One Hundred Dollars ($100), payable by Client to FII, for any partial withdrawal of mutual fund shares or cash of Client allocated to a Model Allocation as of any day that is not requested at least two (2) business days prior to the fifteenth (10th) or twenty-fifth (25th) day of a month.

(c) <u>Custodian Fee</u>. Pursuant to the Custody Agreement, Custodian will debit the account to charge Client a separate custodial fee as set forth therein (the "Custodian Fee").

3.2. <u>Transaction-Based Fees and Costs</u>. The Program fees described in Section 3.1 above do not include the expenses of the individual underlying mutual funds or transaction fees, sales loads, redemption

fees and/or contingent deferred sales charges ("CDSC") charged by persons other than FII and Portfolio Manager, such as the mutual funds and/or their distributors and/or broker-dealers (collectively, "Third-Party Charges"). Clients, as investors in such mutual funds, will bear their proportionate shares of the Third-Party Charges for the mutual funds and other investments in which each Model Allocation's assets are invested, and FII will allocate all such Third-Party Charges to the Client Account or Client Accounts involved. In connection therewith, FII will establish and maintain a Program policy and procedure to account for and properly allocate to the appropriate Client(s) any back-end CDSC or similar third-party early withdrawal transaction charges with respect to each Model Allocation within the Program. FII may delegate the performance of such accounting and allocation to a third party. Except with regard to the Third-Party Charges and the Program partial withdrawal fee described in Section 3.1(b) above, FII, Portfolio Manager and Custodian will not charge any Client any commissions, mark-ups, markdowns or other similar transaction-based fees in connection with the operation of the Program. Neither FII nor Portfolio Manager shall be compensated on the basis of a share of any capital gains upon or capital appreciation of the assets, or any capital gains upon or capital appreciation of any portion of the assets, in the Client Account.

3.3. <u>Calculation of Advisory Fee</u>. The Advisory Fee shall be the product of the value of the assets in the Client Account on each day multiplied by a certain percentage determined in accordance with the <u>Program Fees Schedule</u> set forth on <u>Exhibit B</u> hereto, as revised from time to time and as adjusted to recognize that the percentages set forth on <u>Exhibit B</u> are *per annum* and that the calculations hereunder are per day.

For shares of mutual funds, the shares will be valued by the Portfolio Manager at the reported net asset values of such shares on each day or, if no report is made on such

day, on the immediately preceding day on which a report was made.

Because Portfolio Manager shall calculate the Advisory Fee based upon daily valuation of assets, no pro-ration shall be necessary for new Client Accounts, terminations, additions or withdrawals of assets.

3.4. <u>Fee-Related Disclosure</u>. Due to the nature of the Program, FII makes the following disclosures and Client understands and agrees to the following: (a) Client

would not be obligated to pay the Advisory Fee payable to FII under this Agreement if Client invested outside of the Program directly in the underlying mutual funds of each Model Allocation; and (b) the Advisory Fees payable by Client hereunder are for the personal investment advisory services rendered hereunder, and do not include any Third-Party Charges or expenses of underlying mutual funds such as any Rule 12b-1 fees and investment management fees.

<u>**Article 4**</u>
<u>**Alternative Dispute Resolution**</u>

Client agrees that any and all claims or controversies which may arise among or between Client, FII, Custodian, and/or Portfolio Manager involving any Program-related transaction or the construction, performance, or breach of this Agreement or any other Program-related agreement between or among the parties, whether entered into prior, on or subsequent to the date hereof or relating in any way to the Program, shall be settled and determined by the alternative dispute resolution procedures set forth below.

4.1. <u>Negotiation</u>. The parties will attempt in good faith to resolve any controversy or claim involving, arising out of or relating to any such transaction, this Agreement, any other Program-related agreement or the Program promptly by negotiations between FII and Client. If the parties do not reach a satisfactory solution within a period of 30 days, then, upon notice by any party to the other parties hereto, the matter shall be finally settled by binding arbitration as set forth below.

4.2. <u>Binding Arbitration</u>. Following negotiations, any outstanding controversy or claim shall be settled by binding arbitration, which shall be conducted before a single, neutral arbitrator having experience with and knowledge of the securities and investment advisory industry. The arbitration shall proceed under the arbitration rules then in force in the State of Ohio or such other arbitration rules to which the parties may mutually agree. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof or

application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be. In rendering the award, the arbitrator shall determine the rights and obligations of the parties in accordance with the laws of the State of Ohio and applicable federal laws of the United States. The arbitration award shall be in writing and shall specify the factual and legal basis for the award. The site of the arbitration shall be Ohiopolis, Ohio, or at any other place selected by mutual agreement of the parties. Client hereby consents and submits to personal jurisdiction in the federal and State courts located in the State of Ohio to interpret or enforce any or all of these arbitration provisions and hereby waives any objection to the personal jurisdiction or venue to any such action in any of the federal or State courts located in the State of Ohio.

