

June 19, 2008

**VIA FEDERAL EXPRESS**
Phillip J. Smith, Esq.
Vorys, Sater, Seymour and Pease LLP
221 East Fourth Street
Suite 2000, Atrium Two
Cincinnati, OH 45201-0236

Re:     Insured:              First Insurance and Investments/
                               First Federal Bank of the Midwest/
                               *Jeffrey Hunt*
        Financial Institution Bond No.:    10036276-03
        Claim No.:                         07 1417186

Dear Mr. Smith:

        This letter is Progressive Casualty Insurance Company's ("Progressive") coverage analysis for the above captioned claim. The purpose of this analysis is to apprise the First Federal Bank of the Midwest ("the Bank" or "FFBM") and First Insurance and Investments ("FII") of Progressive's position with respect to coverage under the above-captioned Financial Institution Bond (the "Bond") based on a careful review of all the facts known to us at this time. Progressive must advise that no coverage is found under the Bond for the losses claimed.

        The reasons for the denial of the Claim are discussed fully below. In general, the denial of the Claim is based on the requirement in the Financial Institution Bond that loss, in order to find coverage, must be "direct loss," whereas the matters submitted in the proof of loss (except for the referenced Ballinger matter, which is also discussed herein) are amounts paid by the Bank to resolve third-party liability claims associated with losses which occur in accounts held at or through Online Brokerage Services, Inc. ("OBS"), the broker-dealer, and National Financial Services, LLC ("NFS"), the custodian and clearing agent.

        There is one exception to this analysis, a loss sustained by Floyd Ballinger. I refer specifically to the $56,597.01 check made payable to Sun Life which Jeffrey Hunt contrived to deposit into his own HUNT DBA CAPITAL PLATINUM PROPERTIES checking account at the Bank. This loss is different because at the time of the theft, the Bank held Ballinger's loss and thus, the theft of those funds qualifies for coverage under Insuring Agreement (A). However, exclusion (y) applies to this loss, because it was a "loss resulting directly or indirectly from accepting checks payable to an organization [Sun Life] into an account of a natural person [Hunt doing business as "Capital Platinum Properties"]. Thus, although this theft represents a direct loss, it is not covered under the Bond.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 2

# I.    BACKGROUND

### A.    Introduction

This claim is brought by the Bank under Insuring Agreement (A) and seeks indemnity for (a) amounts paid by the Bank and/or its subsidiary FII in settlement of third-party claims arising out of the alleged infidelity of former Bank/FII employee Jeffrey Hunt, the details regarding which are found in the proof of loss; and (b) liability the bank may incur as a result of third-party claims that have not been settled by the Bank, details regarding which are found in your letter dated September 20, 2007.

The Bank was notified orally on September 28, 2007, and then in writing on October 2, 2007, that Progressive's preliminary analysis was that these losses are not covered under the Bond, because they occurred in accounts maintained at the broker-dealer and/or its custodian, and not in accounts of the Bank or FII, and as such, were not a "direct loss."

### B.    Progressive's Insureds

The Bank has its headquarters in Defiance, Ohio and was an insured of Progressive from November 26, 2003 to November 26, 2007 on bond, CSD and IBL policies only, and never on a D&O/Entity policy. FII, an insurance agency in Defiance acquired by the Bank, supplements the banking services offered by FFBM and provides certain insurance and other offerings to its customers and those of the Bank. For instance, during all times relevant to this Claim, a customer of the Bank could obtain investment advisory services from FII, and could gain assistance and access to retirement and investment solutions, such as annuities, life insurance, and other offerings.

### C.    Relationship between Bank/FII and Online Brokerage Services, Inc.

Beginning in 2004, the Bank and FII entered into a business relationship with an unrelated entity called Online Brokerage Services, Inc. ("OBS"). OBS is not an insured of Progressive. OBS developed and offers a turn-key online brokerage investing solution to various financial institutions. OBS is licensed as a broker-dealer with the NASD. One of the features which OBS offers to the financial institutions that form its customer base is the provision of registered representatives which hold their registrations through OBS. These registered representatives typically are employed by the banks or their investment subsidiaries, and they are employed as well by OBS under a "dual employee" relationship. In this fashion, OBS provided the NASD Series 7 representative licenses to a number of dual employees who worked for OBS and who were also employed by the Bank and/or FII.

The contractual relationship between OBS and the Bank is defined in an executed agreement made between them on August 1, 2004. Under this agreement, the Bank owes

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 3

one central duty: the provision to OBS of the names, addresses and telephone numbers of "Customers" of the Bank.  OBS bears responsibility for the design of a "non-deposit investment program" to be offered to Customers; the offer of "non-deposit investment products" to be "offered and sold only by licensed registered representatives of [OBS] who are also employees" of FII, or through a website designed by OBS;  product selection; compliance supervision and training; back office services; and website access.  Agreement, ¶ 2.

OBS agreed to indemnify the Bank and hold it harmless "against all claims and damages, including reasonable attorneys' fees and costs, arising out of the broker/dealer activities to be conducted by the Corporation pursuant to this Contract or the Corporation's breach of this Contract; provided, however, that such indemnification shall not apply to claims and damages relating to the Bank's breach of this Contract."  Agreement, ¶ 12(a).

OBS also agreed "that all Registered Representatives will be insured, until notified otherwise by the Corporation, under the Corporation's errors and omissions insurance policy."  The policy is described to "currently [have] a coverage level of $1 million aggregate/$1 million per occurrence."  On execution of the agreement, the Bank and its directors and officers shall be caused to be "listed as additional insureds to this errors and omissions insurance policy."  In the event that OBS intends to alter these arrangements, OBS agrees to give the Bank advance prompt notice of such a change or lapse in the policy.  Agreement, ¶ 12(a).

### D.  Online Brokerage Services Utilizes National Financial Services, LLC as Custodian of Investment Accounts

The custodian of the investment accounts is National Financial Services, LLC ("NFS"), which also serves as OBS's clearing house for trades.  Thus, property, such as stock, bond, mutual fund and other holdings maintained in the investment accounts of the customers of the Bank and/or FII who choose to open up accounts by and through OBS are actually entrusting the custody of their assets to NFS as custodian of such property, and not to the Bank or FII.

### E.  Jeffrey Hunt, the Employee Whose Dishonest and Fraudulent Acts Are At Issue in This Fidelity Claim

Jeffrey Hunt, 30, was considered a dual employee of FII and/or the Bank, on the one hand, and OBS on the other hand.  Hunt received a NASD Series 7 license to act as a broker through his status with OBS.  (Several other investment advisors worked with Hunt and were also employees of the Bank/FII and of OBS jointly.)  All of the compensation to these dual employees was paid by the Bank.  These brokers are described in the Brokerage Services Agreement as "Registered Representatives."

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 4

Under the terms of the agreement between OBS and the Bank, OBS was responsible for supervising Hunt's brokerage activities. Section 2(b) of the Agreement, at p.1, states that "[w]hile performing the brokerage services contemplated as being provided by [OBS] and its representatives pursuant to the terms of the Contract, the Registered Representatives shall be under the exclusive control and supervision of [OBS]."

The Bank provided Progressive with a copy of a brochure that once was offered by the Bank/FII to parties interested in investment options. This FII brochure shows a picture and description of Hunt, and prominently identifies OBS as the entity where a customer's online brokerage account actually resides. The brochure states:

> Securities offered through Online Brokerage Services, Inc. Member NASD, SIPC, NFA. Online Brokerage Services is not affiliated with First Insurance and Investments or First Federal Bank of the Midwest. Investments are: Not FDIC Insured – May Lose Value – Not a Deposit – No Bank Guarantee – Not Insured by Any Federal Government Agency.

When a Bank customer desired to open a brokerage account, a Bank/FII employee provided to him or her with a number of documents for completion and signature. These included a "Brokerage Account Application," an exemplar of which was completed and signed by Bradley Mangas and which is attached as Exhibit A. This form was prepared by NFS for use by broker-dealers who utilize NFS, and the customers of those broker-dealers. (By referring generically to a broker-dealer for a generic "customer," the form suggests that it is prepared for use by various broker-dealers across the country that utilize NFS as a custodian and clearing agent.) The customer's completion of and signature on the application represents his agreement to be bound by and to adhere to the terms and conditions of the form of Brokerage Account Customer Agreement, which is made a part of the form of the Application.

## F.     Important Provisions of the Account Agreement

Several of the provisions of the Brokerage Account Customer Agreement have significance to an analysis of the respective roles of the Bank and/or FII, OBS and NFS. Section 1 ("Nature of Services Provided") states as follows:

> I understand that all information supplied by the undersigned will be subject to verification, and that the information on this application is correct. I understand that you have entered into an agreement with National Financial Services, LLC ("NFS") (a NYSE member firm) to execute and clear all brokerage transactions. National Financial Services LLC will provide margin loans if the account applies for and is approved for margin lending. I understand that neither you nor NFS provide investment advice in connection with this account nor do you give advice or offer any opinion with respect to the suitability of any security or order and that no fiduciary relationship exists.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 5

Section 17 ("Account Protection") states as follows:

> Securities in accounts carried by National Financial Services LLC ("NFS"), a Fidelity Investments company, are protected in accordance with the Securities Investor Protection Corporation ("SIPC") up to $500,000 (including cash claims limited to $100,000). For details, please see www.spic.org. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. This additional protection covers total account net equity in excess of the $500,000/$100,000 coverage provided by SIPC. Neither coverage protects against a decline in the market value of securities.

The Agreement, immediately following the end of Section 19, contains a "Notice to the Customer" ("You"), which provides in pertinent part as follows:

> New York Stock Exchange Rule 382 requires that your Broker/Dealer and NFS allocate between them certain functions regarding the administration of your brokerage account.  The following is a summary of the allocation services performed by your Broker/Dealer and NFS.  A more complete description is available upon request.
>
> **Your Broker/Dealer is responsible for** (1) obtaining and verifying brokerage account information and documentation, (2) opening, approving and monitoring your brokerage account, (3) transmitting timely and accurate instructions to NFS with respect to your brokerage account, (4) determining the suitability of investment recommendations and advice, (5) operating and supervising your brokerage account and its own activities in compliance with applicable laws and regulations, including compliance with margin rules pertaining to your margin account (if applicable), and (6) maintaining the required books and records for the services it performs.
>
> **NFS shall perform the following tasks at the direction of your Broker/Dealer:** (1) execute, clear and settle transactions processed through NFS by your Broker/Dealer, (2) prepare and send transaction confirmations and periodic statements of your brokerage account (unless your Broker/Dealer has undertaken to do so).  Certain pricing and other information may be provided by your Broker/Dealer or obtained from third parties, which has not been verified by NFS, (3) act as custodian for funds and securities received by NFS on your behalf, (4) follow the instructions of your Broker/Dealer with respect to transactions and the receipt and delivery of funds and securities for your b account, and (5) extend margin credit for purchasing or carrying securities on margin.  Your Broker/Dealer is responsible for ensuring that your Broker/Dealer is in compliance with federal, industry and NFS margin rules, and for advising you of margin requirements. NFS shall maintain the required books and records for the services it performs.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 6

Another document which the Bank/FII provided to Bank customers who desired to open a brokerage account included a "Financial Institutions Disclosure Form," which provides as follows:

### Financial Institutions Disclosure Form

This disclosure is made a part of the brokerage account application to ensure that the client fully understands the separation of the traditional bank accounts and the new brokerage account being established. Please initial each item where indicated and sign at the bottom stating your understanding of these important points.

_____ I/We understand securities accounts are not FDIC insured; and

_____ I/We understand that funds in an investment account are not deposits or other obligations of the bank and are not guaranteed by the bank; and

_____ I/We understand investment account asset are subject to market risk, including the possible loss of the principal invested.

_____
(Primary Account Holder)

A copy of this Financial Institutions Disclosure Form is attached as Exhibit B.

All customers of the Bank who requested to open a brokerage account at OBS/NFS should have entered into such agreements, consistent with the requirements established by the Bank and OBS for opening such accounts.

### G.     FII's Role as a Registered Investment Advisor

FII acts as a registered investment advisor ("RIA") for individuals, families, entities and other types of customers. A copy of the Investment Management Agreement signed by Customer Brad Mangas is attached as Exhibit C. For customers who sign an agreement in which FII agrees to act for the customer as an RIA, a fee-based account is opened for the customer through OBS. The fee charged can vary, but is usually a quarterly charge of approximately one to two percentage points of the balance of the account. These accounts have a prefix of "LMN." If the customer is not using FII as a registered investment advisor, then the account is a straight brokerage account and bears a prefix of "LMW." On these accounts, the Bank receives a percentage of commissions charged on trades in the account. In either case, the accounts are not held at the Bank, and instead are arranged through OBS and are held by NFS. The account statements themselves reflect that the custodian of the accounts is NFS, which also acts as the clearing agent employed by OBS to carry out the trades in these accounts as instructed. A

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 7

copy of such an account statement for Mr. Mangas (which also shows FII's name at the top) is attached as Exhibit D.

Customers also occasionally purchase annuities, both fixed and variable. In either case, these products are classified as securities and the transactions go through OBS in some fashion. As an example, a customer would send money to the annuity provider, and the annuity provider would enroll the customer directly in the annuity. The insurance company would pay OBS a sum reflecting a commission earned, and then OBS would split the commission with FII and/or the Bank.

### H.     Jeffrey Hunt's Scheme to Convert Monies to His Own Control and Usage

The Bank's investigation indicates (and my own investigation corroborates) that, using a variety of techniques, Hunt began (in May, 2006) to divert monies – without authorization – from certain of the accounts assigned to him as a Registered Representative. Most of the unauthorized transfers were made into a checking account at the Bank which Hunt opened. This account is a checking account opened under the name "JEFFREY D. HUNT DBA CAPITAL PLATINUM PROPERTIES." The majority of the loss for which he is responsible arose through the use of unauthorized wire transfer requests. (Hunt seems not to have been aware that customer signatures were not required in order for a wire transfer request to be processed, although paradoxically, the pre-printed wire transfer forms do bear a space for a customer to sign.) The wire transfers in question transferred monies from investment accounts of bank customers that are maintained through OBS and NFS as custodian, into the HUNT DBA CAPITAL PLATINUM PROPERTIES checking account. "Capital Platinum Properties" is not actually a legal entity. It appears to have been merely a name assigned by Hunt to a checking account which he used to gather monies taken from clients, kept a distance apart from his other personal and family finances.

### I.     Discovery of Hunt's Scheme on April 30, 2007, and Hunt's Response

A few days prior to April 30, 2007, a Bank customer spoke with a Bank employee (not Hunt) about a discrepancy in his account held at OBS. This customer had previously asked Hunt about other discrepancies, and Hunt had made persuasive assurances which persuaded the customer to trust and believe Hunt that nothing was afoul. This time, however, the customer spoke with someone other than Hunt, and this led to an ever-widening investigation of Hunt's involvement in certain of the online brokerage accounts of a number of customers.

On April 30, 2007, Hunt was confronted by management. Initially, he put up a strong front and attempted to provide a broad exculpatory explanation. He contended that he had been granted broad investment and advisory discretion by some or all of the customers in question, and that the monies which were transferred out of the customer accounts represented investments in and/or loans to a business called The Stake

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 8

Company, LLC. Hunt had recently purchased an interest in The Stake Company. Certain of the monies transferred to the JEFFREY D. HUNT DBA CAPITAL PLATINUM PROPERTIES checking account were used directly to make purchases on behalf of The Stake Company, or were transferred to the checking account of The Stake Company held at Fifth Third Bank. Some of the monies were used to purchase equipment for the wooden stake business.

Hunt was eventually discharged from his employment at the Bank/FII. To date, no criminal charges have been brought against Hunt.

### J.    The Bank's Litigation With Hunt, and the Bank's Recoveries To Date

The Bank brought a lawsuit against Hunt, The Stake Company, and a family trust associated with Hunt, among others. The civil case remains pending.

However, Hunt has surrendered certain monies and/or rights he enjoyed, which have resulted in some modest recoveries. The proof of loss lists $32,106.88 in recovered sums: $4,974.68 from deposit accounts of Hunt, and $27,132.20 which he surrendered from his 401(k) account. Since these recoveries, the Bank has received a return of $11,199.34 from a customer named Chris Beck. Mr. Beck had received monies intended to compensate him for a transfer of REIT shares to another OBS account holder, but the transaction never went forward, and until recently, Beck had retained the monies. An additional $26,306.63 was recovered from Hunt's ESOP account. Lastly, FII and/or the Bank received $50,000 paid by Cincinnati Insurance Company on a claim submitted on its commercial crime policy. Thus, the total amount recovered to date is $119,612.85.

