IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| First Defiance Financial Corporation, et al., | Case No. 3:08 CV 2429 |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Progressive Casualty Insurance Company, | |
| Defendant. | |

**INTRODUCTION**

This is a disagreement over whether a fidelity bond covers a bank employee's theft of money from customers' brokerage accounts. Plaintiffs First Defiance Financial Corporation (FDF), First Federal Bank of the Midwest (the Bank), and First Insurance and Investments, Inc. (FII) (collectively: First Defiance), purchased a Financial Institution Bond (bond) from Defendant Progressive Casualty Insurance Company (Progressive). The parties filed cross-Motions for Summary Judgment (Doc. Nos. 39 & 46). First Defiance argues the bond covers the theft loss; Progressive disagrees. First Defiance also asks the Court, in the alternative, to stay its decision on the summary judgment motions so that further discovery may be conducted. After considering the Motions and their respective Oppositions (Doc. Nos. 48 & 50), the Court grants First Defiance's Motion for Summary Judgment, and denies Progressive's Motion; and, in light of this ruling, denies as moot First Defiance's alternative Motion for Discovery.

**BACKGROUND**

The facts are not in dispute. FDF is a bank holding company that owns both the Bank and FII. FII is in the business of selling insurance and investment products. FII is closely associated with FDF and the Bank and does the bulk of its business with Bank customers.

Federally insured financial institutions such as the Bank are required to maintain fidelity bond coverage. 12 C.F.R. § 563.190(a). First Defiance purchased the bond at issue with an annual premium of some $33,000. FDF, the Bank, and FII were each named insureds under the bond. The bond included an attached rider labeled "Modification to Insuring Agreement," as well as a "Brokerage Services Modification," which are further described below.

Consistent with the arrangement contemplated under the bond, the Bank had a Brokerage Services Agreement (BSA) with a third party broker-dealer, On-Line Brokerage Services (OBS). National Financial Services, LLC (NFS) acted as the custodian for customer brokerage accounts. However, the relationship with OBS did not govern all securities transactions because the Bank and FII also became a registered investment advisor (RIA). An RIA allowed First Defiance to manage client assets for a fee.

It was originally contemplated that OBS would provide asset management services and therefore an Investment Advisor Program Agreement (IAPA) was executed in 2006. But First Defiance later decided to pursue RIA activity directly through FII and abandoned the IAPA. FII, and its representatives, including Jeffrey Hunt, were registered with applicable regulators.

Hunt was a registered representative with both FII and OBS. In that dual role, Hunt provided investment advice and sold investment products to customers of First Defiance. In 2006, unbeknownst to his superiors at First Defiance or anyone at OBS, Hunt began diverting money from

customer accounts to a Bank account he controlled. In most cases, Hunt diverted money from RIA customers to an account maintained at the Bank in the name of Capital Platinum Properties. Hunt initiated the transactions without the customers' involvement or authorization. He diverted the funds by using the account holders' forged signatures and faxing them to OBS using the Bank's fax machine. When OBS received the authorizations, it took the steps necessary to wire funds from the customer NFS accounts to the Capital Platinum account at the Bank. From the Capital Platinum account, Hunt then dispersed these funds for his own purposes. First Defiance notified Progressive upon learning of Hunt's scheme, and Progressive assigned a claims adjuster to deal with the expected claims.

Consistent with its liability as Hunt's employer and as the investment advisor trusted with the management and oversight of its clients' funds, First Defiance restored money to its customers, securing affidavits confirming the amount of their losses as it did so. In total, the Bank restored more than $900,000 to customers.

Additionally, First Defiance notified Cincinnati Insurance of the loss under its policy that included a Commercial Crime coverage. That policy provided up to $50,000 for losses "resulting directly from" employee dishonesty. Cincinnati Insurance paid the losses up to the policy limit.

First Defiance also presented Progressive with a proof of its losses. More than a year after the first notice of the loss, Progressive denied the claim.[1]

---

[1] The Complaint in the instant case includes allegations against Defendant OBS under the BSA. First Defiance reached a settlement agreement with OBS, to which Progressive is also a party. As a result, OBS was dismissed from this case (Doc. No. 49), and the claims relating to the losses attributable to Hunt's thefts from several customers' brokerage accounts are no longer subject to recovery in this case (Doc. No. 46, p. 14). The customer accounts for which First Defiance now seeks coverage are: Riley, Wiemken, Ballinger, Hernandez, Pickering, Killion, and Grim.