4.3. <u>Remedies and Expenses</u>. Unless the applicable arbitration rules require otherwise, the arbitrator will have no authority to award punitive, incidental or special damages not measured by the prevailing party's actual damages (and each party hereby waives any right to any form of damages other than actual damages). The arbitrator is authorized to award any party or parties sum(s) deemed proper for the time, expense, and trouble of arbitration, including arbitration fees, but excluding attorneys fees and expenses.

4.4. <u>Consolidation</u>. Arbitration proceedings under this Agreement may be consolidated with arbitration proceedings pending

between other Clients of the Program and/or any affiliates thereof and between parties and Portfolio Manager and/or Custodian if the arbitration proceedings arise from the same transaction or relate to the same subject matter. Consolidation will be by an order of the arbitrator in any of the pending cases, or, if the arbitrator fails to make such an order, any party may apply to any court of competent jurisdiction for such an order.

4.5.  Confidentiality.  Neither a party nor an arbitrator may disclose the results of any arbitration hereunder without the prior consent of the other parties hereto, except as required by applicable law.

4.6.  General ADR Provisions.  The procedures specified in this Article shall be the sole and exclusive procedures for the resolution of disputes between and among Client, FII, the Custodian, and/or Portfolio Manager arising out of or relating to this Agreement and the Program; provided, however, that a party may seek a preliminary injunction or other preliminary judicial relief if such action is necessary to avoid irreparable damage.  Despite such action, the parties will continue to participate in good faith in the procedures specified above.

## Article 5
## Miscellaneous Provisions

5.1.  Amendments.  As permitted by applicable law, by advance written notice to Client, FII shall have the right to amend this Agreement by modifying or rescinding any of its existing provisions or by addition of a new provision.  Any such amendment shall be effective as of a date to be established by FII.  However, any amendment to the schedule of fees under Article 3 above, which has the effect of increasing such fees, shall be subject to and conditioned upon sixty (60) days advance written notice to Client by FII.

5.2.  Effective Date; Termination.  The effective date of this Agreement shall be the later of (i) the date of acceptance by FII, or (ii) the date the minimum amount of funds required by the Program as determined by FII from time to time is made available to FII for management.  This Agreement shall remain in effect unless services are terminated by one of the parties.  Either party, in its discretion, may close the Client Account and terminate services rendered under this Agreement at any time and for any reason upon ten (10) days written notice to the other party.  Further, in the event Client terminates the Custody Agreement, the services rendered hereunder shall terminate as of the date the Custody Agreement terminates.  Termination of services under this Agreement shall not, in any case, affect or preclude the consummation of any transaction initiated prior to such termination.

5.3.  Assignment and Binding Effect.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties.  Subject to the foregoing, all of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of the parties hereto.

5.4.  Waiver.  Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof by a written instrument duly executed by such party.

5.5.  Notices.  Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by telegram or by registered or certified mail, postage prepaid, as follows:

If to FII, to:

> FII First Insurance & Investments, Inc.
> 419 Fifth Street Suite 1200
> Defiance, Ohio 43512
> Attention: Steve G.. FII

If to Client, to:  The address designated on the Client Questionnaire

or to such other address as the addressee

may have specified in a notice duly given to the sender as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, telegraphed or mailed.

5.6.  Ohio Law to Govern.  This Agreement shall be construed as a contract made in the State of Ohio and shall be governed by and interpreted and enforced in accordance with the laws of the State of Ohio.

5.7.  No Benefit to Others.  The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their heirs, executors, administrators, legal representatives, successors and assigns, and they shall not be construed as conferring any rights on any other persons.

5.9.  Schedules, Exhibits and Program Materials.  All Exhibits and Schedules referred to herein and the Program Materials are intended to be and hereby are specifically made a part of this Agreement.

5.10.  Severability.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

5.11.  Further Assurances.  The parties hereto agree that they will cooperate with each other and will execute and deliver, or cause to be delivered, all such other instruments, and will take all such other actions, as any other party hereto may reasonably request from time to time to carry out the provisions and purposes of this Agreement.

5.12.  Disclosure of Account Information.  FII may disclose Client's name and/or information about the Client Account or Client's transactions to affiliates of FII and to third parties in the following limited circumstances: (a) to banks, mutual funds, Portfolio Manager and other business

entities that participate in administering the services FII provides Client; (b) when it is reasonably requested by a third party to complete a transaction authorized pursuant to this Agreement; (c) to verify the existence or condition of the Client Account for a credit bureau, merchant, or collections agency; (d) to comply with a subpoena, court order, or request from a government agency or law enforcement authority; or (e) if Client gives FII permission in a circumstance not described above in this Section 5.12. Notwithstanding the foregoing, Portfolio Manager is prohibited from soliciting or transacting business with Client without the prior consent of FII.