## II.    COVERAGE FOR DEFALCATIONS FROM ACCOUNTS MAINTAINED AT OBS AND/OR NFS

The Bond contains a Brokerage Services Modification endorsement. The Brokerage Services Modification expands the definition of Employee contained in the Bond and adds to subsection (1):

> (iii)    for the purpose of providing brokerage or investment advisory services only, the definition shall also include a Dual Employee who is defined as a registered representative of a third-party broker/dealer who shall be registered and qualified with the National Association of Securities Dealers (NASD) and who shall undertake such employment by the broker-dealer in addition to his or her employment by the Insured.

Thus, for purposes of Bond analysis, and by operation of the Brokerage Services Modification endorsement, Hunt is an Employee under the Bond.

In addition, the Brokerage Services Modification adds certain exclusions to those contained in Conditions and Limitations, Section 2 of the Bond, as follows:

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 9

(a)     loss resulting directly or indirectly from any dishonest or fraudulent act or acts committed by any non-Employee who is a securities, commodities, money, mortgage, real estate, loan, insurance, property management, investment banking broker, agent or other representative of the same character, unless covered under Insuring Agreement (A);

(b)     loss resulting directly or indirectly from any actual or alleged representation, advice, warranty or guarantee as to the performance of any investments;

(c)     loss due to liability imposed upon the Insured as a result of the unlawful disclosure of non-public material information by the Insured or any Employee, or as a result of any Employee acting upon such information, whether authorized or unauthorized;

(d)     loss to any third party broker/dealer with whom the Insured shares any Dual Employee;

(e)     For the purpose of providing brokerage or investment advisory services only, loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money, securities or precious metals, directly from a customer's account by an Employee provided such unlawful withdrawal and conversion is covered under Insuring Agreement (A).

The Brokerage Services Modification contained in the Bond does not contain an Insuring Agreement.  An analysis of coverage for the items of loss relating to the Hunt matter in fact requires an analysis of Insuring Agreement (A), which is the Fidelity Part. The pertinent portion of Insuring Agreement (A) is as follows:

The Underwriter, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

### FIDELITY

(A)     Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(1)     to cause the Insured to sustain such loss, and

(2)     to obtain an improper financial benefit for the Employee or another person or entity....

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 10

Pursuant to the terms of the Brokerage Services Agreement between OBS and FII/the Bank, the "Registered Representatives" (such as was Mr. Hunt) shall be under the "exclusive control and supervision of [OBS]." The investment accounts at issue are not held at the Bank or FII, and instead are arranged through OBS. The account statements themselves reflect that the custodian of the accounts is NFS, which also acts as the clearing agent employed by OBS to carry out the trades in these accounts as instructed.

The Bond does not cover loss resulting from Mr. Hunt's misappropriation of funds (property) from customer accounts maintained with OBS and/or its custodian, NFS. This is because the Brokerage Services Modification leaves unchanged the Bond's requirement that loss caused by employee infidelity (Insuring Agreement (A)) must be "direct loss" in order for the Bond to provide coverage for the loss. Here, the Bank has made payments to third parties (e.g., bank/OBS/NFS customers) who were injured by Hunt's misconduct. Such payments to resolve third-party claims are not covered by the Bond.

The bond's requirement that loss must be direct in order to find any coverage is supported by a substantial body of case law. See, e.g., The Vons Companies v Federal Ins. Co., 212 F.3d 489, 491-93 (9th Cir. 2000) (fidelity coverage does not extend to third party claims brought arising out of the infidelity of the insured's employee). A fidelity insuring agreement only indemnifies the insured for direct loss sustained by that insured, and does not provide coverage to indemnify the insured for its liability to third parties. See, e.g., Finkel v. St. Paul Fire & Marine Ins. Co., 2002 U.S. Dist. LEXIS 11581 (D. Conn. June 5, 2002); In re Ben Kennedy and Assoc., Inc., 40 F.3d 318 (10th Cir. 1994); Lynch Properties Inc. v. Potomac Ins. Co., 962 F. Supp. 956 (N.D. Tex. 19960, aff'd, 140 F.3d 622 (5th Cir. 1998).

The nature of the losses set forth in the Bank's submissions to Progressive, and the details regarding the relationship between the Bank, FII, OBS and NFS, demonstrate that the losses sustained by the third-parties (here, the customers with brokerage accounts maintained at OBS and/or NFS) are not "Covered Property" for purposes of the Bond. That provision, Section 12, states as follows:

COVERED PROPERTY

Section 12. This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss. This bond shall be for the sole use and benefit of the Insured named in the Declarations.

Property is term defined in Section 1 of the Policy as follows:

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 11

    (r)      Property means Money, Certificated Securities, Negotiable Instruments, Certificates of Deposit, Documents of Title, Evidences of Debt, Security Agreements, Withdrawal Orders, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records stored on tangible media, gems, jewelry, precious metals in bars or ingots, (which are collectively the enumerated items of Property), and tangible items of personal property which are not hereinbefore enumerated.

As applied to this Claim, the investments maintained in the accounts held by the third-parties who sustained losses (namely, the Bank's customers that chose to open accounts at OBS and/or NFS) are not "Property... owned by the Insured"; they are not Property "held by the Insured in any capacity"; and they are not Property "owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss." The Account Agreement entered into by the account holder (Ex. A) makes clear that NFS (not the Bank) acts as custodian of the funds and securities received by NFS on behalf of the account holder. Moreover, the account holders initialed and signed a Financial Institutions Disclosure Form (Ex. B) acknowledging that "securities accounts are not FDIC insured," that the 'funds in an investment account are not deposits or other obligations of the bank" and that they "are not guaranteed by the bank."

These contractual arrangements are echoed in the statements and recitals found on the monthly account statements themselves, and in the FII brochure provided to Bank customers interested in opening a brokerage account through OBS and NFS. The brochure states plainly that

    Securities offered through Online Brokerage Services, Inc. Member NASD, SIPC, NFA. Online Brokerage Services is not affiliated with First Insurance and Investments or First Federal Bank of the Midwest. Investments are: Not FDIC Insured – May Lose Value – Not a Deposit – No Bank Guarantee – Not Insured by Any Federal Government Agency.

As is discussed more fully below, no coverage is found for all of the loss associated with payments by the Bank to customers identified in Tabs A through C and E through P of the proof of loss. (Mr. Ballinger's loss, documented in Tab D to the proof of loss, is the exception, and is discussed separately below.) In each instance, the loss was sustained when the Bank made payments to customers to reimburse them for losses which occurred in accounts opened at OBS, with custody of the assets in those accounts maintained by NFS. The Bond (including as modified by the Brokerage Services Modification) does not cover loss sustained by customers from defalcations by Hunt from accounts maintained not with the Bank or FII, but rather with Online Brokerage Services, Inc. and/or its custodian, NFS. Losses occurring in accounts maintained at OBS and/or NFS are not "direct loss" to the Insured, nor do they represent "direct loss" of "property

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 12

owned held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss." Policy, Section 12 ("Covered Property").

With this starting point, below is a summary of the losses occurring in the OBS/NFS accounts of the customers named in the Proof of Loss.

### A.    William Riley; Robin Riley

On December 6, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $42,613.47 out of a "LMN" (Investment Retirement) Account opened in the name of William Riley and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, Riley affirmed that this was an unauthorized transaction. The wire transfer request has a signature on it which purports to be that of William Riley. Evidently, Hunt prepared this wire transfer himself, forged Riley's signature, and then provided Riley with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

An exemplar of the wire transfer request generally used by Hunt to make unauthorized transfers out of customer accounts, and specifically used by Hunt to accomplish the above-described transfer out of Riley's account, is attached as Exhibit E. Similarly, Riley's affidavit of loss, which is attached as Exhibit F, serves as a typical example of the affidavits prepared with the Bank's assistance and signed in the presence of a notary by affected customers. (I have not attached such documents as Exhibits for all of the unauthorized transfers, but copies are available in the file upon request.)

On February 27, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $10,000.00 out of a "LMN" Account opened in the name of William Riley and Robin Riley and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the Rileys affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged the Rileys' signatures, and then provided the Rileys with false reassurances and explanations when Mr. Riley called to inquire after receiving the puzzling transfer confirmation.

**Analysis: Both of these transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### B.    Bradley Mangas

On April 13, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $23,400.00 out of a "LMW" Account opened in the name of Bradley Mangas and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 13

DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, Mangas affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Mangas's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### C.    Henry Wiemkin

On April 10, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $52,341.16 out of a "LMN" (IRA) Account opened in the name of Henry Wiemkin and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, Wiemken affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Wiemkin's signature, and then provided Wiemkin with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### D.    Floyd Ballinger

Of the matters referenced in the proof of loss, one transaction has been identified which finds coverage under Insuring Agreement (A), and where "direct loss" resulted, with the possibility of coverage under the bond. This transaction relates to loss sustained by Bank customer Floyd Ballinger, who also opened an account through OBS/NFS. Ballinger had purchased a fixed deferred annuity from New York Life Annuities in 2002. Hunt apparently persuaded Ballinger to redeem it in March, 2007. After the imposition of a surrender charge of $3,408.88, the net amount payable to Mr. Ballinger was $91,282.32. Hunt allegedly counseled Ballinger to deposit the sum into a money market checking account at the Bank, which Ballinger did. Hunt also apparently persuaded Ballinger to request that the Bank issue cashier's checks payable to Sun Life Financial in the amount of $56,597.01 and to NFS in the amount of $34,685.31. Ballinger did so. Hunt allegedly told Ballinger that he would be using these funds to purchase a new policy to be issued by Sun Life, with the balance to be invested in Ballinger's OBS account. Ballinger entrusted Hunt with both cashier's checks.

Hunt apparently endorsed the check made payable to "Sun Life" with his name ("Jeffrey D. Hunt") and deposited it into the "Capital Platinum" checking account at the Bank. Thus, this $56,597.01 item relates to the conversion of a Bank cashier's check

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 14

drawn against a bank account, and is not a loss that occurred in an OBS/NFS brokerage account. However, Bond Exclusion (y) excludes "loss resulting directly or indirectly from accepting checks payable to an organization for deposit into an account of a natural person." Thus, the loss sustained in connection with this check is excluded from coverage.

As for the remaining amount ($34,685.31) deposited into Ballinger's OBS brokerage account, Hunt converted this money from the OBS brokerage account using a fraudulent wire transfer. Thus, it is a loss that occurred in an OBS/NFS brokerage account, and is not covered by the Progressive Bond.

### E.     David W. Page

On November 6, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $37,313.56 out of a "LMW" (IRA) Account opened in the name of David Page and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, Page affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Page's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### F.     James R. Hovest

On March 19, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $12,000 out of a "LMW" (IRA) Account opened in the name of Hovest and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Hovest's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### G.     James Smith

On January 19, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $15,015 out of a "LMW" Account opened in the name of Smith and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 15

PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Smith's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### H.     Paul and Barb Schweinhagen

On August 9, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $9,915.00 out of a "LMW" (IRA) Account opened in the name of the Schweinhagens jointly and held at OBS/NFS. This sum was transferred by OBS/NFS into the checking account at Fifth Third Bank opened for The Stake Company. By affidavit, the account holders affirmed that they had authorized a transfer in this amount out of the account, but that the purpose was to purchase shares of a REIT.

A similar transaction occurred on August 11, 2006 in the amount of $3,015.00, with the money transferred to the FII's general operations checking account. By affidavit, the account holders affirmed that they had authorized a transfer in this amount out of the account, but that the purpose was to purchase shares of a REIT.

A transaction occurred on February 8, 2007 in the amount of $10,015.00, with the transfer into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that they had authorized a transfer in this amount out of the account, but that the purpose was to purchase shares of a REIT.

**Analysis: No coverage is provided under the Bond for these transactions. As for the August 9, 2006 and February 8, 2007 transfers, These transfers removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

**As for the August 11, 2006 transfer, no coverage is provided under the Bond for a deposit of monies into a FII checking account, and where Hunt seems to have never gotten around to purchasing REIT shares for the customer. No evidence suggests that, as far as this transaction is concerned, Hunt had any fraudulent or dishonest intent. The Bank repaid the sum, and there is no "loss" associated with this transaction.**

### I.     Phillip M. Block

On January 19, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $15,000 out of a "LMW" Account opened in the name of Block and

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 17

On January 24, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $15,015.00 out of a "LMW" Account opened in the name of Hartman and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES checking account held at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. By appearance, the wire transfer request appears to have been prepared by Hunt, with a signature purporting to be that of the customer. Evidently, Hunt prepared this wire transfer himself, forged Hartman's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: Each of these transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A).**

### L.    Robert and Diane Beverly

On January 2, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $74,316.47 out of a "LMN" (IRA) Account opened in the name of Robert Beverly and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. By appearance, the wire transfer request appears to have been prepared by Hunt, with a signature purporting to be that of the customer. Evidently, Hunt prepared this wire transfer himself, forged Beverly's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On January 17, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $51,233.16 out of a "LMN" (IRA) Account opened in the name of Robert Beverly and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Beverly's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On February 23, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $30,000.00 out of a "LMN" (IRA) Account opened in the name of Robert Beverly and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Beverly's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 18

On February 22, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $28,396.14 out of a "LMN" (IRA) Account opened in the name of Robert Beverly and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Beverly's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On March 13, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $20,000.00 out of a "LMN" (IRA) Account opened in the name of Robert Beverly and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Beverly's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

Thus, Hunt transferred the sum of $203,945.77 out of accounts held by the Beverlys at OBS/NFS. The Bank's claim for monies paid to the Beverlys, however, go beyond that sum. The proof of loss seeks to recover that amount plus an additional $38,772.84, for a total of $242,718.61. The (unexecuted) Settlement Agreement attached to the Proof of Loss provides additional detail as to the various components which make up the balance. For instance, the Bank paid the Beverlys a sum which represents "ten monthly car loan payments of $584.26 each"; $2,500 for expenses incurred by the Beverlys in connection with their dispute with the Bank; and $200.00 to compensate them for an IRS penalty they will incur as a result of Hunt's misconduct.

**Analysis: Each of these transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A). As for the other sums paid by the Bank to the Beverlys in contemplation of their "lifestyle" reliance on Mr. Hunt's assurances and promises, the Bond would not provide coverage for such losses, even if coverage existed for the primary loss (which coverage does not exist here). See also exclusion (t), which excludes damages for which an insured is legally liable, unless the insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages"; and exclusion (v), which excludes "indirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages".**

### M.   Kirk and Mary Jo Pickering

On October 3, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $14,015.00 out of a "LMN" Account opened in the name of Kirk and

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 19

Mary Jo Pickering and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged the signatures of the Pickerings, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On October 10, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $22,015.00 out of a "LMW" Account opened in the name of the Pickerings jointly, and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Apparently, Hunt prepared this wire transfer himself, forged the signatures of the Pickerings, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On August 24, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $33,515.00 out of a "LMN" Account opened in the name of the Pickerings jointly, and held at OBS/NFS. This sum was transferred by OBS/NFS into the First Insurance and Investments checking account. The money was intended to purchase shares in a Wells REIT II fund, but never were purchased.

On September 15, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $49,900.00 out of an "LMN" Account opened in the name of Mr. Pickering, and held at OBS/NFS. This sum was transferred by OBS/NFS to the Chase Bank account of another customer for whom Hunt provided investment advice, Jerry Smith. (Hunt had made an unauthorized promise to pay Jerry Smith the sum of $117,000.00 as so-called "restitution." The situation involving Mr. Smith is discussed below in Section VII(C).)

**Analysis: Except for the August 24, 2006 transaction, the above transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

**As for the August 24, 2006 transaction, no coverage is provided under the Bond for a deposit of monies into a FII checking account, and where Hunt seems to have never gotten around to purchasing the REIT shares. No evidence suggests that, as far as this transaction is concerned, Hunt had any fraudulent or dishonest intent. The Bank repaid the sum, and there is no "loss" associated with this transaction.**

### N.   Allen Killion; Allen and Nancy Killion

On October 16, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $53,000.00 out of a "LMN" (IRA) Account opened in the name of

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 20

Allen Killion and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Killion's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

On April 30, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $27,515.00 out of a "LMW" joint Account opened in the name of Allen and Nancy Killion and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged the Killions' signatures, and then provided the Killions with false reassurances and explanations when he was called after the Killions received the puzzling transfer confirmation.