Following Progressive's coverage denial, First Defiance filed suit in state court. Progressive removed the case to this Court under 12 U.S.C. § 1828(e) and 12 C.F.R. § 593.190 (Doc. No. 1). The latter regulation requires financial institutions, like the Bank, to maintain "fidelity bond coverage" in an amount that would be "safe and sound" based on the institution's exposure to risk.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)

The summary judgment standard does not change simply because the parties present cross-motions. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The fact that both parties move for summary judgment does not mean the court must grant judgment as a matter of law for one side or the other; rather, the "court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* As outlined above, the material facts are not in dispute in the instant case making it well suited for summary judgment. *See Havensure, LLC v. Prudential Ins. Co. of Am.*, --- F.3d ---, 2010 WL 489537, *2 (6th Cir. 2010); Fed. Civil Rule 56(c)(2).

**ANALYSIS**

The construction of an insurance contract is a matter of law to be determined by the court. *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 87 Ohio St. 3d 270, 273 (1999). In interpreting the contract, the court is to give effect to the intent of the parties to the agreement. *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003). In doing so, the court

> examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy. [The court] look[s] to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.

*Id.* (citations omitted). If contract provisions allow for more than one reasonable interpretation, the provisions must be strictly construed against the insurer. *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208, 211 (1988).

A fidelity bond covers the "dishonest or fraudulent acts of employees." *Peoples Bank & Trust Co. of Madison Cty. v. Aetna Cas. & Sur. Co.*, 113 F.3d 629, 631, n.1 (6th Cir. 1997). It is a bond made "to indemnify an employer or business for loss due to embezzlement, larceny, or gross negligence by an employee or other person holding a position of trust." Black's Law Dictionary (8th Ed. 2004). Plaintiff Bank is required to maintain fidelity bond coverage. 12 C.F.R. § 563.190(a).

The relevant language in the fidelity bond at issue here (which tracks language in fidelity bonds in general) is found in the Modification to Insuring Agreement and covers:

> [l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

5

>    (1) to cause the Insured to sustain such loss, and
>    (2) to obtain an improper financial benefit for the Employee or another person or entity.

(Doc. No. 39-2, p. 42) ("fidelity language").  Progressive contends there is no coverage because the "loss resulting directly from" ("direct loss") and "manifest intent" provisions have not been met. However, the bond does cover the loss because there is at least one reasonable interpretation of the bond meeting both the "direct loss" and "manifest intent" requirements. *See King*, 35 Ohio St. 3d at 211.

### *Direct Loss*

The parties dispute what the policy means by "loss resulting directly from." Progressive argues this "direct loss" provision limits coverage to only losses incurred by the Insured in the first instance. In other words, the employee would have to convert the *employer's* funds, rather than a third party's funds held in trust by the employer, even if the employer is required to reimburse such losses. First Defiance argues the "direct loss" provision simply requires proximate causation between the insured's loss and the employee's actions. This dispute can be resolved by referring to the language of the bond's Brokerage Services Modification.

The Brokerage Services Modification adds, among other items, an exclusion to coverage. That exclusion states:

> [This bond does not cover:] [f]or the purpose of providing brokerage or investment advisory services only, loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, *except the unlawful withdrawal and conversion of Money, securities or precious metals, directly from a customer's account by an Employee provided such unlawful withdrawal and conversion is covered under [fidelity language]*.

(Doc. No. 39-2, p. 43) (emphasis added).

Progressive argues that exclusion language cannot be used to create coverage, citing *Blake v. Thornton*, 182 Ohio App. 3d 716, 722-23 (2009). However, *Blake* involved the question of whether exclusionary language created an entirely new and distinct *type* of coverage from what was provided in the insuring language. *See id.* at 722 ("[the exclusion] does not expand coverage to include [uninsured motorist] protection, which was never provided for under the . . . umbrella policy."). *Blake* does not hold that a court may not look to exclusion language to *interpret* the insuring language. In fact, *Blake* reaffirms the uncontroversial proposition that a court should "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Id.* at 720 (quoting *Westfield Insurance Co.*, 100 Ohio St. 3d at 219). Therefore, examining the exclusion language in the Brokerage Services Modification in order to better interpret the "direct loss" provision is a proper, and indeed required, inquiry for this Court.