5.13.  Losses Due to Extraordinary Events. Neither FII nor Portfolio Manager is responsible and Client agrees not to hold either of them liable for losses caused directly or indirectly by conditions beyond FII's and/or Portfolio Manager's control, including, without limitation, war, acts of terrorism, natural disaster, government restrictions, exchange or market rulings, strikes, interruptions of communications or data processing services, news analysts' reports, market volatility, or disruption in orderly trading on any exchange or market.

5.14.  Standard of Liability.  FII and Portfolio Manager each will be using its respective best efforts in the management of the Client Account.  Except for negligence or malfeasance, or violation of applicable law, neither FII, Portfolio Manager nor any of the officers, directors, shareholders, members, and employees of either shall be liable for any action performed or omitted to be performed or for any errors of judgment in managing the Client Account.  The federal securities laws impose liabilities in certain circumstances on persons who act in good faith, and therefore nothing herein shall in any way constitute a waiver or limitation of any rights which Client may have under any federal securities laws.

5.15.  Joint or Multiple Party Accounts.  If there is more than one owner of a Client Account, each owner is jointly and severally liable for obligations arising under this Agreement or relating to the Client Account. Each owner of the Client Account has authority, acting individually and without

notice to any other owner, to deal with FII as if that owner is the sole owner of the Client Account. FII is authorized to follow the instructions of any joint owner of a Client Account and to deliver funds, securities or other assets in the Client Account to any owner of the Client Account or on any Client Account owner's instruction. FII is not responsible for determining the purpose or propriety of an instruction FII receives from a Client Account owner or for the disposition of payments or deliveries among multiple owners of a Client Account. FII reserves the right, in its sole discretion, to require written instructions from all owners of a Client Account.

5.16.  Proxy Voting. Client hereby delegates to FII the right to receive and vote any proxy materials related to the underlying portfolio securities in the Client Account ("Proxy Materials") in the event Proxy Materials are delivered to FII and/or Custodian on Client's behalf. Client acknowledges and understands that FII may elect not to vote any Proxy Materials received on behalf of Client. Notwithstanding this waiver as to receipt of Proxy Materials, Client may subsequently elect to receive Proxy Materials by providing written notice to FII.

5.17.  Complete Agreement. This Agreement represents a complete and total integration of the agreement of the parties hereto and supersedes any prior or contemporaneous written or oral agreements relating to its subject matter.

IN WITNESS WHEREOF, the parties hereto have entered into this Client Agreement at Defiance, Ohio, as of the __ day of ____, 20__.

"FII"

FII First Insurance & Investments, Inc.

By: _____

Printed Name: _____

Title: _____

"Client "


_____
(Signature)

Printed Name: _____

Title, if any: _____

Revised as of 05/15/06

# Exhibit A

## Description of Model Allocations

Clients in the FII Investment Advisory Program will have the ability to choose from the following five Model Allocation Portfolios:

### FII 20/80

The 20% growth/80% income Portfolio provides investors with an opportunity to build wealth through a conservative risk managed approach. With 80% of the portfolio invested in fixed income assets, exposure to the stock market is limited, and the bond markets provide a consistent stream of income for the investor. In an attempt to keep pace with inflation, the portfolio invests 20% into the stock market, which raises the growth potential over that of a portfolio void of stock exposure.

### FII 40/60

The 40% growth/60% income Portfolio provides a balanced investment approach, with a touch of conservative emphasis. The Portfolio has a healthy exposure to the stock market, with 40% of its assets diversified throughout the stock market; however, this exposure is moderated by a strong bond presence. With 60% of the portfolio assets in the bond markets, the investor can receive a consistent stream of income and some protection from a downward stock market.

### FII 60/40

The 60% growth/40% income Portfolio provides a fairly balanced investment approach with an emphasis on growth. The Portfolio is more resistant to inflation with an increased potential for growth. Its 40% bond presence provides income to the investor, as well as market downturn protection.

### FII 80/20

The 80%growth/20% income Portfolio provides almost complete exposure to the stock market, with an aggressive approach towards increasing growth. A small bond presence is maintained, but income generation and downturn protection is limited.

### FII 100/00

The 100% Equity Portfolio is the most aggressive portfolio and offers full exposure to the stock market. The 100% Equity Portfolio is diversified between domestic and international stocks, with no exposure to the bond market.