**Analysis: Both of these transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### O.    Catherine and Jerry Matson

On August 25, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $13,515.00 out of a "LMW" (IRA) Account opened in the name of Catherine and Jerry Matson and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holders affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged the signatures of the Matsons, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: This transfer removed property from an account at OBS and/or NFS, and no coverage is found for such a loss, as it is not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### P.    John Grim

On December 1, 2006, a wire transfer request was made which caused OBS/NFS to transfer a sum of $51,413.19 out of a "LMW" (IRA) Account opened in the name of John Grim and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Grim's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 21

On January 10, 2007, a wire transfer request was made which caused OBS/NFS to transfer a sum of $20,000.00 out of a "LMW" (IRA) Account opened in the name of John Grim and held at OBS/NFS. This sum was transferred by OBS/NFS into the Hunt DBA CAPITAL PLATINUM PROPERTIES account at the Bank. By affidavit, the account holder affirmed that this was an unauthorized transaction. Evidently, Hunt prepared this wire transfer himself, forged Grim's signature, and then provided him with false reassurances and explanations when he called to inquire after receiving the puzzling transfer confirmation.

**Analysis: Both of these transfers removed property from an account at OBS and/or NFS, and no coverage is found for such losses, as they are not direct loss under Insuring Agreement (A) and does not represent a loss of "Covered Property."**

### III.  COVERAGE ANALYSIS OF MATTERS REFERENCED IN ENCLOSURES TO PHILLIP SMITH'S LETTER DATED SEPTEMBER 20, 2007

#### A.  Richard Ebbert

This customer opened an IRA account at OBS/NFS. Hunt misrepresented that the account balance was $86,000 more than it actually was, using bogus screen printouts. He alleges he would not have withdrawn monies in the amount he did, had he known the true value of the account. The Bank estimates that "[p]otential full restitution could be between $100,000.00 and $200,000.00."

**Analysis: This loss, while it arises in connection with Hunt's infidelity, is not "direct loss" under Insuring Agreement (A). Unlike the situations described in Section IV above, this claim does not even involve a conversion of monies at all. There is no direct loss in any account, much less in one appearing on the Bank's balance sheet. Rather, what this loss involves is a misrepresentation of what holdings existed in the account at particular times. The loss is akin to a claim for a "lost opportunity," a "lost business opportunity," or a "loss of potential income." See, e.g., U.S. Gypsum Co. v. Ins. Co. of N. Am., 813 F.2d 856 (7th Cir. 1987); Diversified Group, Inc. v. Van Tassel, 806 F.2d 1275, 1277-78 (5th Cir.1987). No intent has been shown to cause the insured to sustain a loss. Also, two exclusions are applicable: exclusion (t), which excludes damages for which an insured is legally liable, unless the insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages"; and exclusion (v), which excludes "indirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages".**

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 22

### B.    Anthony Grohman

This customer rolled over a 401(k) into an IRA account opened at OBS/NFS, with Hunt as investment advisor. He alleges that at the initial meeting (July 2006) with Hunt, they discussed investing in Dimensional Fund Advisors 60/40 Global Fund. Hunt didn't do so, which the client learned in December 2006. Grohman took no action at the time. After hearing of Hunt's departure, he asserted that he missed out on additional growth in the fund from July to December 2006. The Bank has not paid him in consideration for his complaints and states "potential restitution would be $8,400.00."

**Analysis: No direct loss has occurred in any account, much less in one appearing on the Bank's balance sheet. This is a third-party liability claim alleging a failure to invest timely, and for which no coverage exists under the bond. See also exclusions (t) and (v).**

### C.    Jerry Smith

This customer's loss involves a promise made by Hunt to pay him "restitution," or to "settle a claim," in exchange for payment from the Bank or FII in the amount of $117,000.00. Hunt had no authority to promise to make this supposed "restitution," and he told no one that he would be doing so. Hunt actually did wire this customer a total of $67,885.00, but did not perform on his unauthorized promise to pay the rest of the promised sum. One of the wire transfers into Smith's checking account ($49,885) actually came from OBS/NFS and Bank customer Pickering. Two more transfers into Smith's account came from the Hunt DBA Capital Platinum Properties checking account at the Bank – one for $8,000, the other for $10,000. This customer demands the balance of the promised restitution, or $49,115.00.

What was the so-called restitution for? It was not for any defalcation of customer monies. Rather, it was to resolve some disputes that had arisen about Hunt's promises, misinformation and misrepresentations to Smith. Hunt falsely promised the customer that he would receive $20,000 from FII to reimburse him for a surrender penalty on a NY Life variable annuity. Hunt also misrepresented that the customer would receive each year a 5% bonus paid on the Allianz Life annuity purchased with the proceeds from the surrendered NY Life annuity. In fact, the 5% bonus was to be a one-time only bonus.

**Analysis: The bond provides no coverage for misrepresentations nor for the breach of a promise made by an employee without authority. No direct loss has occurred in any account, much less on appearing on the Bank's balance sheet. This is a third-party liability claim alleging breach of contract or fraud, and for which no coverage exists under the bond. See also exclusions (t) and (v). No intent has been shown to cause the insured to sustain a loss.**

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 23

### D.    Henrietta Yoder

This client purchased a NY Life fixed annuity in 2002 in her IRA, with a rate set at 4.85% for the first three years. In 2005, the rate fell to 3.00% for a time, and then was set at 3.55% from 08/26/06 to 08/26/07. She complained, and says Hunt promised that (a) the Bank would make up the difference, so that the collective yield would be 5.00%; and (b) the Bank would pay the surrender penalty should she surrender. A note allegedly written by Hunt promises $180,090.32 (surrender value as of 05/16/07 was $175,120.77.) Thus, according to the Bank, potential restitution would be approximately $10,970 if surrendered, and $2,500 without surrender and making up the interest rate differential.

**Analysis: This claim is merely a set of promises of customer accommodations which Hunt made without authority. The bond provides no coverage for misrepresentations nor for the breach of a promise made by an employee without authority. No direct loss has occurred in any account, much less one appearing on the Bank's balance sheet. This is a third-party liability claim alleging breach of contract or fraud, and for which no coverage exists under the bond. See also exclusions (t) and (v). No intent has been shown to cause the insured to sustain a loss.**

### E.    Gerald Gardner

This customer produces a summary of accounts apparently prepared by Hunt which overstates the value of an annuity. The statement claims surrender value is $9,412, when in fact its is $4,098.35. Also, the summary states wrongly that there is no penalty to liquidate on June 16, 2007. The Bank estimates $5,313.65 for restitution.

**Analysis: This claim is premised on Hunt's misrepresentations as to the value of an annuity held by the customer and/or the attributes of the annuity (such as its surrender value). As such, this claim is a third-party liability claim for fraud, and for which no coverage exists under the bond. No direct loss has occurred in any account, much less on appearing on the Bank's balance sheet. See also exclusions (t) and (v). No intent has been shown to cause the insured to sustain a loss.**

### F.    Walter Boyd

Hunt fabricated an IRS Form 1099R showing an "early distribution exception," which would waive an otherwise applicable 10% (excise) penalty since Boyd was not yet 59½. Mr. Boyd has asserted that he should not be liable for the tax. The restitution would be $700.00.

**Analysis: This claim is premised on Hunt's misrepresentations as to the tax status or implications of a customer's account holdings. As such, it represents a third-party liability claim for fraud, and for which no coverage exists under the bond. No direct loss has occurred in any account, much less one appearing on the Bank's**

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 24

balance sheet. See also exclusions (t) and (v). No intent has been shown to cause the insured to sustain a loss.

### G.     Dale Kersh

This customer complains that his funds were not invested in a timely manner, resulting in a loss of value of his investments of approximately $4,100. A check from Mr. Kersh was found sitting in a file un-cashed sometime after Hunt departed the Bank.

**Analysis: No direct loss has occurred in any account, much less in one appearing on the Bank's balance sheet. This is a third-party liability claim alleging a failure to invest timely, and for which no coverage exists under the bond. See also exclusions (t) and (v).**

### H.     Richard Donald

Client claims that Hunt promised that he would receive a 10% bonus if he bought an Americo annuity. He also claims he was told by Jeff Hunt that he could cash in the annuity after 5 years with no surrender charge. (The customer had in his possession a copy of the Americo contract which appears to have been altered in cut-and-paste fashion in order to support Hunt's apparent misrepresentations.)

**Analysis: No direct loss has occurred in any account, much less in one appearing on the Bank's balance sheet. This is a third-party liability claim alleging misrepresentations, and for which no coverage exists under the bond. See also exclusions (t) and (v).**

### I.     Richard and Alice Lockmiller

For unknown reasons, Hunt took a cashier's check for $25,000 to open 592 plans for education for grandchildren and never invested it for the Lockmillers; yet, at some effort, he fabricated correspondence and statements purportedly from Putnam Investments. The check was found sitting in his desk after he departed the Bank; also, other checks (one for $2,500, and another "replacement" for $2,500) were found in the desk. Why he did these things is a mystery. The loss of earnings is probably in the vicinity of $5,000 to $6,000.

**Analysis: No direct loss has occurred in any account, much less in one appearing on the Bank's balance sheet. This is a third-party liability claim alleging a failure to invest timely and for resulting "diminished earnings," and for which no coverage exists under the bond. See also exclusions (t) and (v).**

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 25

### J.     John Fox

Hunt misrepresented that he had arranged for Sun Life to correct the applicable start date and S&P 500 valuation figure (meaningful for calculating the value of the contracts). The customer was told Hunt had taken care of making the corrections, and Hunt supplied bogus print screens to suggest falsely that he had done so. Sun Life, however, never heard from Hunt and it made no such changes. The Bank estimates an approximate $700 to $1,400 difference in account value as a result of Hunt's misconduct.

**Analysis: No direct loss has occurred in any account, much less in one appearing on the Bank's balance sheet. This is a third-party liability claim alleging misrepresentations, and for which no coverage exists under the bond. See also exclusions (t) and (v).**

## V.     OTHER INSURANCE OR INDEMNITY

### A.     Introduction

As is discussed herein, Progressive finds no coverage for the losses submitted by the Bank/FII in connection with this Claim. As I advised in my letter dated October 2, 2007, I must point out here as well that Section 11 of the Bond states as follows:

OTHER INSURANCE OR INDEMNITY

Section 11. Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured or by one other than the Insured on Property subject to exclusion (q), or by a Transportation Company, or by another entity on whose premises the loss occurred or which employed the person causing the loss.

### B.     Indemnity Owed to the Bank by OBS and/or NFS

The relationship between OBS and the Bank involves a promise by OBS of contractual indemnity. See Section I(C) above. Thus, coverage under the Bond is merely "excess over any valid and collectible... indemnity obtained" by the Bank/FII.

The Bank has contended that OBS is not a "collectible" avenue of indemnity. To my knowledge, the Bank/FII has not yet made a written demand that OBS indemnify the Bank and hold it harmless "against all claims and damages, including reasonable attorneys' fees and costs, arising out of the broker/dealer activities" conducted by Hunt in connection with the Brokerage Services Agreement between the Bank/FII and OBS. Progressive reserves all rights under Section 11 of the Bond with regard to the validity and collectibility of this indemnity.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 26

### C. Insurance Obtained by the Insured

FII was paid $50,000 on a commercial crime policy issued by Cincinnati Insurance. Progressive is aware of other insurance carriers and policies which provide coverage for third-party liability claims: a policy issued by Hudson Insurance, and one issued by Utica Insurance Company. Any coverage afforded under Progressive's Bond is excess to other valid and collectible insurance, such as that which may be afforded by liability policies such as these. Progressive reserves all rights under Section 11 of the Bond with regard to the validity and collectibility of this insurance.

### D. Insurance Obtained by "Another Entity... Which Employed the Person Causing the Loss"

As described in Section I(C) above, OBS was required to secure $1 million aggregate/$1 million per occurrence insurance for the registered representatives such as Hunt. OBS also was obligated contractually to cause the Bank and its officers and directors to be named in those policies as additional insureds. Progressive reserves all rights with regard to these other policies of insurance, to which coverage under Progressive's Bond remains excess.

## VII. <u>CONCLUSION</u>

As discussed above, no coverage exists for the transactions identified in the Proof of Loss, nor for those identified in your correspondence of September 20, 2007, with one exception. Coverage exists under Insuring Agreement (A) for one transaction which qualified as direct loss. The transaction in question is the $56,597.01 check intended to be used to purchase an annuity for Mr. Ballinger and made payable to Sun Life. Hunt contrived to deposit this check into his own HUNT DBA CAPITAL PLATINUM PROPERTIES checking account at the Bank. However, exclusion (y) applies to this loss, because it was a "loss resulting directly or indirectly from accepting checks payable to an organization [Sun Life] into an account of a natural person" [Hunt doing business as "Capital Platinum Properties"]. Even if this exclusion did not apply (which it does), the loss would fall below the $125,000 retention.

Please bear in mind that this analysis is based on the information presently available to Progressive. If you believe that other information or documentation might affect the coverage position set forth above, or if I am, in your view, incorrect in any of my assumptions, please let me know. Similarly, if you find my analysis flawed or unclear in any way, please contact me so we can discuss any questions you may have.

This letter and any subsequent investigation is not to be construed as a waiver of any rights that Progressive has at law or otherwise. Progressive expressly reserves all of its rights with respect to this matter, including, but not limited to, the right to raise additional defenses under the Bond and pursuant to applicable law.

Mr. Phillip J. Smith, Esq.
June 19, 2008
Page 27

If you have any questions, please do not hesitate to call me at 1-800-274-5222, ext. 37711.

Sincerely,

M. Terence Cawley
Senior Attorney

MTC/mf

Enclosures

LMW001759

## Brokerage Account Application

### IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money-laundering activities, Federal law and contractual obligations to National Financial Services ("NFS") require that your Broker/Dealer verify your identify by obtaining your name, date of birth, address, and a government-issued identification number before opening your account. In certain circumstances, your Broker/Dealer may obtain and verify this information with respect to any person(s) authorized to effect transactions in an account. For certain entities, such as trusts, estates, corporations, partnerships, or other organizations, identifying documentation is also required. Your account may be restricted and/or closed if your Broker/Dealer cannot verify this information. Neither your Broker/Dealer nor NFS will be responsible for any losses or damages (including but not limited to lost opportunities) resulting from any failure to provide this information, or from any restriction placed upon, or closing of, your account.

### ACCOUNT REGISTRATION *Types of ownership are governed by the laws of your state of residence. If you need information about which are appropriate in your state, please consult your state tax officials or your tax advisor.*

- ☒ Individual
- ☐ Community Property
- ☐ Joint Tenants with Rights of Survivorship
- ☐ Tenants in Common
- ☐ Tenants in Entirety
- ☐ Custodial - UGMA
- ☐ Other _____

- ☐ Custodial – UTMA
- ☐ Estate – Executor
- ☐ Estate – Administrator
- ☐ Estate – Personal Representative
- ☐ Corporation
- ☐ Limited Liability Company

- ☐ Partnership
- ☐ Unincorporated Association
- ☐ Trust under Agreement
- ☐ Trust under Will

For **TENANTS IN COMMON**: In the event of the death of either or any of the undersigned, the interests in the tenancy shall be equal unless otherwise specified immediately below. **If interests are not to be equal, designate the percentage of each tenant.**

| NAME | PERCENTAGE |
|------|------------|
| | |
| | |
| | |
| | |

**TYPE OF ACCOUNT** ☒ Cash  ☐ Margin (Margin agreement must be completed.)  ☐ Option (Option agreement must be completed.)

### ACCOUNT INFORMATION

Account information will be mailed to the legal address (or mailing address if different) listed below, and deemed to have been received by all account holders at such address, unless otherwise indicated by checking below.

**Legal Address**

(Required – No P.O. Boxes)

Mailing Attn BRADLEY E. MANGUS

Street Address 28799 ST RT 281

City DEFIANCE    State OH    Zip/Postal Code 43512

Province (if applicable) _____    Country UNITED STATES

**Mailing Address**
(If different than
Legal Address)

Mailing Attn BRADLEY E. MANGUS

Street Address 28799 ST RT 281

City DEFIANCE    State OH    Zip/Postal Code 43512

Province (if applicable) _____    Country UNITED STATES

☐ Check here if you would prefer all account information be sent to each account holder's mailing address individually.

| For Internal Use Only | X _____ | | |
|---|---|---|---|
| | Approval Office Manager Signature | Date | LMW001759 |
| | | | Account Number |
| | X _____ | | Jeffrey D. Hurt |
| | Registered Rep Signature | Date | Registered Rep Name     Number |

1

E.764619.105 - 407061.2.0

**Account Service Instructions**

**Sales**
- ☐ Remit proceeds
- ☒ Hold proceeds[1]
- ☐ DVP – delivery versus payment
- ☐ Auto sweep to bank account[2]

**Purchases**
- ☐ Register certificates to account name / send certificates to account mailing address
- ☐ DVP – delivery versus payment
- ☒ Hold securities in street name

**Dividends and Interest**
- ☐ Pay all distributions in cash and send a weekly check
- ☐ Pay all distributions in cash and send a monthly check
- ☐ Pay all distributions in cash and send a check twice a month
- ☐ Pay all distributions in cash and send a quarterly check
- ☐ Pay all distributions in cash and handle the same as sales proceeds are handled[3]
- ☐ Reinvest mutual fund dividends / all other distributions are handled the same as sales proceeds are handled[3]
- ☐ Reinvest equity dividends / all other distributions are handled the same as sales proceeds are handled[3]
- ☒ Reinvest mutual fund and equity dividends / all other distributions are handled the same as sales proceeds are handled[3]

[1] If a core money market has been selected in this application, proceeds will be held in the core fund. If no fund has been selected, proceeds will be held in the brokerage account.