The exclusion language in the Brokerage Services Modification undermines Progressive's position that *no* theft from a customer's account is covered by the bond. A contract is to be read as a whole, and if Progressive's position were correct, then the above exception would be surplusage without meaning. There must be some instance where, in the brokerage or investment advisory service context, an employee's theft from a customer's account constitutes a "direct loss" under the fidelity language. Having concluded such a theft *could* create a "direct loss," the critical next inquiry is whether the thefts in this case meet the "direct loss" requirement. Progressive cites numerous opinions (none from Ohio) holding employee thefts from a third party are not covered under the direct loss provision. However, none of these cases involve language like that found in the Brokerage Services Modification. *See, e.g., Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co., Inc.*, 676 N.Y.S.2d 559 (N.Y. App. Div. 1998).

7

Instead of the overly-literal approach Progressive advances, an interpretation calling for a proximate causation analysis is the better approach. Various courts across the country have adopted a proximate cause test for determining whether a loss was "direct." *See, e.g., Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 386-87 (N.J. 2004) (reviewing trend among federal courts of appeals). At least one other court has recognized that a direct loss may "be caused by [the] employee's theft of property for which [the employer] is legally liable, the typical case being where the insured is a bailee or trustee of property." *Vons Cos. Inc. v. Federal Ins. Co.*, 212 F.3d 489, 491 (9th Cir. 2000). In the instant case, the theft by Hunt and the reimbursements by First Defiance are not so attenuated as to break the causal connection. First Defiance stepped in and, promptly after the thefts were discovered, on its own, paid customers and notified Progressive. This Court finds that Hunt's theft proximately caused First Defiance's loss and therefore the loss resulted directly from Hunt's actions.

### *Manifest Intent*

Progressive's second argument against coverage is that Hunt lacked the requisite "manifest intent" to cause First Defiance a loss. Addressing the "manifest intent" provision, the Sixth Circuit has held that:

> [t]hese policies will cover a loss suffered by a third party only where the dishonest employees intended to cause the third party loss, and knew or expected that the loss would migrate to the bank. The migratory route would need to be short, certain, and obvious to support an inference (in the absence of direct evidence) that dishonest employees harbored such knowledge or expectation.

*Peoples Bank*, 113 F.3d at 634. "[M]anifest intent exists when a particular result is 'substantially certain' to follow from conduct." *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir. 1991). Manifest intent normally exists where the employee's action benefitted the employee at

8

the expense of the employer, as in embezzlement. *Id.* at 1036 ("Embezzlement is a zero-sum game. For the employee to win, the employer must lose.").

Similar to the discussion of proximate cause, First Defiance has met the manifest intent requirement. The loss here was neither the result of years of delay and litigation, nor did it require nearly as many contingencies found in *Peoples Bank*. 113 F.3d at 634-35 (listing the many intervening events necessary for the bank to be liable to a third party for an employee's malfeasance, including that a restaurant and a loan both failed). Instead, the only intervening events between Hunt's theft and First Defiance's loss was that Hunt would be caught -- which is present in every embezzlement -- and that First Defiance reimburse its customers as it was obligated.

This is also not a situation where the employee's interests coincided with the insured employer's interests. *See St. Paul Fire & Marine Ins. Co.*, 942 F.2d at 1036 ("one fact made those cases easy: the actions of the employee, no matter how unlikely they were to succeed in making money, . . . could only make money if the insured did so as well. Both benefitted, or both lost, together."). Instead, any financial gain by Hunt would, when discovered, be a loss to First Defiance. *See id.* at 1035 ("manifest intent exists when a particular result is 'substantially certain' to follow from conduct."). Because the loss to First Defiance was "substantially certain" to result from Hunt's thefts, and because the "migratory route"[2] between the thefts and the loss was "short, certain, and obvious," this Court finds that Hunt had the requisite manifest intent to trigger coverage under the bond.

---

[2] By way of avian illustration, the Hunt loss is comparable to the Eastern Towhee with a short migratory route of a few hundred miles, as compared to, say, the Arctic Tern, which completes a round-trip migration of more than 40,000 miles.

9

## CONCLUSION

Plaintiffs have satisfied the terms of the fidelity bond, which covers their loss. Plaintiffs' Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied. Absent agreement or stipulation to a dollar figure, a hearing will be held on **Thursday, April 1, 2010 at 2:00 p.m.** to determine the amount of the loss.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 25, 2010