**Exhibit B**

**Program Fees Schedule**
as of
May 15, 2006

| Individual Client Assets | RIA Fee | Trust Fee | OBS | Statements & Web Access | Total Client Fee |
|---|---|---|---|---|---|
| $0 to $50,000 | 130 bps | 10 bps | 35 bps | INCLUDED | 175 bps |
| $50,001 to $100,000 | 130 bps | 10 bps | 35 bps | INCLUDED | 175 bps |
| $100,001 to $250,000 | 130 bps | 10 bps | 35 bps | INCLUDED | 175 bps |
| $250,001 to $500,000 | 105 bps | 10 bps | 35 bps | INCLUDED | 150 bps |
| $500,001 to $750,000 | 75 bps | 10 bps | 30 bps | INCLUDED | 125 bps |
| $750,001 to $1,000,000 | 75 bps | 10 bps | 30 bps | INCLUDED | 125 bps |
| $1,000,001 to $2,000,000 | 75 bps | 10 bps | 25 bps | INCLUDED | 110 bps |
| $2,000,001 to $5,000,000 | 60 bps | 010 bps | 20 bps | INCLUDED | 90 bps |
| $5,000,001 to $10,000,000 | 60 bps | 10 bps | 20 bps | INCLUDED | 90 bps |
| $10,000,001 or Greater | 60 bps | 10 bps | 20 bps | INCLUDED | 90 bps |

**Additional Charges to Clients**.  Except for ticket charges and web-based account access charges, the Program fees described above do not include the expenses of the individual underlying mutual funds or transaction fees, sales loads, redemption fees and/or contingent deferred sales charges charged by persons other than FII and Portfolio Manager such as the mutual funds and/or their distributors and/or broker-dealers (collectively, "Third-Party Charges").  Clients, as investors in such mutual funds, will bear their proportionate shares of the Third-Party Charges for the mutual funds in which each Client's assets are invested.

### Exhibit 1.2(d)

### Client Waiver of Immediate Trade
### Confirmations and Consent to Receive
### Periodic Activity Statements
### [First Insurance & Investments Advisory Program]

The undersigned client ("Client") of First Insurance & Investments, Inc, (the "Program") sponsored by First Insurance & Investments, Inc, (the "Sponsor") has previously entered into a First Insurance & Investments Investment Advisory Program Client Agreement with Sponsor (the "Client Agreement") and hereby agrees as follows:

1.  Client understands that Client has a choice between receiving immediate trade confirmation statements upon completion of each account transaction as set forth in the Client Agreement or the opportunity to waive immediate confirmation statements and, instead, receive periodic statements.

2.  Client hereby elects to waive receipt of immediate trade confirmation statements under the Program and, instead, consents to the receipt of periodic activity statements.

3.  Client understands that Client may at any time elect, at no additional cost to Client, to receive immediate confirmations for any prior transactions effected since the immediately preceding periodic activity statement and for all subsequent transactions at no additional cost. Client shall make such election, if at all, by sending a signed, written notice to Sponsor to that effect.

4.  Client understands and acknowledges that neither Sponsor nor the Portfolio Manager (as defined in the Client Agreement) currently acts, or in the future shall act, as principal in transactions regarding the Client's Account (as defined in the Client Agreement) under the Program as long as this Client Waiver and Consent is in effect.

5.  Client understands that Client will not be charged any commissions, mark-ups, mark-downs or other transaction-based fees by either Sponsor or the Portfolio Manager as long as this Client Waiver and Consent is in effect.

6.  Except as set forth herein, the Client Agreement remains in full force and effect.

_____
(Signature)

_____
(Printed Name)

_____
(Date of Signing)

### Exhibit 2.1

### Description of Model Allocations

Clients in the FII Investment Advisory Program will have the ability to choose from the following five Model Allocation Portfolios:

#### FII 20/80
The 20% growth/80% income Portfolio provides investors with an opportunity to build wealth through a conservative risk managed approach.  With 80% of the portfolio invested in fixed income assets, exposure to the stock market is limited, and the bond markets provide a consistent stream of income for the investor.  In an attempt to keep pace with inflation, the portfolio invests 20% into the stock market, which raises the growth potential over that of a portfolio void of stock exposure.

#### FII 40/60
The 40% growth/60% income Portfolio provides a balanced investment approach, with a touch of conservative emphasis.  The Portfolio has a healthy exposure to the stock market, with 40% of its assets diversified throughout the stock market; however, this exposure is moderated by a strong bond presence.  With 60% of the portfolio assets in the bond markets, the investor can receive a consistent stream of income and some protection from a downward stock market.

#### FII 60/40
The 60% growth/40% income Portfolio provides a fairly balanced investment approach with an emphasis on growth.  The Portfolio is more resistant to inflation with an increased potential for growth.  Its 40% bond presence provides income to the investor, as well as market downturn protection.

#### FII 80/20
The 80%growth/20% income Portfolio provides almost complete exposure to the stock market, with an aggressive approach towards increasing growth.  A small bond presence is maintained, but income generation and downturn protection is limited.

#### FII 100/00
The 100% Equity Portfolio is the most aggressive portfolio and offers full exposure to the stock market.  The 100% Equity Portfolio is diversified between domestic and international stocks, with no exposure to the bond market.