[2] Consult your Broker/Dealer to see if this is an option for you.

[3] If received in a DVP account, all other distributions will remain in the account pending additional instructions.

---

**ACCOUNT / ACCOUNT OWNER PROFILE**

**Personal Information**  Marital Status: ☒ Single  ☐ Married  Number of dependents  1

**Financial Information**

**Annual Income** – from all sources (For joint accounts, check your combined income.)
- ☐ Under $25,000  ☐ $25,000 – $50,000  ☐ $50,000 – $100,000
- ☒ Over $100,000 Please state amount $ _____

**Estimated Net Worth** (exclusive of home and farm)
- ☐ Under $50,000  ☐ $50,000 – $100,000  ☐ $100,000 – $500,000
- ☒ Over $500,000  Please state amount $ _____

**Investable Assets** (including cash and securities)
- ☐ Under $50,000  ☐ $50,000 – $100,000  ☐ $100,000 – $500,000
- ☒ Over $500,000  Please state amount $ _____

**Tax Bracket**  ☐ 15% or below  ☒ 25% – 27.5%  ☐ 27.5% or above

**Bank Reference**  Bank Name _____  Account No. _____

Branch/City _____  State _____  Zip/Postal Code _____

---

**Investment Objectives**

Pursuant to various securities regulations, your Broker/Dealer is required to ask you to list your investment objective for your account. The attached Customer Agreement contains descriptions and examples of typical investments for each investment objective presented below. Please rank your investment objectives for this account in order of importance (Highest = 1). Please review these descriptions prior to completing this section to ensure that the investment objective selection you make is appropriate, understanding that the more aggressive objectives incorporate the less aggressive objectives. If at any time you would like to revise your investment objective, please contact your Investment Professional.

- ☐ Preservation of Capital  ☐ Income  ☐ Capital Appreciation
- ☐ Trading Profits  ☐ Speculation  ☐ Other _____

**Risk Tolerance**  ☐ Conservative  ☐ Moderate  ☒ Aggressive  ☐ Combination _____

**Time Horizon**  ☐ Short (0 – 5 Years)  ☐ Intermediate (6 – 10 Years)  ☒ Long (Over 10 Years)
☐ Combination

**General Investment Knowledge**  ☐ Extensive  ☒ Good  ☐ Limited

**Specific Investment Knowledge**  Please enter account holder's level of knowledge (None, Limited, Good, Extensive) OR year of first investment in each of the following:

Stocks  Good_____  Bonds  Good_____  Mutual Funds  Good_____

Options _____  Variable Contracts _____  Limited Partnerships _____

2

## JOINT TENANT / ADDITIONAL ACCOUNT OWNER INFORMATION

**Joint Account Owner / Minor /Trustee / Authorized Individual**

First, Middle, Last Name _____

Entity/Business/Trust Name _____

Date of Birth _____ U.S. Social Security/Taxpayer ID No. _____

**Citizenship**

Citizenship ☐ U.S. ☐ Other, indicate other countries: _____

Tax Residence ☐ U.S. ☐ Other, indicate other countries: _____

Type of Document _____

Document Number _____ State/Country of Issuance _____

Date of Issuance _____ Date of Expiration _____

**Legal Address**

(Required – No P.O. Boxes)

Mailing Attn _____

Street Address _____
_____

City _____ State _____ Zip/Postal Code _____

Province (if applicable) _____ Country _____

**Mailing Address**
(If different than Legal Address)

Mailing Attn _____

Street Address _____
_____

City _____ State _____ Zip/Postal Code _____

Province (If applicable) _____ Country _____

**Phone Numbers**

Home ( ) - _____ Work ( ) - _____ Ext. _____

**Employment Information**

Status: ☐ Employed ☐ Not Employed ☐ Retired

Source of Income (if not employed or retired) _____

Occupation _____

Employer Name _____

Employer Address _____
_____

City _____ State _____ Zip/Postal Code _____

**Affiliations and Acknowledgements**

Are you affiliated with, or employed by a stock exchange or member firm of an exchange or the NASD or municipal securities broker/dealer?

☐ Yes, with _____

Street Address _____
_____

City _____ State _____ Zip/Postal Code _____

Province (if applicable) _____ Country _____

☐ No

Are you a control person or affiliate of a publicly traded company as defined in SEC Rule 144? This would include, but is not limited to, 10% shareholders, policy-making executives and members of the Board of Directors.

☐ Yes ☐ No

Name of Company & Trading Symbol 1 _____

Name of Company & Trading Symbol 2 _____

Name of Company & Trading Symbol 3 _____

4

## Convenient Payment for Your Purchases

# Automatic Trade Settlement Authorization

Complete this section if you wish to link your brokerage account with a money market fund:

I have selected the _____ money market fund for automatic sweep settlement and hereby acknowledge that I have received and read the prospectus for this fund.

Please read the Settlement Sweep section of the Customer Agreement for more information.

## Notice to National Financial Services LLC

This is to advise you that I (we) have instructed My Broker/Dealer to establish, in my (our) behalf, and as my (our) agent an account with you. I (We) have appointed My Broker/Dealer as my (our) exclusive agent to act for and on my (our) behalf with respect to all matters regarding my (our) account with you, including but not limited to the placing of securities purchase and sale orders, and provided margin and/or options trading have/has been approved for the account, delivery of margin and option instructions for my (our) account. I (We) acknowledge that no fiduciary relationship exists. You shall look solely to My Broker/Dealer and not me (us) with respect to such orders or instructions; and you are hereby instructed to deliver confirmations, statements, and all written or other notices including margin maintenance calls, if applicable, with respect to my (our) account to My Broker/Dealer. Any such communications delivered to My Broker/Dealer shall be deemed to have been delivered to me (us). I (We) agree to hold you harmless from and against any losses, costs or expenses arising in connection with the delivery or receipt of any such communication(s), provided you have acted in accordance with the above. The foregoing shall be effective as to my (our) account until written notice to the contrary is received by you and My Broker/Dealer.

## Please Read the Customer Agreement and Sign Your Name

# To My Broker/Dealer and National Financial Services LLC

I am at least 18 years of age and am of full legal age in the state in which I reside. In consideration of your accepting one or more accounts, I hereby acknowledge that I have read, understood and agreed to the terms set forth in the Customer Agreement herein. I understand that upon issuer's request, in accordance with applicable rules and regulations, My Broker/Dealer will disclose my name to issuers of securities if securities are held in my account so that I can receive important information unless I do not consent to disclosure and I will notify My Broker/Dealer if I do not consent.

I understand that telephone calls to My Broker/Dealer may be recorded and I hereby consent to such recording. Reports of executions of orders and statements of my account shall be conclusive if not objected to in writing within five (5) days and ten (10) days respectively, after transmitted to me by mail or otherwise.

Please check which of the following applies:

☐  I CERTIFY UNDER PENALTIES OF PERJURY THAT: (1) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN) AND THE TAXPAYER IDENTIFICATION NUMBER PROVIDED ABOVE IS CORRECT, (OR I AM WAITING FOR ONE TO BE ISSUED TO ME) AND (2) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING, OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING FOR FAILURE TO REPORT ALL INTEREST OR DIVIDENDS, OR (C) I HAVE BEEN NOTIFIED BY THE IRS THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING. (CROSS OUT ITEM 2 IF IT DOES NOT APPLY TO YOU.)

☐  I am not a U.S. person and am submitting IRS Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, with this form to certify my foreign status and, if applicable, claim tax treaty benefits. To obtain a Form W-8BEN, please consult your tax advisor or go to the IRS web site at http://www.irs.gov.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

I REPRESENT THAT I HAVE READ THE TERMS AND CONDITIONS GOVERNING THIS ACCOUNT AND AGREE TO BE BOUND BY SUCH TERMS AND CONDITIONS AS CURRENTLY IN EFFECT AND AS MAY BE AMENDED FROM TIME TO TIME. THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION AGREEMENT WHICH APPEARS ON PAGE 8.

I ACKNOWLEDGE RECEIPT OF THE PRE-DISPUTE ARBITRATION AGREEMENT.

| | |
|---|---|
| _Signature / Date_ | Signature of Joint Tenant (if any) / Date |
| Joint Account Holders (if any) / Date | Joint Account Holders (if any) / Date |
| Joint Account Holders (if any) / Date | Joint Account Holders (if any) / Date |

8055853             National Financial Services LLC, Member NYSE, SIPC              E.764619.105 - 407061.2.0

5

## Brokerage Account Customer Agreement (Please retain this agreement for your records)

To: My Broker/Dealer ("You") - For accounts with more than one account holder, "I" refers to all account holders.

**1. Nature of Services Provided.** I understand that all information supplied by the undersigned will be subject to verification, and that the information on this application is correct. I understand that you have entered into an agreement with National Financial Services LLC ("NFS") (a NYSE member firm) to execute and clear all brokerage transactions. National Financial Services LLC will provide margin loans if the account applies for and is approved for margin lending. I understand that neither you nor NFS provide investment advice in connection with this account nor do you give advice or offer any opinion with respect to the suitability of any security or order and that no fiduciary relationship exists.

**2. Applicable Rules and Regulations.** All transactions are subject to the constitution, rules, regulations, customs and usages of the exchange or market (and its clearing house, if any) where executed as well as to any applicable federal or state laws, rules and regulations.

**3. Security Interest.** Any credit balances, securities, assets or related contracts, and all other property in which I may have an interest held by NFS or carried for my accounts now or hereafter opened shall be subject to a general lien for the discharge of my obligations to you or NFS (including unmatured and contingent obligations), and you may sell, transfer, or assign any such assets or property to satisfy a margin deficiency or other obligations whether or not you have made advances with respect to such property. At any time in your discretion, you may, without notice to me, apply and/or transfer any securities, related contracts, cash or any other property interchangeably between my accounts, whether individual or joint, from any of my accounts to any account guaranteed by me. No provision of this agreement concerning liens or security interest shall apply to the extent such application would be in conflict with any provisions of ERISA or the Internal Revenue Code relating to retirement accounts.

**4. Payment Upon Demand.** The undersigned shall at all times be liable for the payment upon demand of any debit balance or other obligations owing in any of the accounts of the undersigned, and the undersigned shall be liable to you for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by you or by the undersigned; and the undersigned shall make payment of such obligations and indebtedness upon demand. All transactions in any of my accounts are to be paid for or securities delivered no later than 2:00 p.m. Eastern Standard time on the settlement date. I agree that if after demand I fail to pay the indebtedness, you may close my (our) account and liquidate the assets in my (our) account in an amount sufficient to pay my (our) indebtedness.

**5. Liability for Costs of Collection and Debit Balances.** The reasonable costs and expenses of collection of the debit balance or any unpaid deficiency in the account of the undersigned including, but not limited to, attorney's fees, incurred and payable or paid by you shall be reimbursed by the undersigned. The undersigned also agrees to pay a late charge for cash account debits resulting from failure to make full payment for securities by settlement date.

**6. Receipt of Communications.** Communications may be sent to the undersigned at the address of the undersigned or at such other address as the undersigned may hereafter give you in writing, and all communications so sent, whether by mail, telegraph, messenger or otherwise, shall be deemed given to the undersigned personally, whether actually received or not. Reports of executions or orders and statements of my account shall be conclusive if not objected to in writing within five (5) days and ten (10) days respectively, after transmitted to me by mail or otherwise.

**7. Affiliations.** I will not buy or sell any securities of a corporation of which I am an affiliate or sell any restricted securities except in compliance with applicable laws and regulations and upon notice to you that the securities are restricted.

**8. Extraordinary Events.** Neither you nor NFS shall be liable for loss caused directly or indirectly by war, natural disasters, government restrictions, exchange or market rulings or other conditions beyond your control, including but not limited to extreme market volatility or trading volumes.

**9. Purchase of Precious Metals.** I understand and acknowledge the following in regard to the purchase of precious metals: a) The Securities Investor Protection Corporation (SIPC) does not provide protection for precious metals. However, if stored through NFS, they are insured by the depository at market value. b) Precious metals are not marginable. c) Precious metals investments can involve substantial risk as prices can change rapidly and abruptly. Therefore any advantageous purchase or liquidation price cannot be guaranteed. d) If I take delivery of my metals, I am subject to delivery charges and applicable sales and use taxes.

**10. Core Account.** Subject to prior payment by you and on my behalf of any outstanding balances or obligations in my account including, but not limited to, Account settlements, amounts contributed and received will be held in the Core Account. The Core Account may be a money market fund ("Core Fund"), a taxable interest bearing credit account, or any other option my Broker/Dealer makes available to me. In the event that I carry a margin account with National Financial Services LLC, I authorize you to transfer from my Account any sums necessary to maintain the required minimum equity in such

margin accounts. My account statement details all activity in the Core Account. This is provided in lieu of a confirmation that might otherwise be provided to me with respect to those transactions. I agree that I will obtain and read the prospectus before investing any money in the Core Fund.

Any free credit balances in the Account (i.e., any cash that may be transferred out of the Account without giving rise to interest charges) in excess of $1 will be automatically invested on a daily basis in my Core Fund. Amounts of less than $1 will automatically be invested weekly. Any fund I am able to later choose as my Core Fund will also be subject to these provisions.

Interest and dividends accrued daily are paid monthly on those free credit balances. A variable rate of interest or dividends may be paid on cash balances awaiting reinvestment (excluding any short credit balances). The variable rate of interest paid for the Taxable Interest bearing credit account will be determined by the average credit balance for the period in which uninvested assets remain in the account. My Broker/Dealer reserves the right to increase or decrease the rate of interest at any time without notice.

An investment in any money market mutual fund is not guaranteed by the FDIC or any other government agency. Although money market funds seek to preserve the value of my investment at $1 per share, it is possible to lose money by investing in the fund.

Investments by check may be promptly credited to my Core Fund on a daily or weekly basis in accordance with the above minimums for the automatic investments, and will earn dividends of the Core Fund as described in that fund's prospectus, prior to final collection of such checks. I understand that access to the redemption proceeds of the Core Fund shares purchased with monies so advanced may be withheld for up to seven days, 20 business days for acceptable foreign checks, to assure that such checks have been collected.

Shares of the Core Fund will be redeemed at their net asset value, and I agree that such shares shall be automatically redeemed to satisfy debit balances in the Account, electronic funds transfers, and other authorized debit items. If I so elect and upon my telephoned instructions, monies representing the redemption of Core Fund shares may be transferred to a bank account designated by me. Such monies shall be submitted, at your election, via the Federal Reserve Wire System or an automated clearing house system. Except as otherwise limited by federal or state law, I hereby ratify any such instructions and agree that neither you nor a fund's transfer agent will be liable for any loss, liability, cost or expense (i) so long as they have acted in accordance with the procedures set forth herein or in the applicable fund prospectus, or (ii) for acting upon instructions with respect to money transfers given by any person I believed to be genuine, provided monies are transferred to the bank account designated by me. I have received and read a copy of the prospectus of the Core Fund containing a more complete description of it and its operations.

Additionally, I hereby ratify any instructions given on this Account and any account into or from which I exchange and agree that neither you, nor the fund's transfer agent will be liable for any loss, cost or expense for acting upon such instructions (by telephone or writing) believed by them to be genuine and in accordance with the procedures described in the fund prospectus. I understand that it is my responsibility to read the prospectus of any other fund into which I exchange. Written instructions should be signed by all account holders.

**11. Income Account.** Free credit balances in my taxable Income Account (interest, dividends, capital gains and other distributions held awaiting payment to me in accordance with my instructions) may earn a variable rate of taxable interest paid at the discretion of my Broker/Dealer and/or NFS. NFS reserves the right to increase or decrease the rate of interest at any time without notice. The interest paid on the Income Account will be determined by averaging the daily credit balances during the interest period. Interest will be paid on the first business day following the 20th day of each month and will be reflected in the month-end account statement. Interest accrued during the interest period in my Income Account less than $.01 will not be paid. I understand that free credit balances in my Income Account will be applied first against any existing cash debit balances with NFS and the remainder paid out to me. Free credit balances in my Income Account will not be aggregated with free credit balances in my Core Account for purposes of determining the variable interest rate payable in either of the two accounts.

**12. Payment of Items.** I understand that all debit items, including Account transactions, checks and debit card transactions if I have applied for Asset Management Features, other account charges, and other transactions will be accumulated daily, and that NFS will make payment of these items on my behalf to the extent sufficient funds are available. I will maintain sufficient assets in my account to satisfy all obligations as they become due. As used in this Brokerage Account Customer Agreement, the total of cash, Core Account balances, and margin loan value shall be the "Collected Balance." I understand that payment of any debit item in my account will be made, first, from any cash balance available that day (defined as cash available to me on demand without giving rise to margin interest charges), and second, when I have no remaining cash

6

## Brokerage Account Customer Agreement (Please retain this agreement for your records)

balance, from shares available in my Core Fund, and third, if I have applied for margin privileges, any available margin loan value of my marginable securities. In the event margin credit is extended by NFS, interest will accrue beginning on the date credit is extended and is subject to the terms of the Supplemental Application for NFS Margin Account Privileges. Payments for debit items will be made on my behalf in the following order as they become due:

First, securities transactions (including margin calls if applicable) and other account fees;

Second, debit card transactions (if applicable); and

Third, my Asset Management Account checks (if applicable).

NFS and my Broker/Dealer shall not be responsible for the dishonor of any transaction due to insufficient Collected Balance. Other transactions that I initiate or to which I have consented may also reduce the Collected Balance in my account.

I understand that in the event any liability arises in my account that remains unpaid after payment is requested of me, NFS and my Broker/Dealer shall have the right to sell, liquidate, transfer, redeem, or otherwise apply any asset, money, property, security, or shares that I may now or ever have an interest in for the purpose of satisfying that obligation. No further demand or notice shall be required prior to taking such an action.

**13. Choice of Marketplace.** When securities may be traded in more than one marketplace, NFS or my Broker/Dealer may use its discretion in selecting the market in which to place my order.

**14. Termination of Account.** This Agreement will remain in effect until its termination by me is acknowledged in writing by your authorized representative. You may terminate this Agreement upon written notice to me mailed to my last address given to you.

I understand that my Account may be terminated by me, my Broker/Dealer, or NFS at any time. Termination will result in the cancellation of all checkwriting, debit card (if applicable), account and other features or privileges. I will remain responsible for all charges, debit items, or other transactions initiated or authorized by me whether arising before or after termination.

In the event my accounts are held directly at NFS due to my Broker/Dealer changing clearing firms or for other reasons, I understand that my account will be restricted. Such restrictions may include, but not be limited to loss of electronic trading privileges, ability to place liquidating orders only, and imposition of account maintenance fees. The commission and transaction fees charged in these cases may change.

**15. Settlement of Transactions.** I agree to make available to my Broker/Dealer collected funds in an amount sufficient to cover the amount due on all transactions by 11 a.m. Eastern time on settlement date, and I agree to deliver my securities I have in my possession in sufficient time to be received by my Broker/Dealer one day before settlement date. My Broker/Dealer and NFS reserve the right to cancel or liquidate at my risk any transaction not timely settled.

**16. Credit Information.** To help the government fight the funding of terrorism and money-laundering activities, Federal law and contractual obligations to National Financial Services LLC ("NFS") require that my Broker/Dealer obtain my name, date of birth, address and a government-issued identification number before opening my account to verify my identity. In certain circumstances, my Broker/Dealer may obtain and verify this information with respect to any person(s) authorized to effect transactions in an account. For certain entities, such as trusts, estates, corporations, partnerships or other organizations, identifying documentation is also required. My account may be restricted and/or closed if my Broker/Dealer and/or NFS cannot verify this information. Neither my Broker/Dealer nor NFS will be responsible for any losses or damages (including but not limited to lost opportunity) resulting from any failure to provide this information, or from any restriction placed upon, or closing of my account.

Any information I provide to my Broker/Dealer may be shared by my Broker/Dealer and/or NFS may be shared with third parties for the purpose of validating my identity and may be shared for other purposes in accordance with any applicable privacy policy of your Broker/Dealer and the National Financial Services LLC Privacy Policy. Any information I give to my Broker/Dealer may be subject to verification and I authorize my Broker/Dealer and/or NFS to obtain a credit report about me at any time. Upon written request, I will be provided the name and address of the credit reporting agency used. My Broker/Dealer and/or NFS also may monitor or tape-record conversations with me in order to verify data about any transactions I request and I consent to such monitoring or recording.

**17. Account Protection.** Securities in accounts carried by National Financial Services LLC ("NFS"), a Fidelity Investments company, are protected in accordance with the Securities Investor Protection Corporation ("SIPC") up to $500,000 (including cash claims limited to $100,000). For details, please see www.sipc.org. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. This additional protection covers total account net equity in excess of the $500,000/$100,000 coverage provided by SIPC. Neither coverage protects against a decline in the market value of securities.

**18. Joint Accounts.** If this is a joint account, "I" refers to all account holders and each of the account holders jointly and severally agrees that any account holder has authority on behalf of the joint account to:

* buy, sell (including short sales) and otherwise deal in stocks, bonds, options, and other eligible securities or other investments on margin or otherwise.

* receive demands, notices, confirmations, reports, statements of account and communications of every kind on behalf of the joint account;

* receive money, securities and property of every kind and dispose of the same on behalf of the joint account;

* make agreements relating to any of the foregoing matters and to terminate, modify or waive any of the provisions of the agreement on behalf of the joint account; and

* deal with my Broker/Dealer as fully and completely as if he (she) alone were interested in this account and without notice to the other account participants.

All obligations and liabilities arising under this account are joint and several and may be enforced by my Broker/Dealer or NFS against any or all account holders. My Broker/Dealer is authorized to follow the instructions of any joint account holder, without notice to any other account holder, in every respect and to deliver any or all monies, securities or other property to any joint account holder upon the instructions of any joint account holder, or to any other person upon such instructions, even if such delivery or payment is to that joint account holder personally and not to the other(s). My Broker/Dealer will be under no obligation to inquire into the purpose or propriety of such delivery or payment and is not bound to inquire into the disposition or application of such delivery or payment. This authority remains in force until written notice to the contrary is addressed to my Broker/Dealer and delivered to its office. My Broker/Dealer, or NFS, in their sole discretion and for their sole protection, may terminate the account upon receipt of such notice and may require the written consent of all account holders prior to acting upon the instructions of any account holder.

Laws governing joint ownership of property vary from state to state. I understand that I am responsible for verifying that the joint registration I select is valid in my state. Generally, however, for joint tenants with rights of survivorship, in the event of the death of either tenant, the entire interest in the joint account shall be vested in the surviving joint tenant(s) on the same terms and conditions. For tenants in common, joint tenants are responsible for maintaining records of the percent of ownership. In the event of death of either tenant the interest in their share of the tenancy shall vest in the decedent's legal representative. State laws regulating community property vary. Consult your own legal advisor.

**19. Trust and Business Accounts.** If these accounts are trust or business accounts, or these accounts are not owned by individual person(s), "I" also refers to all account holders, trustees, corporate officers, partners, club members, custodians, guardians, executors, and any other authorized person(s) who hold(s) any position of ownership or fiduciary responsibility for these accounts.

**Notice to the Customer ("You")**

**Payment for Order Flow.** Your Broker/Dealer or NFS transmits customer orders for execution to various exchanges or market centers based on a number of factors. These include: size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing and reduced execution costs through price concessions from the market centers. Certain of the market centers may execute orders at prices superior to the publicly quoted market in accordance with their rules or practices. While a customer may specify that an order be directed to a particular market center for execution*, the order-routing policies, taking into consideration all of the factors listed above, are designed to result in favorable transaction processing for customers.

Your Broker/Dealer and/or NFS receives remuneration, compensation or other consideration for directing customer orders for equity securities to particular broker/dealers or market centers for execution. Such consideration, if any, takes the form of financial credits, monetary payments or reciprocal business.

* Please note: Orders placed through any telephone, electronic or online trading systems cannot specify a particular market center for execution.

**Investment Objectives:** The typical investments listed with each objective are only some examples of the kinds of investments that have historically been consistent with the listed objectives. However, neither NFS nor your Broker/Dealer can assure that any investment will achieve your intended objective. You must make your own investment decisions and determine for yourself if the investments you select are appropriate and consistent with your investment objectives.

Neither NFS nor your Broker/Dealer assume any responsibility to you for determining if the investments you selected are suitable for you.

7

## Brokerage Account Customer Agreement (Please retain this agreement for your records)

**Preservation of Capital:** An investment objective of Preservation of Capital indicates you seek to maintain the principal value of your investments and are interested in investments that have historically demonstrated a very low degree of risk of loss of principal value. Some examples of typical investments might include money market 's and high quality, short-term fixed income products.

...me: An investment objective of Income indicates you seek to generate income from investments and are interested in investments that have historically demonstrated a low degree of risk of loss of principal value. Some examples of typical investments might include high quality, short and medium-term fixed income products, short-term bond funds and covered call options.

**Capital Appreciation:** An investment objective of Capital Appreciation indicates you seek to grow the principal value of your investments over time and are willing to invest in securities that have historically demonstrated a moderate to above average degree of risk of loss of principal value to pursue this objective. Some examples of typical investments might include common stocks, lower quality, medium-term fixed income products, equity mutual funds and index funds.

**Trading Profits:** An investment objective of Trading Profits indicates you seek to take advantage of short-term trading opportunities, which may involve establishing and liquidating positions quickly. Some examples of typical investments might include short-term purchases and sales of volatile or low priced common stocks, put or call options, spreads, straddles and/or combinations on equities or indexes. This is a high-risk strategy.

**Speculation:** An investment objective of Speculation indicates you seek a significant increase in the principal value of your investments and are willing to accept a corresponding greater degree of risk by investing in securities that have historically demonstrated a high degree of risk of loss of principal value to pursue this objective. Some examples of typical investments might include lower quality, long-term fixed income products, initial public offerings, volatile or low priced common stocks, the purchase or sale of put or call options, spreads, straddles and/or combinations on equities or indexes[1], and the use of short-term or day trading strategies.

[1]Retirement accounts may not be approved for margin trading privileges. Margin is required to sell covered puts and uncovered puts and call options, conduct spreads, and to write straddles and combinations on equities or indexes.

**Other:** Defined by Broker/Dealer or Account Holder.

New York Stock Exchange Rule 382 requires that your Broker/Dealer and NFS allocate between them certain functions regarding the administration of your brokerage ac-t. The following is a summary of the allocation services performed by your Broker/ .r and NFS. A more complete description is available upon request.

**Your Broker/Dealer is responsible for** (1) obtaining and verifying brokerage account information and documentation, (2) opening, approving and monitoring your brokerage account, (3) transmitting timely and accurate instructions to NFS with respect to your brokerage account, (4) determining the suitability of investment recommendations and advice, (5) operating and supervising your brokerage account and its own activities in compliance with applicable laws and regulations, including compliance with margin rules pertaining to your margin account (if applicable), and (6) maintaining the required books and records for the services it performs.

**NFS shall perform the following tasks** at the direction of your Broker/Dealer: (1) execute, clear and settle transactions processed through NFS by your Broker/Dealer, (2) prepare and send transaction confirmations and periodic statements of your brokerage account (unless your Broker/Dealer has undertaken to do so). Certain pricing and other information may be provided by your Broker/Dealer or obtained from third parties, which has not been verified by NFS, (3) act as custodian for funds and securities received by NFS on your behalf, (4) follow the instructions of your Broker/Dealer with respect to transactions and the receipt and delivery of funds and securities for your brokerage account, and (5) extend margin credit for purchasing or carrying securities on margin. Your Broker/Dealer is responsible for ensuring that your brokerage account is in compliance with federal, industry and NFS margin rules, and for advising you of margin requirements. NFS shall maintain the required books and records for the services it performs.

This Agreement and its enforcement shall be governed by the laws of the Commonwealth of Massachusetts; shall cover individually and collectively all accounts which the undersigned may open or reopen with you, and shall inure to the benefit of your successors, whether by merger, consolidation or otherwise, and assigns and you may transfer the account of the undersigned to your successors and assigns, and this Agreement shall be binding upon heirs, executors, administrators, successors and assigns of the undersigned.

### Brokerage Account

### Pre-Dispute Arbitration Agreement

This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:

(A) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

(B) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

(C) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

(D) The arbitrators do not have to explain the reason(s) for their award.

(E) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

(F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

(G) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

All controversies that may arise between us (including, but not limited to controversies concerning any account, order or transaction, or the continuation, performance, interpretation or breach of this or any other agreement between us, whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in accordance with the rules then prevailing of the New York Stock Exchange, Inc., or the NASD, Inc., as I may designate. If I do not notify you in writing of my designation within five (5) days after I receive from you a written demand for arbitration, then I authorize you to make such designation on my behalf. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any Pre-Dispute Arbitration Agreement against any person who has initiated in court a putative class action; or who is a member of a putative class action who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

# Financial Institutions Disclosure Form

This disclosure is made a part of the brokerage account application to ensure that the client fully understands the separation of the traditional bank accounts and the new brokerage account being established.  Please initial each item where indicated and sign at the bottom stating your understanding of these important points.

_____ _____    I/We understand securities accounts are not FDIC insured; and

_____ _____    I/We understand that funds in an investment account are not deposits or other obligations of the bank and are not guaranteed by the bank; and

_____ _____    I/We understand investment account assets are subject to market risk, including the possible loss of the principal invested.


_____
(Primary Account Holder)


_____
(Joint Account Holder)


_____
(Registered Representative)

# First Insurance & Investments, Inc.
### Registered Investment Advisor
419 Fifth St., Defiance, OH 43512

## INVESTMENT MANAGEMENT AGREEMENT
### (DISCRETIONARY with Limitations)

This is an agreement between First Insurance & Investments, Inc. an Ohio corporation ("Adviser") and, _BRADLEY MANGAS_ ("Client"). By this agreement, Client retains Adviser to provide investment advisory services to Client on the following terms:

*Section 1. Investment Advisory Services.* Adviser will direct, with Client's prior written or oral approval, the investment and reinvestment of the assets in Client's account (the "Account") in securities and cash or cash equivalents. Adviser will take into account Client's financial circumstances and investment objectives and any special instructions or limits that Client wishes Adviser to follow in advising Client on the appropriate investment structure. Client agrees to notify Adviser promptly of any significant change in the information provided by the Client or any other significant change in Client's financial circumstances or investment objectives that might affect the manner in which Client's account should be invested. Client also agrees to provide Adviser with such additional information as Adviser may request from time to time to assist it in advising Client. Adviser's authority under this Agreement will remain in effect until changed or terminated by Client in writing.

*Section 2. Sub-advisers.* First Insurance & Investments, Inc. may contract with other advisers to manage the client's assets. In that event, the contracted adviser shall be paid a portion of the fees earned by First Insurance & Investments, Inc. to perform those services.

*Section 3. Execution of Investment Account Transactions.* First Insurance & Investments, Inc. does not have discretionary authority to select the broker used for client transactions, nor to determine the commission rates to be paid. Clients should understand that because brokers are designated by the client, First Insurance & Investments, Inc. does not have the authority to negotiate commissions, obtain volume discounts and best execution may not be achieved. Clients in need of brokerage and custodial services will have Online Brokerage Services, Inc. recommended to them. First Insurance & Investments, Inc. generally will seek competitive commission rates but will not necessarily attempt to obtain the lowest possible commission for transactions for the Account. In instances where the client directs that a broker-dealer other than Online Brokerage Services, Inc. be used to execute securities transactions, First Insurance & Investments, Inc. will not have the ability to obtain discounted commissions and/or transaction charges, as it can for Online Brokerage Services, Inc. accounts. Transactions for each client account generally will be executed independently, unless Adviser decides to purchase or sell the same securities for several clients at approximately the same time. Adviser may (but is not obligated to) combine or "batch" such orders to obtain best execution, to

·1

negotiate more favorable commission rates or to allocate equitably among Adviser's clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Under this procedure, transactions will be averaged as to price and transaction costs and will be allocated among Adviser's clients in proportion to the purchase and sale orders placed for each client account on any given day.

Instead of allowing Adviser to select brokers or dealers for the Account, Client may direct Adviser in writing to use a particular broker or dealer to execute some or all transactions for Client's Account. In that case, Client will negotiate terms and arrangements for the Account with that broker or dealer, and Adviser will not seek better execution services or prices from other broker or dealers or be able to "batch" Client transactions for execution through other brokers or dealers with orders for other accounts advised or managed by Adviser. As a result, Client may pay higher commissions or other transaction costs or greater spreads, or receive less favorable net prices, on transactions for the Account than would otherwise be the case.

Client authorizes and directs Adviser to instruct all brokers and dealers executing orders for Client to forward confirmations of those transactions to Custodian (as defined below) and Adviser. If Client wishes, Adviser will instruct the brokers and dealers that execute orders for Client's account to send Client all transaction confirmations. Or, Client may choose not to receive confirmations and instead rely on Client's quarterly statements from the Custodian and the statements Adviser provides, to keep informed of the status of Client's account. Please check this space if Client does not wish to receive individual confirmations. _____ (Client may change this decision at any time and instruct Adviser, in writing, to have all confirmations sent directly to Client.)

Adviser may give a copy of this Agreement to any broker, dealer or other party to a transaction for the Account, or the Custodian as evidence of Adviser's authority to act for Client.

On a limited basis, the firm has discretion and authority to determine, without obtaining specific client consent, the securities to be bought or sold, as well as the amount of the securities to be bought or sold. This limited discretion occurs on a systematic basis, when the asset allocation model investment portfolios fall sizably out of balance compared to the pre-determined asset allocation model investment portfolio initially introduced.

*Section 4. Custodial Arrangements.* Custody of Account assets will be maintained with the independent custodian selected by Client and named on Schedule A (the "Custodian"). Adviser will not have custody of any assets in the Account. Client will be solely responsible for paying all fees or charges of the Custodian. Client authorizes Adviser to give Custodian instructions for the purchase, sale, conversion, redemption, exchange or retention of any security, cash or cash equivalent or other investment for the Account. Client also authorizes and directs Adviser to instruct Custodian on Client's behalf to (i) send Client at least quarterly a statement showing all transactions occurring in the Account during the period covered by the account statement, and the funds, securities and other property in the Account at the end of the period; and (ii) provide Adviser copies of all periodic statements and other reports for the Account that Custodian sends to Client

2

*Section 5.*  *Reports*.  Adviser will provide Client quarterly and annual written statements of the assets in Client's Account, the purchase date, the cost, the current market value, and performance data for the period (or since the opening of the Account).

*Section 6.*  *Advisory Fees*.  Client will pay Adviser a fee for its investment advisory services. The fee will be a percentage of the market value of all assets in the Account on the last trading day of each calendar quarter.  The fee schedule is set forth in Schedule A.  The advisory fee is payable quarterly in arrears.  In any partial calendar quarter, the advisory fee will be pro rated based on the number of days that the Account was open during the quarter.  Client understands that Account assets invested in shares of mutual funds or other investment companies ("funds") will be included in calculating the value of the Account for purposes of computing Adviser's fees and the same assets will also be subject to additional advisory and other fees and expenses, as set forth in the prospectuses of those funds, paid by the funds but ultimately borne by the investor.  The Adviser to this contract is not compensated on the basis of a share of capital gains upon the capital appreciation of funds of a client. First Insurance & Investments, Inc. may debit an advisory fee from a clients account. All direct debiting of the advisory fees of Michigan residents will be done in accordance with the provisions of Michigan release 93-3-BD:

1.)     The authorization or agreement will be limited to withdrawing contractually agreed upon adviser fees;

2.)     The investment adviser will notify the client, in writing by at least First class mail not less than (7) days prior to the proposed date of withdrawal and specific manner or basis on which the fee has been calculated.  The notice shall advise clients of the opportunity to object to the invoiced amount and the manner in which the objection is to be made;

3.)     The frequency of fee withdrawal must be specified in the written authorization or agreement;

4.)     The custodian of the account must be advised in writing of the limitation on the adviser's access to the account.  This requirement may be satisfied by furnishing to the custodian a copy of the authorization or agreement;

5.)     The custodian must provide the client, not less than quarterly, a statement including all amounts dispersed from the account, including, separately, the amount of advisory fees paid. This may be contained in the custodian's regular report to the client; and;

6.)     The client is able to terminate the written billing authorization or agreement at any time.

Client elects to pay Adviser for its services as follows (check applicable box):

    X           Client authorizes the Custodian to deduct from this Account, or Account # _____ and pay to Adviser the advisory fee for each calendar year quarter. Adviser will send to the Custodian and the Client at the same time a bill showing the amount of the advisory fee due, the Account value on which the fee is based and how the

3

fee was calculated.  The Custodian will send Client a quarterly statement showing all amounts paid from the Account, including all advisory fees paid by Custodian to Adviser.

_____.   Advisory Fees will be billed directly to Client (and not deducted from Client's Account), and Client agrees to pay all Advisory Fees within 30 days of Client's receipt of an invoice from Adviser.

Section 7.  _Valuation._  Adviser will value securities in the Account that are listed on a national securities exchange or on NASDAQ at the closing price, on the valuation date, on the principal market where the securities are traded.  Other securities or investments in the Account will be valued in a manner determined in good faith by Adviser to reflect fair market value.

Section 8.  _Confidentiality._  Except as otherwise agreed in writing or as required by law, Adviser will keep confidential all information concerning Client's identity, financial affairs, or investments.

Section 9.  _Other Investment Accounts._  Client understands that Adviser serves as investment adviser for other clients and will continue to do so.  Client also understands that Adviser, its personnel and affiliates ("Affiliated Persons") may give advice or take action in performing their duties to other clients, or for their own accounts, that differ from advice given to or action taken for Client.  Adviser is not obligated to buy, sell or recommend for Client any security or other investment that Adviser or its Affiliated Persons may buy, sell or recommend for any other client or for their own accounts.  This Agreement does not limit or restrict in any way Adviser or any of its Affiliated Persons from buying, selling or trading in any securities or other investments for their own accounts.

Adviser or its Affiliated Persons may provide services for, or solicit business from various companies, including issuers of securities that Adviser may recommend or purchase or sell for client accounts.  In providing these services, Adviser or its Affiliated Persons may obtain material, nonpublic or other confidential information that, if disclosed, might affect an investor's decision to buy, sell or hold a security.  Under applicable law, Adviser and its Affiliated Persons cannot improperly disclose or use this information for their personal benefit or for the benefit of any person, including clients of Adviser.  If Adviser or any Affiliated Person obtains nonpublic or other confidential information about any issuer, Adviser will have no obligation to disclose the information to Client or use it for Client's benefit.

Section 10.  _Risk Acknowledgment._  Adviser does not guarantee the future performance of the Account or any specific level of performance, the success of any investment decision or strategy that Adviser may use, or the success of Adviser's overall management of the Account.  Client understands that investment decisions made for Client's Account by Adviser are subject to various market, currency, economic, political and business risks, and that those investment decisions will not always be profitable.  Adviser will provide advice only with respect to the securities, cash and other investments held in Client's Account and, in making recommendations with respect to the Account, Adviser will not consider any other securities, cash or other investments owned by Client.  Except as may otherwise be provided by law,

4

Adviser will not be liable to Client for (i) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith by Adviser with that degree of care, skill, prudence, and diligence under the circumstances that a prudent person acting in a fiduciary capacity would use; (ii) any loss arising from Adviser's adherence to Client's written or oral instructions; or (iii) any act or failure to act by the Custodian, any broker or dealer to which Adviser directs transactions for the Account, or by any other third party. The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in this Agreement will waive or limit any rights that Client may have under those laws.

Section 11.   *Retirement or Employee Benefit Plan Accounts*.  This Section 11 applies if the Account is for a (i) pension or other employee benefit plan (including a 401(k) plan) governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) tax-qualified retirement plan (including a Keogh plan) under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and not covered by ERISA; or (iii) an individual retirement account ("IRA") under Section 408 of the Code.

If the Account is for a plan subject to ERISA, Client appoints Adviser, and Adviser accepts its appointment, as an "investment manager" for purposes of ERISA and the Code, and Adviser acknowledges that it is a "fiduciary" within the meaning of Section 3(21) of ERISA and Section 4975(e)(3) of the Code (but only with respect to the provision of services described in Section 1 of this Agreement).  Adviser represents that it is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

Client represents that Adviser has been furnished true and complete copies of all documents establishing and governing the plan and evidencing Client's authority to retain Adviser.  Client will furnish promptly to Adviser any amendments to the plan, and Client agrees that, if any amendment affects the rights or obligations of Adviser, such amendment will be binding on Adviser only when agreed to by Adviser in writing.  If the Account contains only a part of the assets of the plan, Client understands that Adviser will have no responsibility for the diversification of all of the plan's investments, and that Adviser will have no duty, responsibility or liability for Client assets that are not in the Account.  If ERISA or other applicable law requires bonding with respect to the assets in the Account, Client will obtain and maintain at its expense bonding that satisfies this requirement and covers Adviser and its Affiliated Persons.

Section 12.   *Other Legal Actions*.  The Client agrees that Adviser will not advise or act for Client in any legal proceedings, including bankruptcies or class actions, involving securities held or previously held by the Account or the issuers of these securities ("Legal Proceedings").

Section 13. *Proxy Voting*.  The Client agrees that (check applicable box):

o        Adviser *will vote* proxies for securities held in the Account (in accordance with Adviser's policies regarding proxy voting).  Adviser is authorized and directed to instruct the Custodian to forward promptly to Adviser copies of all proxies and shareholder

5

communications relating to securities held in the Account (other than materials relating to Legal Proceedings). Client agrees that Adviser will not be responsible or liable for failing to vote any proxies where it has not received such proxies or related shareholder communications on a timely basis.

X    Adviser *will **not** vote*, or give any advice about how to vote, proxies for securities held in the Investment Account. If the Investment Account is for a pension or other employee benefit plan governed by ERISA, Client directs Adviser *not* to vote proxies for securities held in the Account because the right to vote such proxies has been expressly reserved to (check applicable box):

O    The plan's trustees

O    The following named fiduciary: _____

Section 14.   *Termination*.   This Agreement will continue in effect until terminated by either party by written notice to the other.   Termination of this Agreement will not affect (i) the validity of any action previously taken by Adviser under this Agreement; (ii) liabilities or obligations of the parties from transactions initiated before termination of this Agreement; or (iii) Client's obligation to pay advisory fees (pro rated through the date of termination). Upon the termination of this Agreement, Adviser will have no obligation to recommend or take any action with regard to the securities, cash or other investments in the Account.

Section 15.   *Client Authority*.   If Client is an individual, Client represents that he or she is of the age of majority. If Client is a corporation, the person signing this Agreement for the Client represents that he or she has been authorized to do so by appropriate corporate action. If this Agreement is entered into by a trustee or other fiduciary, the trustee or fiduciary represents that Adviser's investment management strategies, allocation procedures, and investment advisory services are authorized under the applicable plan, trust, or law and that the person signing this Agreement has the authority to negotiate and enter into this Agreement. Client will inform Adviser of any event that might affect this authority or the propriety of this Agreement.

Section 16.   *Death or Disability*.   If Client is a natural person, the death, disability or incompetence of Client will not terminate or change the terms of this Agreement. However, Client's executor, guardian, attorney-in-fact or other authorized representative may terminate this Agreement by giving written notice to Adviser.

Section 17.   *Binding Agreement*.   This Agreement will bind and be for the benefit of the parties to the Agreement and their successors and permitted assigns, except that this Agreement may not be assigned (within the meaning of the Advisers Act) by either party without the prior consent of the other party.

Section 18.   *Governing Law*.   This Agreement will be governed by and construed in accordance with the laws of the State of Ohio without giving effect to any conflict or choice of law provisions of that State, provided that nothing in this Agreement will be construed in any manner inconsistent with the Advisers Act, any rule or order of the Securities and Exchange

Commission under the Advisers Act and, if applicable to the Account, ERISA and any rule or order of the Department of Labor under ERISA.

*Section 19. Notices.* Any notice, advice or report to be given to Adviser under this Agreement will be delivered in person, by U.S. mail or overnight courier (postage prepaid) or sent by facsimile transmission (with a hard copy sent by U.S. mail) to Adviser at the address on the first page of this Agreement (Attention: Steven Grosenbacher, President) or at such other address as Adviser may designate in writing. Any notice, advice or report given to Client under this Agreement will be delivered in person, by U.S. mail or overnight courier (postage prepaid) or sent by facsimile transmission (with a hard copy sent by U.S. mail) to Client at the address set forth below or at such other address as Client may designate in writing.

*Section 20. Miscellaneous.* If any provision of this Agreement is or should become inconsistent with any law or rule of any governmental or regulatory body having jurisdiction over the subject matter of this Agreement, the provision will be deemed to be rescinded or modified in accordance with any such law or rule. In all other respects, this Agreement will continue and remain in full force and effect. No term or provision of this Agreement may be waived or changed except in writing signed by the party against whom such waiver or change is sought to be enforced. Adviser's failure to insist at any time upon strict compliance with this Agreement or with any of the terms of the Agreement or any continued course of such conduct on its part will not constitute or be considered a waiver by Adviser of any of its rights or privileges. This Agreement contains the entire understanding between Client and Adviser concerning the subject matter of this Agreement.

*Section 21. Disclosure.* Client has received and reviewed a copy of Part II of Adviser's Form ADV dated __01-01-2006__, as well as a copy of this Agreement: (initial one)

_____ (a) at least 48 hours prior to signing this Agreement.

___X_____ (b) upon entering into this Agreement, in which event Client shall have the right to terminate this Agreement without penalty within five (5) business days from the date hereof.

Client and Adviser have executed this Discretionary with Limitations Investment Advisory Agreement on this _____ day of _____, _____.

| | |
|---|---|
| _____ | _____ |
| Client Signature | Joint Client Signature |
| | |
| _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_____ | _28799 State Route 281_____ |
| | _Defiance, OH 43512_____ |
| _____ | |
| Social Security or Tax I.D. Number(s) | Client Address |
| | |
| _____ | |
| Advisor Signature | |
| | By: _____ |

7

## Schedule A

- *Custody of Account Assets*

  The assets to be managed under this agreement will be held in an account established with National Financial Services, LLC unless otherwise directed by you below.

  National Financial Services, LLC      Name of Custodian: _____
  82 Devonshire St.                     Address: _____
  Boston, MA  02109                     Address (cont.): _____

- *Investment Advisory Fees*

  Account fees are charged quarterly in arrears, based on the value of the account at quarter end.  All assets are included in this calculation unless noted below.

  | *Assets* | | | *Annual Fee* |
  |---|---|---|---|
  | $   - 0 - | to | $250,000 | 1.75% |
  | $250,001 | to | $500,000 | 1.50% |
  | $500,001 | to | $1,000,000 | 1.25% |
  | $1,000,001 | to | $2,000,000 | 1.10% |
  | $2,000,001 | to | $5,000,000 | 0.90% |

  Assets To be excluded form the fee calculation:

  MONEY MARKETS _____

  _____

  _____

- **Signature:**

  _____    _____
  Client Signature                Date    Joint Client Signature            Date

                                          JEFFERY  D.  HUNT
  _____    _____
  Investment Advisor Representative Signature   Date    Investment Advisor Representative Printed Name

                                          FI&I IMA 02.16.06.doc

8

# Client Portfolio Acknowledgement

Client Name(s): _BRADLEY MANGAS_____ Account #: _____

*Portfolio recommended by Advisor (please check one):*

___ DFA 0/100 Fixed          ___ DFA 60/40 Normal
___ DFA 20/80 Conservative   ___ DFA 80/20 Aggressive
___ DFA 40/60 Moderate       ___ DFA 100/0 Equity
___ Other: _____
_____
_____

*Portfolio chosen by Client(s) (please check one):*

___ DFA 0/100 Fixed          ___ DFA 60/40 Normal
___ DFA 20/80 Conservative   ___ DFA 80/20 Aggressive
___ DFA 40/60 Moderate       ___ DFA 100/0 Equity
___ Other: _____
_____
_____

Client has chosen other than the Advisor's recommendation for the following reason:
_____
_____
_____


_____          _____
Client Signature                 Client Signature


_____          _____
Advisor Signature                Date

FI&I Client Acknowlededement 06.29.06.doc

070531  280  001237573  C  1

SECURITIES OFFERED THROUGH
ONLINE BROKERAGE SERVICES, INC.
FIRST INSURANCE&INVESTMENTS,INC.
419 FIFTH STREET SUITE 1200
P.O. BOX 700
DEFIANCE, OH 43512

BRADLEY E MANGAS
28799 ST RT 281
DEFIANCE OH 43512

## ≡ ≡

**Account Number:** LMW-001759

### FIRST INSURANCE & INVESTMENTS

Securities offered through Online Brokerage Services, Inc. Member NASD, SIPC.
Online Brokerage Services, Inc. is an affiliate affiliated with First Insurance and Investments at First Federal
Bank of the Midwest.
Investments are Not FDIC Insured • May Lose Value • Not a Bank Deposit • No Bank Guarantee • Not Insured by
any Federal Government Agency

YOUR INVESTMENT REPRESENTATIVE
JEFFERY HUNT
RR#: 202

FOR QUESTIONS OR UP-TO-DATE ACCOUNT INFORMATION:
Local                                    419 784 2664

First Insurance & Investments
419 Fifth Street, Suite 1200
P.O. Box 700
Defiance, OH 43512
1-800-974-0411

Online Brokerage Services, Inc
10200 Waterville Street
Whitehouse, OH 43571

---

**Statement Date: 05/01/07 to 05/31/07**

# SNAPSHOT

**TOTAL PORTFOLIO**
## $258,897.45

| PORTFOLIO VALUE | This Period | Prior Period |
|---|---|---|
| Cash and Cash Equivalents | $258,897.45 | $234,332.57 |
| **TOTAL PORTFOLIO VALUE** | **$258,897.45** | **$234,332.57** |

| ACCOUNT ACTIVITY | This Period | Year-To-Date |
|---|---|---|
| Net Core Fund Activity | ($24,564.86) | ($120,919.83) |
| Net Additions and Withdrawals | $23,632.87 | $116,632.87 |
| Net Income and Expenses | $932.01 | $4,301.96 |
| Net Miscellaneous Activity | $0.00 | ($15.00) |

**Portfolio Value**
(in hundreds of dollars)



A portfolio value less than $100.00 may not be displayed.

September 2006
December 2006
March 2007
This Period

2,610.
1,740.
870.
0.

*Account carried with National Financial Services LLC, Member NYSE, SIPC*

---

LEGEND
( ) Numbers in parenthesis
are debits or subtractions
NFS ~ National Financial
Services LLC

Page 1 of 6
070531 280 001237573

Account Number: LMW-001759
Account Name: MANGAS

Statement Date:  05/01/2007 to 05/31/2007

# FIRST INSURANCE & INVESTMENTS

American Mutual Savings Online Brokerage Service, Inc. Member NASD, SIPC.
Online Brokerage Services, Inc. is not otherwise Affiliated with First Insurance and Investments or First Federal Bank of the Midwest.
Investments are Not FDIC Insured • May Lose Value • Not a Bank Deposit • No Bank Guarantee • Not Insured by any Federal Government Agency

First Insurance & Investments
419 Fifth Street, Suite 1300
P.O. Box 745
Defiance, OH 43512
1 (800) 875-3435

Cetera Brokerage Services, Inc.
12555 Manchester Road
Whitehouse, OH 43571

## SUMMARY

| TOTAL PORTFOLIO VALUE | This Period | Prior Period |
|---|---|---|
| Cash and Cash Equivalents | | |
| Money Markets | $258,897.45 | $234,332.57 |
| **TOTAL PORTFOLIO VALUE** | **$258,897.45** | **$234,332.57** |

| ACCOUNT ACTIVITY | This Period | This Period Year to Date |
|---|---|---|
| BEGINNING BALANCE | $0.00 | |
| Core Fund Activity | | |
| Core Funds Purchased | ($24,564.88) | ($144,334.83) |
| Core Funds Sold | $0.00 | $23,415.00 |
| **NET CORE FUND ACTIVITY** | **($24,564.88)** | **($120,919.83)** |
| Additions and Withdrawals | | |
| Deposits | $23,632.87 | $140,032.87 |
| Other Additions and Withdrawals | $0.00 | ($23,400.00) |
| **NET ADDITIONS AND WITHDRAWALS** | **$23,632.87** | **$116,632.87** |
| Income and Expenses | | |
| Taxable Income | | |
| Taxable Dividends | $932.01 | $4,301.96 |
| **NET TAXABLE INCOME** | **$932.01** | **$4,301.96** |
| **TOTAL INCOME** | **$932.01** | **$4,301.96** |
| NET INCOME AND EXPENSES | $932.01 | $4,301.96 |
| NET MISCELLANEOUS ACTIVITY | $0.00 | ($15.00) |
| **ENDING BALANCE** | **$0.00** | |

## DETAIL

ALERT: Taxable income is determined based on information available to NFS at the time the statement was prepared, and is subject to change. Final information on taxation of interest and dividends is available on Form 1099-Div, which is mailed in January of the subsequent year.

See last page for important information about your brokerage account and this statement.

*Account carried with National Financial Services LLC, Member NYSE, SIPC*

Account number: LMW-001759
Account name: MANGAS

Statement Date: 05/01/2007 to 05/31/2007

## FIRST INSURANCE & INVESTMENTS

Securities offered through Online Brokerage Services, Inc. Member FINRA, SIPC.
Online Brokerage Services, Inc. is an affiliate, affiliated with First Insurance & Investments at First Federal Bank of the Midwest.
Investments are NOT FDIC Insured • May Lose Value • Not a Bank Deposit • Not Bank Guarantee • Not Issued by any Federal Government Agency

First Insurance & Investments
419 Fifth Street, Suite 1340
P.O. Box 794
Defiance, OH 43512
1-800-875-3431

Online Brokerage Services, In
13325 Worumble Street
Whitehouse, OH 43571

### PORTFOLIO VALUE

NFS-provided estimated cost basis (including cost basis and short sale proceeds information provided to NFS by customers), realized gain and loss, and holding period information may not reflect all adjustments necessary for tax reporting purposes. Taxpayers should verify such information against their own records when calculating reportable gain or loss resulting from a sale, redemption, or exchange. NFS does not report such information to the IRS or other taxing authorities and is not responsible for the accuracy of such information taxpayers may be required to report to federal, state, and other taxing authorities. NFS makes no warranties with respect to, and specifically disclaims any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information. Unless otherwise specified, NFS determines cost basis at the time of sale based on the average cost-single category (ACSC) method for open-end mutual funds and based on the first-in, first-out (FIFO) method for all other securities.

Amortization, accretion and similar adjustments to cost basis have been provided for many fixed income securities (and some bond-like equities), however, they are not provided for certain types, such as short-term instruments, Unit Investment Trusts, foreign fixed income securities, or those that are subject to early prepayment of principal (pay downs). Where current year premium or acquisition premium amortization is provided, the prior years' cumulative amortization is reflected in the adjusted cost basis, but we cannot provide a breakdown or the total of such prior year amortization amounts.

LIMITATION ON COST BASIS INFORMATION: NFS's cost basis information system has a cumulative lifetime limit on how much activity it can track for each individual security position in an account. For this purpose, each buy, sell, dividend, wash sale disallowed loss, stock split, stock merger, etc. is an event. For some customers, this limit can be reached with approximately 1500 events. Upon reaching the limit, the system no longer displays or tracks cost basis information for the affected position, and such information will usually show as not available or unknown. Once the limit is reached, all cost basis information for the affected position will need to be tracked and updated by you, the investor.

Please be aware that all accounts that have not had any trading activity will be charged an inactivity fee of $20.00 in June. Please contact your Registered Representative if you have any questions.

## CASH AND CASH EQUIVALENTS 100.00%

| Description | Symbol/Cusip Account Type | Quantity | Price on 05/31/07 | Current Market Value | Prior Market Value | Estimated Annual Income |
|---|---|---|---|---|---|---|
| **Money Markets** | | | | | | |
| PRIME FUND - CAPITAL RESERVES CLASS | FPRXX CASH | 258,897.45 | $1.00 | $258,897.45 | $234,332.57 | |
| 7 DAY AVG NET YIELD 4.47% | | | | | | |
| Dividend Option Reinvest | | | | | | |
| Capital Gain Option Reinvest | | | | | | |
| **Total Cash and Cash Equivalents** | | | | **$258,897.45** | | |

## TOTAL PORTFOLIO VALUE

**$258,897.45**

*Account carried with National Financial Services LLC, Member NYSE, SIPC*

Account   mber: LMW-001759
Account Name: MANGAS

Statement Date:   05/01/2007 to 05/31/2007

# FIRST INSURANCE & INVESTMENTS

Securities offered through Online Brokerage Services, Inc. Member NASD, SIPC.
Online Brokerage Services, Inc. is not otherwise affiliated with First Insurance and Investments or First Federal Bank of the Midwest.
In rełiance on the FDIC Second and Any Loss Value / Not a Bank Deposit / Not Bank Guarantee / Not Insured by any Federal Government agency

First Insurance & Investments
419 FIfth Street, Suite 1600
P.O. Box 140
Defiance, OH 43512

Online Brokerage Services, Inc.
4300 Water side Street
Whitehouse, OH 43571

## ACCOUNT ACTIVITY

NFS-provided estimated cost basis (including cost basis and short sale proceeds information provided to NFS by customers), realized gain and loss, and holding period information may not reflect all adjustments necessary for tax reporting purposes. Taxpayers should verify such information against their own records when calculating reportable gain or loss resulting from a sale, redemption, or exchange. NFS does not report such information to the IRS or other taxing authorities and is not responsible for the accuracy of such information taxpayers may be required to report to federal, state, and other taxing authorities. NFS makes no warranties with respect to, and specifically disclaims any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information. Unless otherwise specified, NFS determines cost basis at the time of sale based on the average cost-single category (ACSC) method for open-end mutual funds and based on the first-in, first-out (FIFO) method for all other securities.

Amortization, accretion and similar adjustments to cost basis have been provided for many fixed income securities (and some bond-like equities), however, they are not provided for certain types, such as short-term instruments, Unit Investment Trusts, foreign fixed income securities, or those that are subject to early prepayment of principal (pay downs). Where current year premium or acquisition premium amortization is provided, the prior years' cumulative amortization is reflected in the adjusted cost basis, but we cannot provide a breakdown or the total of such prior amortization amounts.

LIMITATION ON COST BASIS INFORMATION. NFS's cost basis information system has a cumulative lifetime limit on how much activity it can track for each individual security position in an account. For this purpose, each buy, sell, dividend, wash sale, disallowed loss, stock split, stock merger, etc. Is an event. For some customers, this limit can be reached with approximately 1500 events. Upon reaching the limit, the system no longer displays or tracks cost basis information for the affected position, and such information will usually show as not available or unknown. Once the limit is reached, all cost basis information for the affected position will need to be tracked and updated by you, the investor.

## CORE FUND ACTIVITY

### Core Funds Purchased

| Settlement Date | Account Type | Transaction | Description | Quantity | Amount |
|---|---|---|---|---|---|
| 05/01/07 | CASH | YOU BOUGHT | PRIME FUND - CAPITAL RESERVES CLASS @ 1 | 150 | ($150.00) |
| 05/15/07 | CASH | YOU BOUGHT | PRIME FUND - CAPITAL RESERVES CLASS @ 1 | 23,482.87 | ($23,482.87) |
| 05/31/07 | CASH | REINVESTMENT | PRIME FUND - CAPITAL RESERVES CLASS REINVESTED @ $1.00 | 932.01 | ($932.01) |

**Net Core Funds Purchased** — ($24,564.88)

## NET CORE FUND ACTIVITY — ($24,564.88)

## ADDITIONS AND WITHDRAWALS

### Deposits

| Date | Account Type | Transaction | Description | Quantity | Amount |
|---|---|---|---|---|---|
| 05/01/07 | CASH | EFT FUNDS RECEIVED | EFT FUNDS RECEIVED ER65221766 | | $150.00 |
| 05/15/07 | CASH | CHECK RECEIVED | CHECK RECEIVED | | $23,482.87 |

**Net Deposits** — $23,632.87

*Account carried with National Financial Services LLC, Member NYSE, SIPC*

Account number: LMW-001759
Account name: MANGAS

Statement Date: 05/01/2007 to 05/31/2007

**FIRST INSURANCE & INVESTMENTS**

First Insurance & Investments
419 Fifth Street, Suite 1200
P.O. Box 798
Defiance, OH 43512
1-800-879-4141

Securities offered through Online Brokerage Services, Inc. Member NASD, SIPC.
Online Advisory Services, Inc. is a Registered Investment Advisor affiliated with First Insurance and Investments as First Federal Bank of the Midwest.
Investments are not FDIC insured. May Lose Value. Not a bank Deposit. Not bank Guaranteed. Not insured by any Federal Government Agency.

Online Brokerage Services, Inc.
10200 Waterville Street
Whitehouse, OH 43571

---

## NET ADDITIONS AND WITHDRAWALS $23,632.87

## INCOME AND EXPENSES

### Taxable Income

| Date | Account Type | Transaction | Description | Quantity | Amount |
|------|--------------|-------------|-------------|----------|--------|
| Taxable Dividends | | | | | |
| 05/31/07 | CASH | DIVIDEND RECEIVED | PRIME FUND - CAPITAL RESERVES CLASS DIVIDEND RECEIVED | | $932.01 |

**Net Taxable Income** $932.01

**Total Income** $932.01

## NET INCOME AND EXPENSES $932.01

**FOOTNOTES AND COST BASIS INFORMATION**

NFS-provided estimated cost basis (including estimated cost basis and short sale proceeds information provided to NFS by customers), realized gain and loss, and holding period information may not reflect all adjustments necessary for tax reporting purposes. Taxpayers should verify such information against their own records when calculating reportable gain or loss resulting from a sale, redemption, or exchange. NFS does not report such information to the IRS or other taxing authorities and is not responsible for the accuracy of such information taxpayers may be required to report to federal, state, and other taxing authorities. NFS makes no warranties with respect to, and specifically disclaims any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information. Unless otherwise specified, NFS determines cost basis at the time of sale based on the average cost-single category (ACSC) method for open-end mutual funds and based on the first-in, first-out (FIFO) method for all other securities. Customers should consult their tax advisors for further information.

For investments in partnerships, NFS does not make any adjustments to cost basis information as the calculation of basis in such investments requires supplemental information from the partnership on its income and distributions during the period you held your investment. Partnerships usually provide this additional information on a Form K-1 issued by April 15th of the following year.

*Account carried with National Financial Services LLC, Member NYSE, SIPC*

**GLOSSA...**

**...hort Account Balances**-If you have sold securities under the short sale rule, we have, in accordance with regulations, segregated the proceeds from such transactions in your Short Account. Any market increases or decreases from the original sale price will be marked to the market and will be transferred to your Margin Account on a weekly basis. Market Value - The Total Market Value has been calculated out to 3 decimal places, however, the individual unit price is displayed at 5 decimal places. This amount includes values based on remittent quotation services, which may in turn, exhibit approximately the accuracy of such prices and/or the mean bid and ask on the last day of the statement period. Accordingly, the accuracy of such prices cannot be guaranteed. The securities may be unpriced for various reasons including, but not limited to, unavailability of pricing, illiquidity, or the securities may not have value. The value of a security may differ from its purchase price. Securities are identified on the front of the statement. Investment decisions should be made only after consulting your broker/dealer for an actual quote. Estimated Yield and Estimated Annual Income – When available, the coupon rate of some fixed income securities is divided by the current market value of the fixed income security to create the Estimated Yield figure and/or the current...

**CUSTOMER SERVICE** – Please review your statement and report any discrepancies immediately. Inquiries or concerns regarding your brokerage account or the activity therein should be directed to your broker/dealer at the telephone number and address reflected on the front of this statement and National Financial Services LLC ("NFS") who carries your brokerage account and acts as your custodian for funds and securities deposited with NFS directly by you, through your broker/dealer, or as a result of transactions NFS processes for your account. NFS may be contacted by calling (617) 563-5977. Any oral communications regarding inaccuracies or discrepancies should be reconfirmed in writing to protect your rights, including those under the Securities Investor Protection Act of 1970 ("SIPA"). When contacting either NFS or your broker/dealer, remember to include your entire brokerage account number to ensure a prompt reply. Please notify the service center of your broker/dealer promptly in writing of any change of address.

**ADDITIONAL INFORMATION** Customer free credit balances are not segregated and may be used in NFS business, subject to the limitations of 17CFR Section 240.15c3-2 under the Securities and Exchange Act of 1934. You have the right to receive from NFS in the course of normal business operations, subject to your commitments to any of your brokerage accounts, any free credit balances to which you are entitled or any fully paid securities which you are able to and not indebted against. In addition, interest should be paid to you for any indebtedness to NFS. Interest on free credit balances awaiting reinvestment may be paid out at rates that may vary with current short-term money market rates and/or your brokerage account balances. at the discretion of your broker/dealer and/or NFS.

**Credit Adjustment Program** – Accountholders receiving payments in lieu of qualified dividends may not be eligible to receive credit adjustments intended to help cover additional associated federal tax burdens. NFS reserves the right to deny the adjustment to any accountholder and to amend or terminate the credit adjustment program.

**Options Customers** – Each transaction confirmation previously delivered to you contains full information about commissions and other charges. If you require further information, please contact your broker/dealer. Assignments of American and European-style options are allocated among customer short positions pursuant to a random allocation procedure, a description of which is available upon request. Short positions in American-style options are liable for assignment at any time. The writer of a European-style option is subject to exercise assignment procedures during the period in which the option is exercisable. Upon request you may obtain, without charge, information concerning the time periods during the expiration cycle when material change in your investment objectives or financial situation.Splits, Dividends, and Interest. Expected stock split, next dividend payable, and next interest payable information has been provided by third parties and may be subject to change. Information for certain securities may be missing if not received from third parties in time for printing. NFS is not responsible for inaccurate, incomplete, or missing information. Please consult your broker/dealer for more information about expected stock split, next dividend payable, and next interest payable or other securities.

**Equity Dividend Reinvestment Customers.** Shares credited to your brokerage account resulted from transactions effected by agent by either: 1) Your broker/dealer for your investment account, or 2) through the Depository Trust Company (DTC) dividend reinvestment program. For broker/dealer effected transactions, the time of the transactions, the exchange upon which these transactions occurred and the name of the person from whom the security was purchased will be furnished upon written request. NFS may have acted as market maker in effecting trades in over-the-counter securities.

**Retirement Contributions/Distributions.** A summary of retirement contributions/distributions is displayed for you in the activity summary section of your statement. Income Reporting. NFS reports earnings from investments in Traditional IRAs, Rollover IRAs, SEP-IRAs and, Keoghs as tax-deferred income. Earnings from Roth IRAs are reported as tax-free income, since distributions may be tax-free after meeting the 5 year aging requirement and certain other conditions. A financial statement of NFS is available for your personal inspection at its office, or a copy of it will be mailed upon your written request.

**Statement Mailing.** NFS will mail statements to customers who have affirmatively requested that affect their cash balances or security positions held in their brokerage accounts during the last monthly reporting period. All other brokerage customers will receive customer statements at least four times during a calendar year as long as the brokerage account contains cash or securities balances. Please keep these statements for your records, as they will help you prepare your income tax returns.

**Page 6 of 6**

---

**...rest rate or most recently declared dividends for certain securities are annualized to create the L... ...lated Annual Income figure. These figures are estimates only, based on mathematical calculations of available data, and have been obtained from information providers believed to be reliable, but no assurance can be made as to accuracy. Since the interest and dividend rates are subject to change at any time, and may be affected by current and future economic, political and business conditions, they should not be relied upon to predict your actual future income, or tax decisions. Estimated Value - If this statement contains an estimated value, you should be aware that this value may be based on a limited number of trades or quotes. Therefore, you may not be able to sell these securities at a price equal or near to the value shown. However, the broker/dealer furnishing this statement may not refuse to accept your order to sell these securities. Also, the amount you receive from a sale generally will be reduced by the amount of any commissions or similar charges. If an estimated value is not shown for a security, a value could not be determined because of lack of information.**

**Loads and Fees.** In addition to sales loads and 12b-1 fees described in the prospectus, NFS or your broker/dealer may receive compensation up to 35 basis points of the average daily net assets of certain mutual funds in connection with your purchase of those mutual funds and/or the on-going maintenance of your brokerage account with respect to those shares. The compensation is paid by the mutual fund and/or its affiliate. Additional information about the source and amount of the compensation will be furnished to you upon written request. Fixed Income. The prices given for fixed income securities on this statement are approximations, and actual interest bills on prices and are provided only as a general guide.

**Margin.** If you have purchased securities on margin, you are borrowing money from NFS in exchange for pledging the assets in your account as collateral for any outstanding margin loan. The amount you may borrow is based on the value of securities in your margin account, which is identified on your statement. If you have a margin account, this is a combined statement of your margin account and special memorandum account maintained for you under Section 220.5 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of the separate account, as required by Regulation T, is available for your inspection upon request.

**NASD NASDAQ.** In addition to the conditions, rules, regulations, customs, rulings and interpretations of the exchange market and its clearing house, if any, where the transactions are executed, and of the New York Stock Exchange (NYSE) and of the National Association of Securities Dealers, Inc. ("NASD"). The NASD requires that we notify you of the availability of an Investor brochure that include information describing NASD Regulation's Public Disclosure Program ("Program"). To obtain a brochure or more information about the Program or NASD Regulation, contact the NASD Regulation Public Disclosure Program Hotline at (800) 289-9999 or access the NASD web site at www.nasdr.com.

**New York Stock Exchange Rule 382** requires that your broker/dealer and NFS allocate between them certain functions regarding the administration of your brokerage account. The following is a summary of the allocation services performed by your broker/dealer and NFS. A more complete description is available upon request. Your broker/dealer is responsible for (1) obtaining and verifying brokerage account information and documentation, (2) opening, approving and monitoring your brokerage account, (3) transmitting timely and accurate instructions to NFS with respect to your brokerage account, (4) determining the suitability of investment recommendations and advice, (5) operating, supervising and complying with its own activities in compliance with applicable laws and regulations including compliance with margin rules pertaining to your margin account, if applicable, and (6) maintaining required books and records for the services that it performs.

NFS shall, at the direction of your broker/dealer: (1) execute, clear and settle transactions processed through NFS by your broker/dealer, (2) prepare and send transaction confirmations and periodic statements of your brokerage account (unless your broker/dealer has undertaken to do so). Certain pricing and other information to be provided by your broker/dealer or obtained from third parties, which has not been verified by NFS, (3) act as custodian for funds and securities received by NFS on your behalf, (4) follow the instructions of your broker/dealer with respect to transactions and the receipt and delivery of funds and securities for your brokerage account, and (5) extend margin credit for purchasing or carrying securities on margin. Your broker/dealer is responsible for ensuring that your brokerage account is in compliance with federal, industry and NFS margin rules, and for advising you of margin requirements. NFS shall maintain the required books and records for the services it performs.

**SIPC.** Securities in accounts carried by National Financial Services LLC ("NFS"), a Fidelity Investments company, are protected in accordance with the Securities Investor Protection Corporation ("SIPC") up to $500,000 (including claims limited to $100,000). For details, please see www.sipc.org. NFS has arranged for additional insurance protection for cash and securities to supplement its SIPC coverage. This additional protection covers total account net equity in excess of the $500,000 SIPC limitation. Neither coverage protects against a decline in the market value of securities, nor do these protections cover other investments. Mutual funds and/or other securities are not backed or guaranteed by any bank, nor are they insured by the FDIC and involve investment risk including possible loss of principal.

**End of Statement**

070531 280 001327573
070313

Account Number  LMN-000980

Transaction ID Number
(Broker Use Only)

# Premiere Select® IRA One-Time Distribution Request Form

Please read the attached Customer Instructions, Terms and Conditions before completing this form.

## ❶ Account Information

Account Holder Name  William Riley

Address  17154 Highland Ctr Road

City  Defiance     State  OH   Zip/Postal Code  43512-

Phone Number  419-382-2688

Social Security Number/
Taxpayer ID Number  281541072     Date of Birth  06-26-1953

## ❷ Reason for Distribution — Choose One:

☐ Normal: I am at least 59½

☐ Substantially Equal Periodic Payments (SEPPs): I am under the age of 59½ and will continue this distribution schedule for the greater of five years or until I reach age 59½.

☐ Rollover from an IRA to an employer-sponsored retirement plan

☒ Premature: I am under the age of 59½ (includes qualified first-time home purchases and distributions for qualified higher education expenses)

☐ Disability: I am disabled and under the age of 59½

☐ Return of Excess Contribution(s)

☐ Death Distribution

## ❸ Distribution Instructions — Choose One. DO NOT complete this section if you are requesting a Return of Excess Contribution; go to Section 4)

☒ A. Partial Distribution in Cash  Amount  $ 42618.47

Be sure to consider the effect of any fees that are associated with the payment method selected in Section 5.

☐ B. Partial Distribution In-Kind to my non-retirement brokerage account
Provide the security name(s) and share/unit amount(s) for the security position(s) to be distributed in-kind.

| Investment Name | CUSIP or Symbol | # of Shares or All |
|---|---|---|
| | | |
| Investment Name | CUSIP or Symbol | # of Shares or All |
| | | |
| Investment Name | CUSIP or Symbol | # of Shares or All |
| | | |

☐ C. Full Distribution (Please distribute my entire IRA balance)

## ❹ Return of Excess Contribution

Date on which excess contribution was made:  ☐☐-☐☐-☐☐☐☐     Tax year for which the excess contribution was made:  ☐☐☐☐

I am requesting this return of excess contribution:  ☐ Before my tax filing deadline   ☐ After my tax filing deadline

Distribute the following excess contribution amount and attributable earnings, if any.

Principal amount  $ _____ + Earnings amount  $ _____ = Total (principal + earnings)

Of the total amount above, $ _____ is to be distributed to me and  $ _____ is to be distributed and then redeposited as a current year contribution (cannot exceed your allowable current year contribution amount).

1: 747740. 107                    010540001

3

4194824598          419-482-4598          ONLINE BROKERAGE SERVICES, INC          11:46:04 a.m.      12-06-2006      2/3
DEC-06-2006 10:11 From:FIRST FEDERAL          4197843467          To:4194824599          P.3/4

Account Number ☐☐☐-☐☐☐☐☐☐☐

**⑤ Payment Method** – Choose One:

☐ A. In-kind distribution to my non-retirement brokerage account number  ☐☐☐-☐☐☐☐☐☐☐

(Signature Guarantee required in Section 7 for distribution amounts of $100,000 or more if this account is registered other than in your name only)

☐ B. Check to my mailing address of record*

☐ C. Check paid and/or mailed to an alternate payee and/or address (Signature Guarantee required in Section 7 for distribution amounts of $100,000 or more)*

Alternate Payee Name (if applicable) _____

Street Address _____

City _____ State ___ Zip/Postal Code ☐☐☐☐☐-☐☐☐☐

*Distribution check will be sent via regular mail unless you provide accurate overnight delivery instructions below.

☐ Send my check to me via overnight delivery   Carrier Name _____   Billing Number _____

☐ D. Directly deposited to my bank or credit union account, using Electronic Funds Transfer (EFT) (Signature Guarantee required in Section 7 for distribution amounts of $100,000 or more.) Please provide your Bank information below or attach a voided check.

☑ E. Wired to my bank account. Provide your Bank information below or attach a voided check (Signature Guarantee required in Section 7 for distribution amounts of $100,000 or more.) A wire fee of $15.00 will be deducted from your distribution amount and will impact your tax reporting. See the Customer Instructions, Terms and Conditions for additional information.

Bank Information - For wires, please verify the appropriate wire instructions with your Bank.

Type of Account: ☑ Checking   ☐ Savings (non-passbook)   ☐ NOW/MMDA

Bank Name   First Federal Bank of the Midwest

Your Bank's Routing Number  2 4 1 2 7 0 8 6 1    Your Bank Account Number  5 0 5 1 6 0 4 0 5 8 7 ☐☐

Your Name as it Appears on Your Bank Account:  Capital Platinum Properties

☐ F. Direct Rollover to an employer-sponsored retirement plan (Signature Guarantee required in Section 7 for distribution amounts of $100,000 or more.) Please provide complete payee and address information below.

Plan Name _____

C/O Plan Administrator Name _____

Street Address _____

City _____ State ___ Zip/Postal Code ☐☐☐☐☐-☐☐☐☐

1.747740.107                                                4                                                010540002

Account Number  ☐☐☐-☐☐☐☐☐☐

**❻ Withholding Election**

Please carefully read the Notice of Withholding in the attached Customer Instructions, Terms and Conditions before completing this section. Your withholding election will apply to this distribution only.

Note: If you are not a U.S. person (including a U.S. resident alien) DO NOT complete this section.

Federal Income Tax Withholding — If you do not make an election below, federal income tax will be withheld from your IRA distribution (excluding Roth IRA distributions) at a rate of 10%.

☑ I DO NOT want to have federal income tax withheld from my IRA distribution

☐ I want to have federal income tax withheld from my IRA distribution at the rate of ☐☐☐ % (insert whole percentage).
If you select a percentage of less then 10%, we will withhold 10%.

State Income Tax Withholding — Do not complete this section if you are a resident of AK, FL, HI, MS, NH, NV SD, TN, TX, WA, or WY

☑ I DO NOT want state income taxes withheld (For residents of CA, DE, NC, and OR, you must check this box if federal income taxes are being withheld and you do not want state income taxes withheld.)

☐ I want to have state income taxes withheld from my IRA distribution in accordance with the minimum amount or percentage, if any, as determined by the requirements of my state of residence. Note: If your state does not provide a minimum amount or percentage for withholding and you do not provide a percentage below, state income taxes will not be withheld from your distribution.

☐ I want to have ☐☐☐ % (insert whole percentage) withheld from my IRA distribution for state income taxes.

Note: If you elect to have state income taxes withheld from your IRA distribution in a percentage that is less than your state's minimum withholding requirements, your state's minimum amount or percentage will be withheld.

**❼ Signature** — Please check to make sure you have completed all appropriate sections of this form, then sign and date below.

I authorize and request National Financial Services LLC ("NFS") to make the above distribution from my Premiere Select IRA indicated above. I have carefully read, fully understand, and agree to comply with the Customer Instructions, Terms and Conditions including the Notice of Withholding attached to this Premiere Select IRA One-Time Distribution Request Form.

I hereby certify under penalties of perjury that if I am a U.S. person (including a U.S. resident alien) the number shown in Section 1 of this form is my correct taxpayer identification (or Social Security) number. If I am not a U.S. person (including a U.S. resident alien), I have attached IRS Form W-8BEN with the Premiere Select IRA One-Time Distribution Request Form and included my U.S. taxpayer identification (or Social Security) number in order to claim tax treaty benefits, if applicable.

If I am taking SEPPs, I hereby certify that I will comply with all IRS rules with regard to SEPPs including restrictions on any addition(s) to the account balance, any nontaxable transfer of a portion of the account balance to another retirement plan, or subsequent rollover of a SEPP distribution amount. I understand that NFS may review my account for certain transactions prior to reporting distributions to the IRS.

I indemnify the Custodian of my Premiere Select IRA and NFS and their agent(s), successors, affiliates, and employees from any liability in the event that I fail to meet the IRS requirements regarding distributions from my Premiere Select Traditional IRA, Rollover IRA, Roth IRA, SEP-IRA, SIMPLE IRA, IRA Beneficiary Distribution Account, or Roth IRA Beneficiary Distribution Account as applicable.

Signature Guarantee Stamp

IRA Owner _William D. Riley_                    Date _12/6/06_

OR

Authorized Signator Signature _____  Date _____

# AFFIDAVIT OF LOSS

STATE OF OHIO      )
                        )ss:
COUNTY OF DEFIANCE   )

RECEIVED

NOV 30 2007

PROGRESSIVE

The undersigned, being first duly sworn, states that:

1.    I am the owner of account number LMN000930 (the "Account") held at or through First Insurance and Investments, Inc., First Federal Bank of the Midwest, or OnLine Brokerage Services, Inc. (collectively, the "Company").

2.    Funds were withdrawn from the Account as follows (the "Withdrawal"):

| Date of Withdrawal | Amount of Withdrawal |
| --- | --- |
| December 6, 2006 | $42,613.47 |

3.    I did not consent to or authorize the Withdrawal, and, to the best of my knowledge, none of the funds from the Withdrawals were distributed directly to me or deposited into any other account of which I am the owner or a beneficiary. I have reviewed the Distribution Request Form attached to this Affidavit, and I confirm that I did not sign the Distribution Request Form.

4.    I have reviewed the records for the Account and I confirm that, to the best of my knowledge, no other unauthorized transactions, other than the Withdrawal, have occurred in the Account.

5.    In accordance with the Client Portfolio Acknowledgement dated March 12, 2007, a copy of which is attached to this Affidavit as Exhibit B, the amount of the Withdrawal should have been invested in the Dimensional Fund Advisors 60/40 Normal portfolio. Based on the share/unit price of Dimensional Fund Advisors 60/40 Normal of $12.33 per share on October 17, 2006, the date I funded the Account, there should have been 4,935.633 shares of Dimensional Fund Advisors 60/40 Normal in the Account, and the Account would have received a dividend of 65.8084 shares on December 18, 2006 and 0.7828 shares on March 8, 2007, resulting in 5,002.2247 shares in the Account.

6.    This Affidavit of Loss is made for the purpose of inducing the Company to reimburse the Account for the loss of principal and income sustained in the account as a result of the Withdrawals. I agree that the amount of the loss is $48,556.71, which is the difference between the market value of 5,002.2247 shares of Dimensional Fund Advisors 60/40 Normal as of the end of trading on May 25, 2007, based on a per share price of $13.45, and the $18,723.21 which is currently in the Account.

7.    I authorize the Company to invest the entire balance in the Account in Dimensional Fund Advisors 60/40 Normal unless and until I provide different investment instructions to the Company.

IN WITNESS WHEREOF, I have executed this instrument this 11ᵗʰ day of June, 2007.

_William D. Riley_
William Riley

The foregoing instrument was acknowledged before me this 11th day of June, 2007, by William Riley.

_Sharon M. Bassett_
Notary Public
My Commission Expires:

SHARON M. BASSETT
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES SEPT. 30, 2011

[Seal]